**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Case No. 18-62758-CIV-DIMITROULEAS

FREDERIC and JENNIFER GUTTENBERG,
As co-representatives of the Estate of
Jaime Guttenberg,

     Plaintiffs,

vs.

UNITED STATES OF AMERICA,
     Defendant.

_____/

### DEFENDANT UNITED STATES OF AMERICA'S MOTION TO DISMISS

<div align="right">

**JOSEPH H. HUNT**
Assistant Attorney General
Civil Division
**ARIANA FAJARDO ORSHAN**
United States Attorney
**THOMAS G. WARD**
Deputy Assistant Attorney General
Civil Division
**JAMES G. TOUHEY, JR.**
Director, Torts Branch
Civil Division
**KIRSTEN L. WILKERSON**
Assistant Director, Torts Branch
Civil Division
**STEPHEN E. HANDLER**
Senior Trial Counsel, Torts Branch
**SABRINA UNDERWOOD**
Trial Attorney, Torts Branch
**CARLOS RAURELL**
Assistant United States Attorney
Florida Bar No. 529893
**PAUL DAVID STERN**
Trial Attorney, Torts Branch
Civil Division
United States Department of Justice
**Attorneys for Defendant**
**UNITED STATES OF AMERICA**

</div>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................... ii

INTRODUCTION .................................................................. 1

BACKGROUND ................................................................... 2

LEGAL STANDARD.............................................................. 4

ARGUMENT ..................................................................... 5

  I.  The Court Lacks Subject Matter Jurisdiction Because The United States Did Not Owe A
     Duty To Plaintiffs Under Florida Law. ................................... 5

    A.  Generally, There Is No Legal Duty Under Florida Law To Protect Another From the
       Criminal Acts of a Third Party ...................................... 5

    B.  No Special Relationship Existed Under Florida Law. ................. 7

    C.  Florida's Voluntary Undertaking Doctrine Does Not Apply In This   Case................. 11

  II.  This Court Lacks Subject Matter Jurisdiction For the Additional Reason That the
      Discretionary Function Exception Bars This Claim. ......................... 14

    A.  Overview of the Discretionary Function Exception...................... 14

    B.  The FBI's Law Enforcement and Investigative Activities Are Protected by the
       Discretionary Function Exception. ................................... 15

CONCLUSION..................................................................... 28

## TABLE OF AUTHORITIES

### Cases

*Amato v. United States*,
   549 F. Supp. 863 (D.N.J. 1982) ...................................................................... 25, 27

*Aragon v. United States,*
   146 F.3d 819 (10th Cir. 1998) ......................................................................... 21

*Autery v. United States*,
   992 F.2d 1523 (11th Cir. 1993) ...................................................................... 14, 15

*Baer v. United States*,
   722 F.3d 168 (3d Cir. 2013) ........................................................................... 21, 22

*Berkovitz v. United States*,
   486 U.S. 531 (1988) ........................................................................................ 14, 15

*Bierer-Carter v. United States*,
   806 F. Supp. 2d 1245 (S.D. Fla. 2011) .......................................................... 4

*Block v. Neal*,
   460 U.S. 289 (1983) ........................................................................................ 11

*Bonner v. City of Pritchard, Ala.*,
   661 F.2d 1206 (11th Cir. 1981) ...................................................................... 17

*Boynton v. Burglass*,
   590 So. 2d 446 (Fla. Dist. Ct. App. 1991) ..................................................... 6, 7, 8

*Carney v. Gambel*,
   751 So. 2d 653 (Fla. Dist. Ct. App. 1999) ..................................................... 6

*Clay Elec. Co-op., Inc. v. Johnson*,
   873 So. 2d 1182 (Fla. 2003) ........................................................................... 12

*Deuser v. Vecera*,
   139 F.3d 1190 (8th Cir. 1998) ........................................................................ 27

*Dichter-Mad Family Partners, LLP v. United States*,
   709 F.3d 749 (9th Cir. 2013) .......................................................................... 16

*Dube v. Pittsburgh Corning*,
   870 F.2d 790 (1st Cir. 1989) .......................................................................... 22

*Everton v. Willard,*
    468 So. 2d 936 (Fla. 1985) ................................................................................ 6

*FDIC v. Meyer,*
    510 U.S. 471 (1994) ........................................................................................ 5

*Fisher Bros. Sales, Inc. v. United States,*
    46 F.3d 279 (3d Cir. 1995) ............................................................................ 16

*Flammia v. United States,*
    739 F.2d 202 (5th Cir. 1984) ......................................................................... 27

*Flax v. United States,*
    847 F. Supp. 1183 (D.N.J. 1994) .............................................................. 19, 21

*Fortney v. United States,*
    714 F. Supp. 207 (W.D. Va. 1989) ................................................................ 22

*Free v. United States,*
    885 F.2d 840 (11th Cir. 1989) ......................................................................... 3

*Gaudet v. United States,*
    517 F.2d 1034 (5th Cir. 1975) ....................................................................... 11

*Gen. Dynamics Corp. v. United States,*
    139 F. 3d 1280 (9th Cir. 1998) ...................................................................... 16

*Goldberg v. Fla. Power & Light Co.,*
    899 So. 2d 1105 (Fla. 2005) ............................................................................ 5

*Gonzalez v. United States,*
    814 F.3d 1022 (9th Cir. 2016) ............................................................. 24, 26, 28

*Greer v. Ivey,*
    242 F. Supp. 3d 1284 (M.D. Fla. 2017) ................................................ 6, 8, 9, 12

*Horsley v. Feldt,*
    304 F.3d 1125 (11th Cir. 2002) ................................................................. 10, 11

*Howell v. United States,*
    932 F.2d 915 (11th Cir. 1991) ....................................................................... 13

*Hughes v. United States,*
    110 F.3d 765 (11th Cir. 1997) ....................................................................... 15

*JBP Acquisitions v. United States ex rel. FDIC*,
    224 F.3d 1260 (11th Cir. 2000) ................................................................................. 11

*Jordan v. Nienhuis*,
    203 So. 3d 974 (Fla. Dist. Ct. App. 2016) ........................................................... 8, 13

*Kelly v. United States*,
    924 F.2d 355 (1st Cir. 1991) ................................................................................... 27

*Knight v. Merhige*,
    133 So. 3d 1140 (Fla. Dist. Ct. App. 2014) ..................................................... 5, 7, 8

*Lawrence v. Dunbar*,
    919 F.2d 1525 (11th Cir. 1990) ................................................................................. 4

*Limones v. Sch. Dist. of Lee Cty.*,
    161 So. 3d 384 (Fla. 2015) ........................................................................................ 7

*Lipkin v. Norwegian Cruise Line, Ltd.*,
    93 F. Supp. 3d 1311 (S.D. Fla. 2015) ....................................................................... 8

*Lippman v. City of Miami*,
    622 F. Supp. 2d 1337 (S.D. Fla. 2008) .............................................................. 5, 8, 13

*Littell v. United States*,
    191 F. Supp. 2d 1338 (M.D. Fla. 2002) ........................................................... passim

*Mader v. United States*,
    654 F.3d 794 (8th Cir. 2011) ..................................................................................... 3

*Manko v. United States*,
    830 F.2d 831 (8th Cir. 1987) ..................................................................................... 3

*McCloskey v. Mueller*,
    385 F. Supp. 2d 74 (D. Mass. 2005) ................................................... 18, 19, 25, 27

*McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*,
    501 F.3d 1244 (11th Cir. 2007) ................................................................................. 4

*McElroy v. United States*,
    861 F. Supp. 585 (W.D. Tex. 1994) ....................................................................... 27

*Mesa v. United States*,
    123 F.3d 1435 (11th Cir. 1997) ................................................................... 17, 22, 24

*Mesa v. United States*,
  837 F. Supp. 1210 (S.D. Fla. 1993).................................................................. 16

*Mid-South Holding Co., v. United States*,
  225 F.3d 1201 (11th Cir. 2000)........................................................................ 18

*Miller v. Whitworth*,
  455 S.E.2d 821 (W. Va. 1995) ............................................................................ 5

*Molzof v. United States*,
  502 U.S. 301 (1992) ......................................................................................... 14

*Ochran v. United States*,
  117 F.3d 495 (11th Cir. 1997)..................................................................... 15, 26

*Ochran v. United States*,
  273 F.3d 1315 (11th Cir. 2001).................................................................... 5, 6

*OSI, Inc. v. United States*,
  285 F.3d 947 (11th Cir. 2002)................................................................... 21, 26

*Ostera v. United States*,
  769 F.2d 716 (11th Cir. 1985)......................................................................... 18

*O'Ferrell v. United States*,
  253 F.3d 1257 (11th Cir. 2001)............................................................. 15, 16, 18

*Patentas v. United States*,
  687 F.2d 707 (3d Cir. 1982) ............................................................................ 13

*Paul v. Nat'l Life*,
  352 S.E.2d 550 (W. Va. 1986) ........................................................................... 5

*Pierre v. Jenne*,
  795 So. 2d 1062 (Fla. Dist. Ct. App. 2001) ....................................................... 8, 9

*Plyler v. United States*,
  900 F.2d 41 (4th Cir. 1990)............................................................................... 3

*Pollock v. Fla. Dep't of Highway Patrol*,
  882 So. 2d 928 (Fla. 2004) ...................................................................... passim

*Pooler v. United States*,
  787 F.2d 868 (3d Cir. 1986)............................................................................ 16

*Powers v. United States,*
    996 F.2d 1121 (11th Cir. 1993) ............................................................. 14

*Rayonier v. United States*,
    352 U.S. 315 (1957) .............................................................................. 6

*Richards v. United States*,
    369 U.S. 1 (1962) ................................................................. 5, 20, 21, 23

*Riley v. United States*,
    486 F.3d 1030 (8th Cir. 2007) ............................................................. 21

*Rinker v. Carnival Corp.*,
    753 F. Supp. 2d 1237 (S.D. Fla. 2010) ................................................... 6

*Rosas v. Brock*,
    826 F.2d 1004 (11th Cir. 1987) ............................................................ 16

*Sabow v. United States*,
    93 F.3d 1445 (9th Cir. 1996) ................................................................ 27

*Shuler v. United States*,
    531 F.3d 930 (D.C. Cir. 2008) .............................................................. 27

*Smith v. United States*,
    375 F.2d 243 (5th Cir.) .................................................................. 25, 27

*Starnes ex rel. AS v. United States*,
    No. 06-10079-CIV, 2007 WL 5238398 (S.D. Fla. May 15, 2007) ........................... 12

*State ex rel. Am. Elec. Power Co. v. Swope*,
    801 S.E.2d 485 (W. Va. 2017) ................................................................ 5

*Suter v. United States*,
    441 F.3d 306 (4th Cir. 2006) .......................................................... 18, 24

*Taitt v. United States*,
    770 F.2d 890 (10th Cir. 1985) ......................................................... 26, 28

*Taylor v. Appleton*,
    30 F.3d 1365 (11th Cir. 1994) ............................................................... 4

*Trianon Park Condo. Ass'n v. City of Hialeah*,
    468 So. 2d 912 (Fla. 1985) .................................................................. 6

*Turner v. United States,*
   736 F.3d 274 (4th Cir. 2013)...........................................................................................12

*U.S. Aviation Underwriters, Inc. v. United States,*
   562 F.3d 1297 (11th Cir. 2009)........................................................................................4

*Union Park Mem'l Chapel v. Hutt,*
   670 So. 2d 64 (Fla. 1996)................................................................................................11

*United States v. Faneca,*
   332 F.2d 872 (5th Cir. 1964)...........................................................................................17

*United States v. Gaubert,*
   499 U.S. 315 (1991) .........................................................................................14, 15, 26

*United States v. Shearer,*
   473 U.S. 52 (1985) ..........................................................................................................11

*United States v. Spitzer,*
   245 F. App'x 908 (11th Cir. 2007)....................................................................................4

*United States v. Varig Airlines,*
   467 U.S. 797 (1984) ........................................................................................................15

*Wallace v. Dean,*
   3 So. 3d 1035 (Fla. 2009)......................................................................................5, 11, 12

*Weissich v. United States,*
   4 F.3d 810 (9th Cir. 1993)...............................................................................................22

*Zelaya v. United States,*
   781 F.3d 1315 (11th Cir. 2015)................................................................................passim

**Statutes**

28 U.S.C. § 1346(b) ...........................................................................................................1, 5

28 U.S.C. § 2675(a) ...............................................................................................................3

28 U.S.C. § 2680..................................................................................................................14

28 U.S.C. § 2680(a) .........................................................................................1, 14, 16, 25

28 U.S.C. § 2680(h) .............................................................................................................11

## INTRODUCTION

Frederic and Jennifer Guttenberg brought this action against the United States, seeking damages for the death of their daughter, Jaime Guttenberg, under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b).  Jaime Guttenberg was a student at Marjory Stoneman Douglas High School in Parkland, Florida.  On February 14, 2018, Nikolas Cruz entered the high school, murdered 17 students and teachers, and injured at least 17 others.[1]  Jaime Guttenberg was one of the students killed during the school shooting.

The Complaint contains one claim of negligence, alleging that the FBI failed to properly handle tips it received concerning Nikolas Cruz prior to the shooting.  It avers that, had the FBI properly acted upon the tips, Jaime would not have been killed.  However, this claim is not legally cognizable under the FTCA.  The United States is not legally responsible for the actions of Nikolas Cruz and requests that this action be dismissed for lack of subject matter jurisdiction.  This motion is predicated on two separate grounds.

First, the Court lacks subject matter jurisdiction because, under Florida law, there is no duty to prevent a third person from harming another, absent certain circumstances, none of which are present here.  No special relationship was established, under which the FBI owed a legal duty to a particular individual, when it received tips concerning Nikolas Cruz.  Nor did the FBI engage in the type of affirmative conduct that creates a duty under Florida's voluntary undertaking doctrine.

Second, even if a duty was established under Florida law, the FTCA's discretionary function exception, 28 U.S.C. § 2680(a), immunizes the decisions of the FBI in assessing, prioritizing, and investigating tips of potential criminal activity.  FBI personnel have broad, policy-based discretion in determining whether and how to respond to the type of information at issue in this case.  Given the discretion afforded to the FBI in this context, its decisions here are exempt from the FTCA's waiver of sovereign immunity and cannot legally form the basis for civil liability.

---

[1] On March 7, 2018, Nikolas Jacob Cruz was indicted on 17 counts of Murder in the First Degree and 17 counts of Attempted Murder in the First Degree. *See* Grand Jury Indictment, *State of Florida v. Nikolas Cruz*, Case No. 18001958CF10A (Fla. Broward County Ct. Mar. 7 2018) (retrieved from http://www.browardclerk.org on Mar. 4, 2019).

## BACKGROUND

In 2012, the FBI established the Public Access Line ("PAL") to serve as a central intake point through which the public can provide tip information about potential or ongoing unlawful conduct.[2]  The PAL unit functions as part of the FBI's Criminal Justice Information Services Division in Clarksburg, West Virginia.  The PAL unit operates 24 hours per day, 7 days per week, and 365 days per year.  It receives thousands of calls each day from the public regarding potential unlawful activity.  In fiscal year 2018, PAL handled more than 1.3 million tips via telephone calls and electronic submissions (E-tips).[3]

On September 24, 2017, a Mississippi bail bondsman received a comment on his YouTube channel from someone with the username "nikolas cruz."  Compl. ¶ 30.  The comment read, "Im going to be a professional school shooter."  *Id.*  The bail bondsman submitted an E-Tip to the PAL, notifying the FBI of the comment.  *Id.* ¶ 32.  On October 2, 2017, an FBI agent visited the bail bondsman's place of business and interviewed him about the comment.[4]  *Id.* ¶ 32.  The FBI closed its file on the matter in October 2017.  *Id.* ¶ 33.

On January 5, 2018, a person purportedly close to Nikolas Cruz telephoned the PAL to report her concerns about Cruz's behavior.  *Id.* ¶ 34.  The caller told the intake specialist that she previously called the Parkland Police Department and spoke to an officer about Cruz's behavior.  *Id.* ¶ 36.  The caller expressed a variety of concerns about Cruz, ranging from his "mental capacity of a 12 to a 14 year old," to the fact that he "bought all these rifles and ammunition and he posted pictures of them on Instagram."  *Id.* ¶¶ 35-38.  The caller noted that Cruz was living with a family who let him keep his guns in the house.  At one point during the call, the caller expressed her concern about Cruz "getting into a school and just shooting the place up."  *Id.* ¶ 47.  The information provided by the caller was not forwarded to the FBI Miami Field Office or

---

[2] https://www.fbi.gov/news/stories/fbi-public-access-line.

[3] https://www.fbi.gov/services/cjis/cjis-link/cjis-division-2018-year-in-review.

[4] Plaintiffs do not specify how the tip was submitted.  Compl. ¶¶ 30-32.  Additionally, Plaintiffs suggest two FBI agents interviewed the bail bondsman the day after he submitted the E-Tip.  In fact, the E-Tip was submitted on September 25, 2017, and one agent interviewed the bail bondsman on October 2, 2017.  The United States does not contend that these facts are material for purposes of this motion to dismiss, but offers the clarification for factual accuracy.

passed along to Marjory Stoneman Douglas High School or local law enforcement agencies. *Id.* ¶ 50.

On February 14, 2018, Nikolas Cruz entered the grounds of Marjory Stoneman Douglas High School through an unstaffed gate and made his way to Building 12 on the north side of campus. *Id.* ¶ 89. Upon entering Building 12, Cruz murdered 17 people and injured at least 17 others. *Id.* ¶¶ 91-95. Cruz fled the scene and was later apprehended by local law enforcement. *Id.* ¶ 95.

On April 2, 2018, the United States received administrative claims on behalf of Frederic and Jennifer Guttenberg, individually and as co-personal representatives of the Estate of Jaime Guttenberg. On November 13, 2018, this Complaint was filed, alleging Mr. and Mrs. Guttenberg were "in the process of being appointed as the co-personal representatives of the Estate of Jaime T. Guttenberg."[5] *Id.* ¶ 11.

---

[5] A jurisdictional infirmity appears to exist in this case based on the Complaint's representation that Mr. and Mrs. Guttenberg were in the process of being appointed as co-personal representatives at the time of filing. "An action shall not be instituted upon a claim against the United States . . . unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail." 28 U.S.C. § 2675(a). Appointment as co-personal representatives of the estate would be necessary to properly exhaust administrative remedies under § 2675(a). *See Mader v. United States*, 654 F.3d 794, 803 (8th Cir. 2011) (affirming dismissal of action because Mader was not designated as estate representative at the time she filed her administrative claim -- a jurisdictional prerequisite to bringing an FTCA action). *Free v. United States*, 885 F.2d 840 (11th Cir. 1989), is not to the contrary, as the claimant in that case submitted an "Amendment for Reconsideration" after he had been properly appointed administrator, but before the agency finally disposed of the claim. Moreover, unlike in *Free*, here the United States does not suggest that this action is time-barred, or that an amended claim cannot be filed within the statute of limitations time period. However, a jurisdictional defect based on an insufficient administrative claim cannot be cured by relying on a separate administrative claim or amending a pleading after the commencement of the litigation. *See Manko v. United States*, 830 F.2d 831 (8th Cir. 1987). As a complaint may be dismissed for lack of subject matter jurisdiction at any stage of the case based on the failure to exhaust administrative remedies, *see Plyler v. United States*, 900 F.2d 41 (4th Cir. 1990) (dismissing case on appeal after court awarded post-trial judgment to plaintiffs), the United States brings the issue to the Court's attention before the litigation proceeds any further and asks that the Court dismiss on this ground as well.

## LEGAL STANDARD

"Federal courts exercise limited subject matter jurisdiction, empowered to hear only those cases within the judicial power of the United States as defined by Article III or otherwise authorized by Congress." *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994). In FTCA cases, whether a private person analog exists and whether the discretionary function exception applies are issues of subject matter jurisdiction. *See Lawrence v. Dunbar*, 919 F.2d 1525, 1528 (11th Cir. 1990) ("Unless, according to the law of Florida, the United States could be liable for this alleged tort of its employee if it were a private person, then not only is the sovereign's immunity intact, but the district court is without subject matter jurisdiction and must dismiss the suit."); *U.S. Aviation Underwriters, Inc. v. United States*, 562 F.3d 1297, 1299 (11th Cir. 2009) ("When the discretionary function exception to the FTCA applies, no federal jurisdiction exists.").

"A defendant may attack subject matter jurisdiction under Rule 12(b)(1) by making 'facial attacks' or 'factual attacks.'" *Bierer-Carter v. United States*, 806 F. Supp. 2d 1245, 1248 (S.D. Fla. 2011) (quoting *United States v. Spitzer*, 245 F. App'x 908, 910 (11th Cir. 2007)). "When there is a facial attack on the complaint, courts look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Id.* (quoting *Lawrence*, 919 F.2d at 1529 (internal quotation marks and brackets omitted)). In the case of a facial attack, no jurisdictional discovery is necessary to adjudicate the motion. *See McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244 (11th Cir. 2007) (affirming dismissal based on complaint and attached exhibits without the need for jurisdictional discovery).

Here, because the United States' arguments constitute a facial attack, there is no need for the Court to look beyond the four corners of the Complaint to determine whether it has subject matter jurisdiction.

## ARGUMENT

I.   **THE COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE THE UNITED STATES DID NOT OWE A DUTY TO PLAINTIFFS UNDER FLORIDA LAW.**

### A.   Generally, There Is No Legal Duty Under Florida Law To Protect Another From the Criminal Acts of a Third Party.

Under the FTCA, the United States has waived its sovereign immunity only "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. §§ 1346(b), 2674; *FDIC v. Meyer*, 510 U.S. 471, 477 (1994). Thus, the Court must determine whether the relevant state law, in this case Florida negligence law,[6] imposes an analogous duty of care on a private person under like circumstances. *Ochran v. United States*, 273 F.3d 1315, 1317 (11th Cir. 2001); *see also Lippman v. City of Miami*, 622 F. Supp. 2d 1337, 1341 (S.D. Fla. 2008) (dismissing FTCA negligence claim based on FBI's actions because no private person could be held liable for similar conduct).

Under Florida law, the threshold inquiry in a negligence case is whether the defendant owes a legal duty to the plaintiff. *See Wallace v. Dean*, 3 So. 3d 1035, 1046 (Fla. 2009). Whether a duty exists is a question of law. *Goldberg v. Fla. Power & Light Co.*, 899 So. 2d 1105, 1110 (Fla. 2005). "Generally, there is no duty to control the conduct of a third person to prevent [that person] from causing physical harm to another." *Knight v. Merhige*, 133 So. 3d 1140, 1145 (Fla. Dist. Ct. App. 2014) (finding parents had no duty to control the "extremely violent and aggressive acts" of son who killed family members at a Thanksgiving gathering)

---

[6] The FBI's PAL call center is located in Clarksburg, West Virginia. Because the Complaint alleges that the FBI was negligent in the manner it handled the information it received concerning Nikolas Cruz, *see* Compl. ¶ 125, the place where the act or omission occurred is arguably West Virginia. West Virginia adheres to the conflict of law doctrine *lex loci delicti*, which applies the substantive law of the state where the injury occurred. *State ex rel. Am. Elec. Power Co. v. Swope*, 801 S.E.2d 485 (W. Va. 2017); *Paul v. Nat'l Life*, 352 S.E.2d 550 (W. Va. 1986); *see generally Richards v. United States*, 369 U.S. 1 (1962) (interpreting FTCA to include choice-of-law rules of the state where negligent act or omission occurred). Here, Florida is the state where the injury occurred, and therefore its substantive law governs this case. But even if West Virginia law applied, the result would be the same. *Miller v. Whitworth*, 455 S.E.2d 821, 825 (W. Va. 1995) ("Generally, a person does not have a duty to protect others from the deliberate criminal conduct of third parties.").

(citing *Carney v. Gambel*, 751 So. 2d 653, 654 (Fla. Dist. Ct. App. 1999)); *Boynton v. Burglass*, 590 So. 2d 446, 448 (Fla. Dist. Ct. App. 1991) ("Florida courts have been loathe to impose liability based on a defendant's failure to control the conduct of a third party."). "There is not now, nor has there ever been, any common law duty for either a private person or a government entity to enforce the law for the benefit of an individual or a specific group of individuals. In addition, there is no common law duty to prevent the misconduct of third persons." *Trianon Park Condo. Ass'n v. City of Hialeah*, 468 So. 2d 912, 918 (Fla. 1985).[7]

"The responsibility to enforce the laws for the good of the public cannot engender a duty to act with care toward any one individual, unless an official assumes a special duty with regard to that person."[8] *Pollock*, 882 So. 2d 928. "A law enforcement officer's duty to protect the citizens is a general duty owed to the public as a whole. The victim of a criminal offense, which might have been prevented through reasonable law enforcement action, does not establish a common law duty of care to the individual citizen and resulting tort liability, absent a special duty to the victim." *Everton v. Willard*, 468 So. 2d 936, 938 (Fla. 1985); *see also Greer v. Ivey*, 242 F. Supp. 3d 1284, 1298 (M.D. Fla. 2017) (finding no duty for law enforcement public safety functions).

---

[7] The Complaint asserts that the FBI should have taken certain investigative steps, including forwarding the information to local law enforcement. *See* Compl. ¶¶ 124-26. However, the Complaint fails to identify any specific act that the FBI could have taken to prevent Nikolas Cruz from committing the murders. *See* Compl. ¶ 126 ("But for the FBI's negligence, Nikolas Cruz would not have murdered Jaime Guttenberg."). Absent the showing of a duty to perform a specific act that would have prevented the harm, the Complaint is deficient as a matter of law. *Rinker v. Carnival Corp.*, 753 F. Supp. 2d 1237 (S.D. Fla. 2010) (dismissing action because plaintiff failed to demonstrate how the injury was caused by defendant's alleged negligence).

[8] Under the FTCA, the United States can only be held liable to the extent state law "would impose liability on private persons or corporations under similar circumstances." *Rayonier v. United States*, 352 U.S. 315, 318 (1957). The Supreme Court of Florida has made clear that its governmental tort analysis for law enforcement derives from its common law governing private parties. *Pollock v. Fla. Dep't of Highway Patrol*, 882 So. 2d 928, 935 (Fla. 2004) ("There can be no governmental liability unless a common law or statutory duty existed that would have been applicable to an individual under similar circumstances."). Assuming the legal framework for public tort law outlined in *Pollock* is applicable to private citizens under Florida law, it applies in this case. *See, e.g.*, *Ochran*, 273 F.3d at 1317 (noting Florida's "special relationship" test applies in cases where "a law enforcement officer promises or agrees to take some specific action at the individual's request").

The specificity of information provided to the FBI through the PAL does not change that conclusion under Florida law.  Instructive is *Knight v. Merhige*, a case in which parents were alleged to have known about the extent of their adult son's history of irrational violence, mental health issues, and specific threats to family members.  133 So. 3d 1140 (Fla. Dist. Ct. App. 2014).  The adult son was deemed "legally disabled" and, while he lived with his parents, law enforcement officers were called to the residence "on at least ten separate occasions, each time the result of [his] extremely violent and aggressive acts and expressed threats of violence."  *Id*. at 1142.  The son "communicated threats of violence . . . towards members of his immediate and extended family."  *Id*.  Specific threats were made against family members, causing one of his sisters to obtain a restraining order based on her fear that her brother "was one day going to kill both her and her [other] sister."  *Id*. at 1142 n.2.  Family members specifically told the parents not to bring their son to Thanksgiving dinner and said they would cancel the dinner if they brought him.  Nonetheless, the parents invited their son to Thanksgiving dinner.  He repeatedly asked about party details, including specifically asking whether his sisters and uncle would be attending.  During the dinner, he killed four family members with a firearm, including both of his sisters and uncle, and seriously wounded others.  Despite the parents' prior knowledge of their son's violent tendencies and threats to specific family members, the Florida court found that the parents owed no legal duty to protect family members from the conduct of their adult son.  *Id*. at 1145-49.  Along the same lines, Florida courts have declined to adopt the rule that holds a psychiatrist who allegedly "knows, or should know," that a patient of his presents a serious threat of violence to an identifiable third party has a duty to warn the intended victim.  *Boynton*, 590 So. 2d at 447.  Therefore, even though the FBI allegedly received specific information about Nikolas Cruz, no legally cognizable duty to his victims existed absent a special relationship.

## B.  No Special Relationship Existed Under Florida Law.

No special relationship existed between the United States and the shooter, his victims, or the tipsters under Florida law.  "As a general principle, a party does not have a duty to take affirmative action to protect or aid another unless a special relationship exists which creates such a duty."  *Limones v. Sch. Dist. of Lee Cty.*, 161 So. 3d 384 (Fla. 2015) (citing Restatement (Second) of Torts § 314 cmt. a (1965)); *see also Knight*, 133 So. 3d at 1146-47

(recognizing special relationship generally limited to "the context of professional custodians with special competence to control the behavior of those in their charge"); *Boynton*, 590 So. 2d at 448 (rejecting other states' adoption of duty to warn based on therapist-patient relationship).[9]

Under Florida's private-person-analog analysis for governmental liability, "courts have … determined that a special duty is established when a police officer makes a direct representation to a plaintiff, or one so closely involved with the plaintiff that their interests cannot be separated, that he or she will take a specified law enforcement action." *Pollock*, 882 So. 2d at 936. "The following elements must be plead and proved to establish a special relationship between law enforcement and the tort victim: 1) an express promise or assurance of assistance; 2) justifiable reliance on the promise or assurance of assistance; and, 3) harm suffered because of the reliance upon the express promise of assurance of assistance." *Pierre v. Jenne*, 795 So. 2d 1062, 1064 (Fla. Dist. Ct. App. 2001); *see also Jordan v. Nienhuis*, 203 So. 3d 974, 977 (Fla. Dist. Ct. App. 2016) (same). Those elements are not present here.

The Complaint contains allegations that appear to imply that the FBI established a special relationship with the tipster through a "direct representation." Specifically, the Complaint alleges that the "FBI's tip intake specialist assured the tipster that the FBI, and not

---

[9] One exception to the no-duty rule holds that, "[a]bsent a special relationship between a defendant and a plaintiff, a duty to protect a plaintiff from harm from a third party may arise if the defendant is in actual or constructive control of: (1) the instrumentality of the harm; (2) the premises on which the tort was committed; or (3) the person who committed the tort." *Lipkin v. Norwegian Cruise Line, Ltd.*, 93 F. Supp. 3d 1311, 1328 (S.D. Fla. 2015) (citing *Knight*, 133 So. 3d at 1145). Here, the Complaint does not allege that the United States had actual or constructive control over the instrumentality of the harm (the shooter's firearms), the premises upon which the tort was committed (the Marjory Stoneman Douglas High School), or the person who committed the tort (Nikolas Cruz). Therefore, this exception is inapplicable. Similarly, "[a] duty may . . . arise when law enforcement officers become 'directly involved in circumstances which place people within a 'zone of risk' by creating or permitting dangers to exist, by taking persons into police custody detaining them, or otherwise subjecting them to danger.'" *Lippman*, 622 F. Supp. 2d at 1342 (quoting *Pollock*, 882 So. 2d at 935). However, "where police officers have not arrived on the scene or assumed any degree of control over the situation, the 'zone of risk' analysis has no application." *Id*. at 935-36. As the FBI never arrived on a scene or otherwise took control of a situation prior to the injuries, the "'zone of risk' analysis has no application." *Id.* at 936; *see also Greer*, 242 F. Supp. 3d at 1299 (defendant did not arrive on the scene until after the victim was shot).

some other government body, was the proper forum for reporting school shooting threats." Compl. ¶ 55.  The Complaint further alleges that "the FBI intake specialist responded by assuring the caller that the FBI appreciated that the tipster had chosen to call. . . .  Either implicitly or explicitly, the FBI assured the tipster that she had reported her information to the right place."  Compl. ¶ 55.  The Complaint claims that "[t]he tipster relied on the FBI to investigate the matter and decide the best course of action."  Compl. ¶ 56.  With respect to the FBI's potential handling of the tip, the Complaint alleges: "Either expressly or implicitly, the FBI's responses to the tipster had the effect of assuring [] her that the FBI would take action – at the very least, look into the threat and potentially follow-up with her."  Compl. ¶ 57.

These allegations fail to establish a special relationship for several reasons.  First, even assuming the intake specialist provided assurances that the FBI would "look into the threat and potentially follow-up with her," Compl. ¶ 57, such statements are legally insufficient to create a special relationship.  Florida law is clear on this point.  In *Pollock*, a driver telephoned 911 after almost colliding with a vehicle that was stalled on the highway.  882 So. 2d 928 (Fla. 2004).  The Florida Highway Patrol dispatcher told the driver that he would "send a unit to check it out."  *Id*. at 931.  At the time, the highway patrol "had internal operating rules requiring it to dispatch a trooper to the scene of the stalled vehicle."  *Id*.  The dispatcher, however, failed to enter the call into the computer for assignment, and another car eventually collided with the stalled vehicle, killing its passengers.  *Id*.

The Florida Supreme Court affirmed the dismissal based on the lack of an owed duty. The Court rejected the argument that the dispatcher's comments created a special relationship: "FHP did not, by word or deed, create a duty of care towards the decedents over and above its general duty to enforce the state's traffic laws."  *Id*. at 936.  Thus, general statements of assurance, such as informing a caller that a dispatcher will "send a unit to check it out," do not create a legal duty owed by the law enforcement entity beyond that which is owed to the general public.  *See Greer*, 242 F. Supp. 3d at 1299-1300 (rejecting argument that a special relationship was made through an assurance that officers would help get mental and medical help for the assailant if the caller called again); *Pierre*, 795 So. 2d at 1064 (finding no duty where "911 operators did not ever give assurances of their ability to provide assistance other than to direct the caller to the nearest police station" and the caller never "abandoned an available option to avoid their chasers in justifiable reliance on any promise of assistance

extended by any of the 911 operators").

Second, in order to give rise to a special relationship, the direct representation must be made to "a plaintiff, or one so closely involved with the plaintiff that their interests cannot be separated . . . ." *Pollock*, 882 So. 2d at 936. Here, there are no allegations that a direct representation was made to Mr. or Mrs. Guttenberg, or to their daughter. Nor does the Complaint allege that the tipsters were so closely involved with the Plaintiffs that their interests cannot be separated. In fact, the Complaint does not even allege that the tipsters knew the Plaintiffs or anyone at Marjory Stoneman Douglas High School. The September 2017 tipster lived in Mississippi, and there is no allegation he knew Cruz or the victims. While the January 2018 tipster purported to know Cruz, she is not a direct plaintiff, nor is it alleged that she was so closely involved with Marjory Stoneman Douglas High School that their interests cannot be separated. Under these circumstances, a special relationship has not been created.

Third, the transcript of the January 5, 2018 call to the PAL tipline rebuts any allegation that the FBI made an express or implicit promise or assurance of assistance.[10] As the transcript demonstrates, the FBI intake specialist responded to most of the tipster's concerns with short responses, such as "Okay" and "Mhm." *See* Ex. 1. In four instances during the call, the intake specialist attempted to elicit additional information: "And did he say he would do that or he just wanted to, ma'am?"; "Does he say anything else about doing anything, ma'am?"; "And is that the one that he's staying with, ma'am?"; "Yeah, and does he talk about ISIS or he just dressed up like one of --?" *Id*. At one point, the intake specialist asked, "So if anybody else has questions they can call you back. Is that correct, ma'am?" *Id*. Towards the end of the call, the tipster tells the intake specialist that she "didn't know

---

[10] The Complaint makes several direct references to the January 5, 2018 telephone call, often providing block quotes from the transcript. *See* Compl. ¶¶ 35-49. The transcript is publically available: http://online.wsj.com/public/resources/documents/FBI-transcript-02-23-2018.pdf. For the Court's convenience, a complete copy of the transcript is attached to this motion. (Attachment 1). *See generally Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (considering an AP article that was referenced in complaint while adjudicating a motion to dismiss). While reference is made to the September 24, 2017 tip from the Mississippi bail bondsman, *see* Compl. ¶¶ 30-33, the Complaint does not allege that the FBI made any promises or assurances to the bail bondsman. *See* Compl. ¶¶ 119-125.

whether to call you or Homeland Security or who . . . ." *Id*.  In response, the specialist simply
thanked the tipster for calling: "Yeah, I do appreciate you calling that in, ma'am." *Id*.  At no
point during the call did the intake specialist make any direct representations to the tipster that
the FBI would take any specific action.  Such statements demonstrate that no special
relationship was formed under Florida law.[11]

## C. Florida's Voluntary Undertaking Doctrine Does Not Apply In This Case.

Nor does Florida's voluntary undertaking doctrine apply.  Under Florida law,
"one who undertakes to act, even when under no obligation to do so, thereby becomes
obligated to act with reasonable care." *Union Park Mem'l Chapel v. Hutt*, 670 So. 2d 64,
66-67 (Fla. 1996) (citations omitted).  The Florida Supreme Court has adopted the
Restatement (Second) of Torts for identifying "the type of harm that the tortfeasor's
alleged negligent undertaking must have caused for the courts to recognize a duty of
care." *Wallace*, 3 So. 3d at 1052 (quoting Restatement (Second) of Torts § 324A
(1965)).  The Florida Supreme Court has noted that the voluntary undertaking doctrine
only applies if the failure to exercise reasonable care increases the risk of harm or if the

---

[11] The Complaint alleges one count of negligence.  Compl. at 28.  Any attempt to
establish a duty by relying on communications made by the FBI to the tipster is further barred by
the FTCA's misrepresentation exception, 28 U.S.C. § 2680(h).  "[T]he essence of an action for
misrepresentation, whether negligent or intentional, is the communication of misinformation on
which the recipient relies." *Zelaya v. United States*, 781 F.3d 1315, 1334 (11th Cir. 2015)
(quoting *Block v. Neal*, 460 U.S. 289, 296 (1983)).  "[M]iscommunication and non-
communication yield the same result for purposes of the misrepresentation exception, because
the misrepresentation exception encompasses failure to communicate as well as
miscommunication." *Id*. (quoting *JBP Acquisitions v. United States ex rel. FDIC*, 224 F.3d 1260,
1265 n.3 (11th Cir. 2000)).  "The test in applying the misrepresentation exception is whether the
essence of the claim involves the government's failure to use due care in obtaining and
communicating information." *JBP Acquisitions*, 224 F.3d at 1264.  "Accordingly, it is the
substance of the claim and not the language used in stating it which controls." *Id*. (quoting
*Gaudet v. United States*, 517 F.2d 1034, 1035 (5th Cir. 1975)).  Here, the essence of the
Complaint is that the FBI intake specialist communicated false assurances to the January 2018
tipster, which were relied upon to the detriment of Mr. and Mrs. Guttenberg and their daughter.
Absent such a communication, there would be no basis to argue that the FBI had a special
relationship with the Plaintiffs or someone closely involved with them.  *Pollock*, 882 So. 2d at
936.  The communication between the FBI intake specialist and the tipster would be a necessary
link in the causal chain that led to the Plaintiffs' injury.  .  *See United States v. Shearer*, 473 U.S.
52, 55 (1985).

11

harm is suffered because of reliance of the other or a third person upon the undertaking. *Id.* (citing *Clay Elec. Co-op., Inc. v. Johnson*, 873 So. 2d 1182, 1188 (Fla. 2003) and Restatement (Second) of Torts § 324A cmts. c, e (1965)).

Here, the FBI did not engage in sufficient affirmative conduct to establish a duty under the voluntary undertaking doctrine. The Complaint alleges that the FBI "took on the responsibility of investigating and preventing mass shootings." Compl. ¶ 15. It further alleges the FBI describes itself as "the go-to entity for concerned citizens to report a potential mass shooting." Compl. ¶ 53. But the FBI's creation of a tipline, in and of itself, is not the type of affirmative conduct that creates a legal duty. *See Pollock*, 882 So. 2d at 936 (finding no negligent undertaking based on the receipt of a 911 call). Engaging in traditional law enforcement functions does not establish a duty under Florida's voluntary undertaking doctrine. *See Greer*, 242 F. Supp. 3d at 1300 (finding voluntary undertaking doctrine inapplicable when officers engage in traditional law enforcement activities, such as 911 call responses) (*citing Wallace*, 3 So. 3d at 1049)).

Moreover, the negligence claim is based on the allegation that the FBI failed to exercise reasonable care in handling the information it received. *See* Compl. ¶¶ 119-126. The Complaint faults the FBI for "[d]oing nothing whatsoever with the information that it received concerning Nikolas Cruz." Compl. ¶ 125. Alleging that a defendant should have acted but failed to do so is insufficient to establish a duty under the voluntary undertaking doctrine. "[T]he test is whether the government did something to increase the risk of harm, not whether it could have done something to prevent the harm from occurring." *Starnes ex rel. AS v. United States*, No. 06-10079-CIV, 2007 WL 5238398, at *12 (S.D. Fla. May 15, 2007); *see also Turner v. United States*, 736 F.3d 274 (4th Cir. 2013) ("Indeed, the thrust of the plaintiff's case is that the USCG should have done something to alleviate [the] predicament sooner. . . . The USCG was under no obligation to do so."). Here, the legal theory is that the FBI should have affirmatively prevented the shooting. The absence of affirmative conduct that neither increased the risk nor otherwise discouraged another from acting, however, cannot form the basis of liability under the voluntary undertaking doctrine.

Additionally, the Complaint does not satisfy the other factors required under the voluntary undertaking doctrine. The FBI's conduct did not affirmatively increase the risk

of harm because "a risk is only increased when a nonhazardous condition is made hazardous through the negligence of a person who changed its condition or caused it to be changed." *Howell v. United States*, 932 F.2d 915, 919 (11th Cir. 1991); *Patentas v. United States*, 687 F.2d 707, 707-16 (3d Cir. 1982) ("'increased risk' means some physical change to the environment or some other material alteration of the circumstances"). "It is not enough that a risk merely exists or that is it foreseeable. Instead, the defendant's conduct must create the risk or control the situation before liability may be imposed." *Jordan*, 203 So. 3d at 978; *see also Lippman*, 622 F. Supp. 2d at 1342 (finding no duty because "there are no allegations that [the plaintiff] was placed in danger by the FBI agents"). Here, the Complaint alleges that a risk already existed and should have been prevented by the FBI. It does not allege that the FBI increased the risk of harm by failing to act. This is insufficient as a matter of law.

Second, there was no reliance by the tipsters or a third party such that they were discouraged from acting themselves. As noted, the intake specialist did not make any representations to the January 5, 2018 tipster that could have been relied upon by the caller. In fact, the caller also called the Parkland Police Department and spoke to an officer about Cruz's behavior. Compl. ¶ 36. The Complaint alleges that local law enforcement was aware of Cruz's propensity for violence and intent to commit a violent act "long before the shooting," Compl. ¶ 4, and that, before the FBI received any information regarding Cruz, several people (Cruz's mother and other family members and friends, a neighbor, and a school resource officer at the Marjory Stoneman Douglas High School) called the Broward County Sheriff's Office repeatedly from January 2013 through the end of November 2017. *See* Compl. ¶¶15-24. The Complaint specifically alleges that "[i]n February 2016, the Broward County Sheriff received a report from an unnamed neighbor who said that Cruz was posting pictures of himself with guns on Instagram and saying he planned to shoot up his high school. At that time, Cruz was a student at Marjory Stoneman Douglas High School. The Sheriff's office forwarded the information to the school resource officer." Compl. ¶ 16. Nothing in the Complaint intimates that the local law enforcement officers conveyed such information to the FBI, or that the FBI informed local law enforcement that the FBI would handle the investigation. According to the allegations in the Complaint, local law enforcement was

well aware of Cruz's propensities and continued to process incoming tips.  The FBI did not interfere with local officials acting on information they independently received about Nikolas Cruz.  Therefore, it cannot be said that the FBI provided any assurances or compelled any other entity to forgo investigating or acting upon the violent propensities of Nikolas Cruz.  As a result, the voluntary undertaking doctrine does not apply in this case.

II.   **THIS COURT LACKS SUBJECT MATTER JURISDICTION FOR THE ADDITIONAL REASON THAT THE DISCRETIONARY FUNCTION EXCEPTION BARS THIS CLAIM.**

### A.  Overview of the Discretionary Function Exception.

The FTCA's waiver of sovereign immunity is subject to several exceptions set forth in 28 U.S.C. § 2680, which "are designed to protect certain important government functions and prerogatives from disruption."  *Molzof v. United States*, 502 U.S. 301, 311 (1992).  Among these exceptions is the discretionary function exception, which bars "any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).

The Supreme Court has created a two-part test for determining whether a claim is barred by the discretionary function exception.  A court must first determine whether the act "involv[es] an element of judgment or choice."  *United States v. Gaubert*, 499 U.S. 315, 322 (1991).  Pursuant to this first part of the test, courts look to whether "a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow[.]"  *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).  "If a government official in performing his statutory duties must act without reliance upon a *fixed or readily ascertainable standard*, the decision he makes is discretionary and within the discretionary function exception."  *Powers v. United States,* 996 F.2d 1121, 1125 (11th Cir. 1993) (citation and internal quotation marks omitted).

It is not sufficient that "a federal statute, regulation, or policy" prescribe generalized mandatory action.  "[T]he relevant inquiry is whether the controlling statute or regulation mandates that a government agent perform his or her function *in a specific manner*."  *Id*. at 1125 (emphasis supplied) (citing *Autery v. United States*, 992 F.2d 1523 (11th Cir. 1993)).  Where there is no mandatory directive governing the governmental conduct at issue, but instead

14

judgment or choice is involved, the court proceeds to the second part of the test, which is "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23 (quoting *Berkovitz*, 486 U.S. at 536).

"The basis for the discretionary function exception was Congress' desire to 'prevent judicial second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Berkovitz*, 486 U.S. at 536-37 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)). Thus, the exception protects "governmental actions and decisions based on considerations of public policy." *Gaubert*, 499 U.S. at 323 (quoting *Berkovitz*, 486 U.S. at 537). It is immaterial whether various policy considerations *actually* were considered, because "[t]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are *susceptible* to policy analysis." *Gaubert*, 499 U.S. at 325 (emphasis supplied); *Ochran v. United States*, 117 F.3d 495, 500 (11th Cir. 1997). Furthermore, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 323; *Hughes v. United States*, 110 F.3d 765, 768 (11th Cir. 1997). The discretionary function exception is so broad that it applies even if the government's conduct was negligent or an abuse of discretion. *See Gaubert*, 499 U.S. at 323; *O'Ferrell v. United States*, 253 F.3d 1257, 1267 (11th Cir. 2001).

### B. The FBI's Law Enforcement and Investigative Activities Are Protected by the Discretionary Function Exception.

Before addressing whether the government's conduct violated a mandatory regulation or policy, the court first "must determine exactly what conduct is at issue." *Autery v. United States*, 992 F.2d 1523 (11th Cir. 1993). Here, the Complaint alleges that the FBI negligently failed to follow mandatory investigatory procedures. *See* Compl. ¶ 121. Whether the FBI negligently carried out preliminary mandatory actions, however, is not relevant to whether the Court has jurisdiction because the failure to follow any purportedly mandatory initial directives was not the actual cause of the injury. The Complaint's assertion that preliminary investigatory steps, including whether to forward information to the Miami Field Office, were not followed is one thing. The ultimate decision of what steps to take that may have prevented Nikolas Cruz from

acting is quite another.  The Complaint does not address the discretionary nature of decisions upon which any legal theory of liability depends, and asks the Court to consider alleged failures of the FBI to follow purportedly mandatory investigatory procedures in isolation of the true context of their negligence claim.  Such an inquiry cannot be reconciled with well-established precedent which holds that the discretionary function exception applies if the ultimate action that allegedly caused the injury was discretionary.  *Gen. Dynamics Corp. v. United States*, 139 F. 3d 1280, 1285 (9th Cir. 1998) (discretionary function exception applies when "discretion intervenes between an alleged wrongdoer and the harm suffered by a plaintiff" even if the wrongdoer violated a mandatory requirement); *Fisher Bros. Sales, Inc. v. United States*, 46 F.3d 279, 286 (3d Cir. 1995).

It is not clear from the Complaint what ultimate action this lawsuit asserts that the FBI should have taken to prevent Nikolas Cruz from committing the murders.  Even had PAL or the Miami Field Office failed to take preliminary mandatory action, the Field Office ultimately would have had discretion in the manner it acted to attempt to prevent the shooting.  As courts have held, a plaintiff cannot circumvent the discretionary function exception by relying on failures to follow mandatory directives when the harm was caused by or could have been prevented by a subsequent and intervening act of discretion.  *See also Rosas v. Brock*, 826 F.2d 1004, 1010 (11th Cir. 1987) ("[I]f a discretionary decision is made without following mandated procedures, it is an abuse of discretion and, as such, protected from judicial review."); *Zelaya v. United States*, 781 F.3d 1315, 1332 (11th Cir. 2015) (citing *Dichter-Mad Family Partners, LLP v. United States*, 709 F.3d 749, 750-51 (9th Cir. 2013)).

Moreover, "[t]he overwhelming consensus of federal case law establishes that criminal law enforcement decisions – investigative and prosecutorial alike – are discretionary in nature and, therefore, by Congressional mandate, immune from judicial review."  *Mesa v. United States*, 837 F. Supp. 1210, 1213 (S.D. Fla. 1993) (citing *Pooler v. United States*, 787 F.2d 868, 871 (3d Cir. 1986), *cert. denied*, 479 U.S. 849 (1986)).  The Eleventh Circuit jurisprudence is consistent with this consensus.  Such discretion is protected from hindsight review, even in cases that allege discretion was abused.  28 U.S.C. § 2680(a); *O'Ferrell v. United States*, 253 F.3d 1257, 1267 (11th Cir. 2001) ("[T]he FTCA expressly exempts the United States from liability for acts which constitute abuse of discretion."); *Pooler*, 787 F.2d at 871  (discretionary function

exception bars judicial review of investigative efforts, even in cases involving allegations of negligence.).

In *Zelaya*, 781 F.3d at 1332, for example, investors in a Ponzi scheme brought an action against the United States alleging that the Securities and Exchange Commission ("SEC") negligently approved the annual re-registration of a fraudulent company as an investment advisor and failed to investigate the company for fraudulent activity.  The court, citing opinions from other circuit courts holding that the discretionary function exception precluded claims based on the SEC's failure to discover, investigate, and dissolve other Ponzi schemes, held that "investigatory decisions by the SEC are the types of decisions that the discretionary function exemption would be expected to shield."  *Id.*; *see also United States v. Faneca*, 332 F.2d 872, 874-75 (5th Cir. 1964) (decisions regarding "modus operandi" of law enforcement operations and means of enforcing the law are protected by discretionary function exception).[12]

In *Mesa v. United States*, 123 F.3d 1435, 1438 (11th Cir. 1997), the plaintiff brought an FTCA suit alleging that Drug Enforcement Administration agents failed to properly identify the subject of an arrest warrant and mistakenly arrested the plaintiff.  The court found that law enforcement agents' "decisions regarding how to locate and identify the subject of an arrest warrant and regarding whether the person apprehended is in fact the person named in the warrant are discretionary in nature and involve an element of judgment or choice."  *Id.*  The court held that the "investigation of the whereabouts and identity of the subject of an arrest warrant" is conduct that falls within the discretionary function exception.  *Id.*

In *Littell v. United States*, 191 F. Supp. 2d 1338, 1345 (M.D. Fla. 2002), the plaintiffs similarly contested the conduct and efficacy of a law enforcement investigation after they were prosecuted and acquitted of criminal charges.  The *Littell* plaintiffs sued the United States under the FTCA, alleging that agents of the Federal Deposit Insurance Corporation negligently investigated, obtained information, and caused the initiation of a criminal action against them.  In applying the first part of the *Gaubert* test, the court recognized that "the tasks accorded to the investigative officer during the course of the investigation demanded the exercise of discretion throughout."  *Id.*  The court observed that:

---

[12] *See Bonner v. City of Pritchard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*) (decisions of the United States Fifth Circuit Court of Appeals issued on or before September 30, 1981, are binding as precedent in the Eleventh Circuit Court of Appeals).

the investigative officer was required to decide how the investigation would be pursued, including considerations of the use and availability of potential witnesses, the value of any documentary evidence, whether the evidence was consistent or contradictory, and whether to seek a search warrant and to refer the matter for possible prosecution.

*Id.* The court found that the first part of the *Gaubert* analysis was met and, ultimately, held that the discretionary function exception barred plaintiffs' claims as to the conduct and efficacy of the investigation.

Courts have been cautious about intervening in this area, aware that "imposing liability for such decisions would seriously handicap the FBI and other federal law enforcement agencies in carrying out the important duties assigned to them by Congress." *Suter v. United States*, 441 F.3d 306, 312 (4th Cir. 2006) (holding that discretionary function exception applied to FBI's methods in undercover investigation). *See also O'Ferrell*, 253 F.3d at 1267 ("how law enforcement agents conduct interrogations would appear to be a paradigmatic example of a discretionary function" involving "elements of judgment and choice – the central ingredients of discretion"); *Mid-South Holding Co.*, *v. United States,* 225 F.3d 1201 (11th Cir. 2000) ("decisions of [federal agents] concerning the manner in which to search . . . fall within the scope of the discretionary function exception"); *Ostera v. United States*, 769 F.2d 716, 718 (11th Cir. 1985) (holding that FBI's decision to use an informant is discretionary because "[t]here is neither guideline nor law to cabin the decision as to which individual should be used as an informant").

*McCloskey v. Mueller*, 385 F. Supp. 2d 74 (D. Mass. 2005), likewise provides support for application of the discretionary function exception in this case. In *McCloskey*, the plaintiffs alleged that the FBI's failure to follow-up on a telephonic tip caused the death of a family member. There, a personnel security specialist at the FBI Boston Field Office took a call from Gary Lee Sampson, who identified himself as a fugitive seeking to turn himself into custody. *Id.* at 76. The specialist disconnected the call; Sampson did not call back. *Id.* Sampson murdered Philip McCloskey the next day and killed two others before he was apprehended a week later. *Id.* The executors of McCloskey's estate brought an FTCA action against the United States, asserting that the FBI was negligent in disconnecting and then failing to trace Sampson's capture, which may have led to his apprehension and prevented his crimes. *Id.* The court dismissed the case, holding that the first part of the discretionary function exception shielded the FBI's conduct because the "FBI's broad discretion to decide whether to investigate and/or

apprehend a particular individual, encompasses the discretion of an individual officer like [the specialist] to report or not report a particular call." *Id.* at 80; *see also Flax v. United States*, 847 F. Supp. 1183, 1190 (D.N.J. 1994) (decisions on how to conduct surveillance and how to follow suspects are protected by discretionary function exception). The court here should reach the same result.

### 1. The First Part of the *Gaubert* Test: There Are No Mandatory Statutes, Regulations, or Directives that Constrained the FBI's Discretion in the Conduct at Issue.

The first part of the *Gaubert* test is satisfied here, as there are no mandatory statutes, regulations, or directives that constrained the FBI's discretion as to the conduct at issue. The Complaint relies on two threat assessment studies and a statement by the FBI Press Office referencing protocols to argue to the contrary. However, neither those studies nor any protocols established mandatory conduct that was required to be taken by the FBI here. Rather, FBI employees retained discretion to assess the information provided by the tipsters in the first instance. Yet, even if FBI employees had decided further investigation was warranted (either by PAL or during a secondary assessment at the Field Office), the decisions regarding the scope and manner of how best to conduct that investigation were discretionary. Moreover, after any investigation was conducted, the ultimate decision of whether to take any action that may have prevented Nikolas Cruz from carrying out the shootings would have involved many levels of discretion, judgment, and choice. Each of these decisions is therefore protected by the discretionary function exception, depriving the Court of jurisdiction and warranting dismissal for the reasons explained below.

#### a. The Two Studies Cited by Plaintiffs Do Not Constrain the FBI's Discretion as to How to Conduct Its Law Enforcement Activities.

To support the claim that the FBI was required to investigate and intervene in light of tips indicating Nikolas Cruz presented a threat, the Complaint cites two studies published by the Behavioral Analysis Unit within the FBI's National Center for the Analysis of Violent Crime. *See* Compl. ¶¶ 58-87.[13] These studies, however, do not constrain the FBI's discretion because they do not set forth any mandatory directives on whether and how to initiate an investigation.

---

[13] As with the January 5, 2018, telephone call, the Complaint makes several references to the two studies, often quoting extensively from them. *See* Compl. ¶¶ 61-63, 74-75, 81-82. The

The Complaint summarizes the findings of these studies to suggest the tipsters provided information that should have caused the FBI to realize "Cruz was exhibiting an elevated or high level of risk."  Compl. ¶¶ 64-80.  It alleges that "the FBI was aware that Nikolas Cruz had displayed many of the observable concerning behaviors that precipitate a mass shooting" and he had "experienced multiple triggering stressors and displayed observable concerning behaviors in the months before the shooting."  Compl. ¶¶ 83-84.  It further suggests that the FBI was aware, or reasonably should have foreseen, that Marjory Stoneman Douglas High School was Nikolas Cruz's likely target.  Compl. ¶¶ 85.

First, the studies cannot be a source of any mandatory directive because they do not address how the FBI must handle tips regarding potential shooters at either the intake level (such as at the PAL) or the secondary level (such as at the FBI field office).  Moreover, the intended audience of the studies was the law enforcement community generally, not the FBI specifically.  As explained in one of the two studies, *Making Prevention a Reality: Identifying, Assessing, and Managing the Threat of Targeted Attacks* (hereinafter "Phase I Study"), the task of threat assessment and management "is a complex and nuanced one" that requires research to be "applied to the facts and circumstances of each case."  Phase I Study at 1.

Second, the studies are not a source of mandatory directives because the express purpose of the studies were conducted to provide guidance, not to set mandatory and specific policies for the FBI itself.  The Phase I study is a "monograph" intended to "serve as a useful and practical *guide* for understanding and implementing threat assessment and management at all levels."  *Id.* at 1 (emphasis added).  Similarly, the second study, *A Study of the Pre-Attack Behaviors of Active Shooters in the United States Between 2000 and 2013* (hereinafter "Phase II Study"), builds on the first monograph "to examine specific behaviors that may precede an attack and which may be useful in identifying, assessing, and managing those who may be on a pathway to deadly violence."  Phase II Study at 6.  The Phase II Study states that it does not purport to have "predictive value in determining if a person will become violent or not, as the findings and observations herein are not a 'checklist' but instead are offered to promote awareness among

---

studies are publically available: https://www.fbi.gov/file-repository/making-prevention-a-reality.pdf/view; https://www.fbi.gov/file-repository/pre-attack-behaviors-of-active-shooters-in-us-2000-2013.pdf/view.  For the Court's convenience, a complete copy of each study is attached to this motion.  (Attachment 2 and Attachment 3).

potential bystanders and for consideration in the context of a thorough, holistic threat assessment by trained professionals." *Id.* Nor does the Phase II Study mandate specific concrete steps that must be taken by law enforcement in the event of reports or tips: "Once reported to law enforcement, those in authority may also struggle to decide how best to assess and intervene, particularly if no crime has yet been committed." *Id.* at 6. In short, neither study provides mandatory steps that the FBI must take upon receiving tips concerning potential active shooters; instead, they serve as mere reference tools to the law enforcement community to assess potential threats and devise management plans. *See Riley v. United States*, 486 F.3d 1030, 1033 (8th Cir. 2007) (publication addressing engineering criteria were "guidelines and not mandatory"); *OSI, Inc. v. United States*, 285 F.3d 947, 952 (11th Cir. 2002) (finding that objectives and principles do not create mandatory directives that overcome the discretionary function exception). Thus, these studies do not bar application of the discretionary function exception.

**b. There Were No "Established Protocols" That Constrained FBI Employees' Discretion.**

In addition to the Phase I and Phase II studies, the Complaint also cites a statement by the FBI Press Office that alluded to protocols that were not followed. *See e.g.*, Compl. ¶¶ 100, 102, 105, 107.[14] The FBI press statement reads, in part, "[u]nder established protocols, the information provided by the caller should have been assessed as a potential threat to life. The information then should have been forwarded to the FBI Miami Field Office, where appropriate investigative steps would have been taken." Compl. ¶ 102. Notwithstanding the press release, the decisions of FBI employees regarding how to assess the information relating to Cruz would have involved discretion. At most, the statements describe steps that *should have been* taken. As courts have recognized, the use of the word "should" is considered to be suggestive or permissive, not mandatory. *Aragon v. United States,* 146 F.3d 819, 826 (10th Cir. 1998) (the word "should" is "suggestive, rather than mandatory").[15] The PAL employees' decisions on

---

[14] The Complaint cites the FBI Statement on the Parkland, Florida Shooting released by the National Press Office on February 16, 2018. The statement is publically available: https://www.fbi.gov/news/pressrel/press-releases/fbi-statement-on-the-shooting-in-parkland-florida. For the Court's convenience, a complete copy of the statement is attached to this motion. (Attachment 4).

[15] *Baer v. United States*, 722 F.3d 168, 173 (3d Cir. 2013) (manual stating that a

how to assess the information received, whether that information is credible, and whether to forward information for further investigation intrinsically involve discretionary judgments. Any assessment would depend on the employee's understanding of the information available at the time and analyzed within a broader context to determine the credibility and viability of the potential threat. Accordingly, these statements as to how the information provided by the caller *should have been* assessed or *should have been* forwarded to the Miami Field Office do not negate the FBI employees' discretionary judgments.

But even if the protocols referenced in the press release removed the discretion of the particular PAL employees receiving the tips, any subsequent investigation conducted by the FBI's Miami Field Office would have itself involved numerous discretionary decisions. The Complaint does not allege that a mandatory statute or regulation required the Field Office to investigate or specified how to investigate. Rather, the Complaint relies on the press release's statement that "the information then should have been forwarded to the FBI Miami Field Office, where appropriate investigative steps would have been taken." Compl. ¶¶ 102, 105. However, as discussed in detail below, the Miami Field Office would have had broad discretion to determine what steps were appropriate based on the forwarded information. The Field Office would have determined whether the lead was credible, whether to prioritize the lead, how to investigate, including the amount of available resources to allocate to the particular investigation. As courts have recognized repeatedly, such decisions are imbued with discretion; indeed, the FBI could not conduct its law enforcement activities without such flexibility. *See Baer*, 722 F.3d at 173 (regulation stating that particular action shall be taken "as appropriate" was not a mandatory directive); *see also Mesa*, 123 F.3d at 1438 ("[A]gents may consider their available resources and decide how to allocate those resources among the many investigations for which they are responsible."). Regardless of whether the PAL unit should have forwarded the information to the Miami Field Office, the Field Office's inherent discretion in deciding how to assess that

---

particular action "should" be taken was not a mandatory directive)*; Weissich v. United States*, 4 F.3d 810, 814 (9th Cir. 1993), *cert. denied*, 512 U.S. 1219 (1994); *Dube v. Pittsburgh Corning*, 870 F.2d 790 (1st Cir. 1989) ("should" is advisory); *Fortney v. United States*, 714 F. Supp. 207 (W.D. Va. 1989), *aff'd* 912 F.2d 722 (4th Cir. 1990) (discretion was involved where "should" was used rather than "must").

information and whether further investigation was warranted necessitates dismissal of this action pursuant to the discretionary function exception.

### c. Because Plaintiffs Challenge Discretionary Decisions Related to the Law Enforcement Activities of the FBI, Their Claim Is Barred by the Discretionary Function Exception.

The Complaint challenges the nature and extent of the FBI's investigation into tips it received concerning Nikolas Cruz. Compl. ¶ 125(a)-(e). The alleged failures to act fall within multiple levels of discretionary conduct: (1) whether PAL should have forwarded the caller's tip to a Field Office for determination of whether to investigate; (2) whether the Field Office should have opened an investigation; and (3) how the Field Office should have conducted any investigation it may have decided to open, including whether to intervene in some way. *See* Compl. ¶ 125(a)-(e). The Complaint does not only address conduct at the PAL, but also the actions that would have been taken by the Miami Field Office. Thus, the allegations in the Complaint concern at least two separate, critical levels of decision making that are protected from suit under the discretionary function exception. First, at the PAL level, assessing information that comes in through the tipline is discretionary. Second, even where the PAL forwards information, the Field Office has an added level of discretion to determine the appropriate investigative steps to take in response. Each level requires discretion and is not mandated by statute, regulation, or directive. Therefore, these decisions are protected by the discretionary function exception. *See Littell*, 191 F. Supp. 2d at 1344 ("To establish jurisdiction the Plaintiff must draft a complaint that is facially outside the exceptions of § 2680.").

### i. The Nature and Extent of Any Investigation Is Discretionary.

The Complaint alleges that the FBI did "nothing whatsoever with the information that it received concerning Nikolas Cruz; fail[ed] to investigate and follow-up on the credible information it received from the public . . . ; fail[ed] to follow non-discretionary, established protocols that required the FBI to forward the information it had received concerning Nikolas Cruz to its Miami Field Office, which would have had a non-discretionary obligation to take investigative steps." Compl. ¶ 125(a)-(c). For the reasons explained above, *see supra* at 19-23, there were no non-discretionary protocols or obligations dictating the FBI's steps here.

Absent such a mandatory directive, the FBI maintains discretion in how to follow-up on tips that were received at PAL.  Courts have made it clear that decisions by FBI employees on whether to investigate and follow-up on information it received from the public are ones in which the FBI is afforded broad discretion.  Law enforcement personnel's "failure to discover, investigate, and dissolve" crimes are "the types of decisions that the discretionary function exemption would be expected to shield." *Zelaya v. United States*, 781 F.3d 1315, 1332 (11th Cir. 2015).  The FBI employees who received tips from the public were not constrained to take mandatory and specific steps in the course of their assessment of the tips.  FBI personnel retains discretion to determine whether a tip indicates a credible threat that is appropriate for FBI involvement.  The decisions of how to analyze and assess the information gathered and whether to forward the tips to a Field Office were each imbued with discretion, without which the FBI could not perform its investigative and law enforcement functions.

Separate and distinct from the decision on how to follow-up on tips received at PAL is the myriad of decisions that agents in the Field Office would have made, which demands the exercise of discretion throughout.  As a preliminary matter, "FBI agents, like detectives and police officers must evaluate whether the information requires immediate action, deferred action, or no action at all." *Gonzalez v. United States*, 814 F.3d 1022, 1029 (9th Cir. 2016).  Regardless of PAL's assessment, the Field Office would have determined for itself, anew, whether the information revealed a credible threat that is appropriate for FBI involvement and whether or not to take any action.  If FBI agents had decided to take action, they would have had discretion to decide how to act, including the ultimate law enforcement decision of what steps to take to prevent potential criminal conduct.  In exercising that discretion, considerations such as the feasibility of interviewing the complainant or the subject of the complaint, how to locate and identify the subject, the use and availability of potential witnesses, the value of any documentary evidence, whether the evidence was consistent or contradictory, and whether to refer the matter for possible prosecution may come into play.  *See Mesa*, 123 F.3d at 1438; *Littell*, 191 F. Supp. 2d at 1345.  Any other result "would seriously handicap the FBI and other federal law enforcement agencies in carrying out the important duties assigned to them by Congress." *Suter*, 441 F.3d at 312.

24

### ii.  Whether to Intervene Is Discretionary.

The Complaint also alleges that the FBI "fail[ed] to intervene, including in any of a number of ways that the FBI has previously identified as effective intervention methods for potential school shootings."  Compl. ¶ 125(d).  Even if the Complaint alleged any specific intervention would have prevented this tragedy, courts have held that the FBI's discretion in investigations is broad and encompasses such decisions as whether to intervene in any particular manner, and the same is true here.  *See McCloskey v. Mueller*, 385 F. Supp. 2d at 74 (FBI has "broad discretion whether to investigate and/or apprehend a particular individual."); *Smith v. United States*, 375 F.2d 243, 248 (5th Cir.), *cert. denied*, 389 U.S. 841 (1967) ("§ 2680(a) exempts the government from liability for exercising the discretion inherent in the prosecutorial function of the Attorney General, no matter whether these decisions are made during the investigation or prosecution of offenses."); *Amato v. United States*, 549 F. Supp. 863, 866 (D.N.J. 1982) ("[D]ecision of when to arrest the perpetrators and the determination of the plan of arrest to be used are discretionary functions.").  The FBI had discretion whether to intervene in some manner, or at all, and the FBI was not cabined by any mandatory or specific statute, regulation, or directive that would defeat the first part of the *Gaubert* analysis.

### iii.  Whether to Share Information with Other Agencies Is Discretionary.

Finally, the Complaint alleges that the FBI "fail[ed] to relay the information received from the January 5 tipster to another governmental body that could have handled the investigation."  Compl. ¶ 125(e).[16]  The broad discretion afforded to law enforcement agents for conducting investigations extends to its decisions on whether to relay information to any other government agency.  In *Ochran v. United States*, the plaintiff alleged that an Assistant United States Attorney ("AUSA") negligently failed to protect him after being informed of a suspected offender's threats against the plaintiff.  Noting "that AUSAs are typically endowed with a high level of responsibility – and attendant discretion – in representing the Government," and "that the Attorney General has entrusted to . . . AUSAs the responsibility of allocating the limited resources of the Justice Department," the court held that the AUSA's decisions of whether to

---

[16] The Complaint refers to the electronic tip that the FBI received in 2017 but that tip does not form the basis of this claim that the FBI failed to relay information to another governmental body.  Compl. ¶¶ 125(e).

notify the United States Marshals Service of the threat to the plaintiff was protected by the discretionary function exception.  *Id.* at 502; *see also Taitt v. United States*, 770 F.2d 890, 894 (10th Cir. 1985) ("[T]he decision not to inform law enforcement officials of [participant's] release [from federal witness protection program] is within the discretionary function exemption.").  FBI agents have the same discretion as to whether to relay information to other agencies.  *See Gonzalez*, 814 F.3d at 1029  (FBI agents "regularly make judgment calls with respect to information sharing" and "consider the source of the information, its credibility, and the amount of detail in the information.").  Here, the FBI had discretion whether and when to share information with other government agencies such as local law enforcement, and the FBI was not cabined by any mandatory or specific statute, regulation, or directive that removed this conduct from the scope of the discretionary function exception.

The Complaint requires judicial second-guessing of whether federal agents should conduct investigations, prevent potential criminal activity, and relay information to other agencies.  The broad discretion afforded to the FBI in these activities satisfies the first part of the two-part test for determining whether a claim is barred by the discretionary function exception.

### 2. The Second Part of the *Gaubert* Test: the Federal Agents' Decision on Whether and How to Investigate Are Grounded in Public Policy.

If no mandatory directive controls the governmental conduct at issue, the second part of the discretionary function analysis requires the court to "determine whether the discretion involved in the governmental act 'is the kind that the discretionary function was designed to shield.'"  *Gaubert*, 499 U.S. at 322-23; *see also OSI, Inc.* 285 F.3d at 950.  The answer is clear in the Eleventh Circuit:  "when a government agent is permitted to exercise discretion in making a particular decision – whether that permission is express or implied – 'it must be presumed that the agent's acts are grounded in policy when exercising that discretion.'"  *Zelaya v.* 781 F.3d at 1330 (citing *Gaubert*, 499 U.S. at 324).  "[I]n examining whether an employee's discretion is of the type grounded in public policy, one uses an objective test, and the employee's subjective intent is irrelevant."  *Id.*  This case is no different.  The FBI's discretionary decisions in dealing with the two tips at issue are presumed to be grounded in public policy and thus protected from hindsight review under Eleventh Circuit law.  Here, the manner in which the FBI received information from the public, how it prioritized the information received, how it responded to that information, and how it allocated resources and personnel, were grounded in public policy.

The second part of the *Gaubert* test is also met here because decisions of whether to investigate an individual "are at the core of law enforcement activity" that the discretionary function exception "was designed to safeguard."  *Kelly v. United States*, 924 F.2d 355, 362 (1st Cir. 1991); *see also McCloskey*, 385 F. Supp. 2d at 81.  After all, "the ability of an investigator to choose the way in which an investigation will proceed is undoubtedly grounded in considerations of public policy."  *Littell*, 191 F. Supp. 2d at 1345; *see also Sabow v. United States*, 93 F.3d 1445, 1454 (9th Cir. 1996) ("Investigations . . . clearly require investigative officers to consider relevant political and social circumstances in making decisions about the nature and scope of a criminal investigation.").

Thus, to the extent the Complaint predicates liability on the assumption that, if the FBI had followed up on the telephone tip then the FBI would have prevented Nikolas Cruz from acting, such a claim falls within the discretionary function exception because it challenges policy-based decisions on whether and how to enforce statutes authorizing the FBI to investigate potential crimes.  *McCloskey*, 385 F. Supp. 2d at 81; *see also Smith*, 375 F.2d at 247-48, *cert. denied*, 389 U.S. 841 (1967) ("The federal government's decisions concerning enforcement of its criminal statutes comprise a part of its pursuit of national policy."); *Flammia v. United States*, 739 F.2d 202, 205 (5th Cir. 1984) (decision to release immigration detainee who was a known violent felon protected by the discretionary function exception).[17]  The discretionary function exception applies to both the decision to take action, as well as the decision to refrain from taking action.  *See Amato*, 549 F. Supp. at 866 (discretionary function exception protected decision by FBI to allow suspects under surveillance to complete the crime of attempted bank robbery so that they could be charged with more serious offense).

Finally, the manner in which the FBI chose to share, or not to share, information concerning a potential threat with local law enforcement is the type of policy-based decision that is protected by the discretionary function exception.  "The FBI's judgment about how to respond

---

[17] *Shuler v. United States*, 531 F.3d 930, 934 (D.C. Cir. 2008) ("Decisions regarding the timing of arrests are the kind of discretionary government decisions, rife with considerations of public policy, that Congress did not want the judiciary second-guessing.") (citation and internal quotation marks omitted); *Deuser v. Vecera*, 139 F.3d 1190, 1195 (8th Cir. 1998) (decision to terminate arrest protected by the discretionary function exception); *McElroy v. United States*, 861 F. Supp. 585, 592 (W.D. Tex. 1994) (decisions by undercover law enforcement officers "to take or refrain from certain actions" during investigation correlates with the public policy goal of punishing and deterring crime).

to a reported threat and how extensively to disclose information to other law enforcement organizations implicates many risks, all of which must be weighed in accordance with the FBI's social and public policy judgments." *Gonzalez*, 814 F.3d at 1032; *see also Taitt*, 770 F.2d at 893-94 (decision not to alert local law enforcement of dangerous person's release was protected by discretionary function exception). Accordingly, to the extent the Complaint bases liability on the alleged inadequacies or failures of the FBI's communications with local law enforcement regarding potential threats, the discretionary function exception must be applied.

## CONCLUSION

For the reasons stated and upon the authorities cited, this action should be dismissed for lack of jurisdiction over the subject matter.

Dated this 5th day of March 2019.

<div style="margin-left:40%">

Respectfully submitted,

**JOSEPH H. HUNT**
Assistant Attorney General
Civil Division

**ARIANA FAJARDO ORSHAN**
United States Attorney

**THOMAS G. WARD**
Deputy Assistant Attorney General
Civil Division

**JAMES G. TOUHEY, JR.**
Director, Torts Branch
Civil Division

**KIRSTEN L. WILKERSON**
Assistant Director, Torts Branch
Civil Division

**STEPHEN E. HANDLER**
Senior Trial Counsel, Torts Branch

**SABRINA UNDERWOOD**
Trial Attorney, Torts Branch

**CARLOS RAURELL**
Assistant United States Attorney
Florida Bar No. 529893

*/s/ Paul David Stern*
**PAUL DAVID STERN**
Trial Attorney, Torts Branch
Civil Division
**Attorneys for Defendant**
**UNITED STATES OF AMERICA**

</div>

28

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 5, 2019, I electronically filed the foregoing with the clerk of court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record and any other electronic filer as of the time of the filing.  I further certify that on the same date copies of the foregoing document and the notice of electronic filing will be mailed by first-class mail to the following counsel for Plaintiffs:

Steven C. Marks
Kristina M. Infante
Dayron Silverio
PODHURST ORSECK, P.A.
One S.E. 3rd Avenue, Suite 2300
Miami, FL 33131
Telephone: (305) 358-2800
Fax: (305) 358-2382

<u>/s/ Paul David Stern</u>
PAUL DAVID STERN
Trial Attorney, Torts Branch
*Attorney for Defendant*

29