UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED ACTION

Case No. 18-62758-CIV-DIMITROULEAS
Case No. 19-61623-CIV-DIMITROULEAS
Case No. 20-60303-CIV-DIMITROULEAS
Case No. 20-60306-CIV-DIMITROULEAS
Case No. 20-60307-CIV-DIMITROULEAS
Case No. 20-60308-CIV-DIMITROULEAS
Case No. 20-60310-CIV-DIMITROULEAS
Case No. 20-60311-CIV-DIMITROULEAS
Case No. 20-60317-CIV-DIMITROULEAS
Case No. 20-60319-CIV-DIMITROULEAS
Case No. 20-60322-CIV-DIMITROULEAS
Case No. 20-60325-CIV-DIMITROULEAS
Case No. 20-60326-CIV-DIMITROULEAS
Case No. 20-60327-CIV-DIMITROULEAS
Case No. 20-60328-CIV-DIMITROULEAS
Case No. 20-60330-CIV-DIMITROULEAS
Case No. 20-60331-CIV-DIMITROULEAS
Case No. 20-60332-CIV-DIMITROULEAS
Case No. 20-60333-CIV-DIMITROULEAS
Case No. 20-60481-CIV-DIMITROULEAS
Case No. 20-60483-CIV-DIMITROULEAS
Case No. 20-61088-CIV-DIMITROULEAS
Case No. 20-61103-CIV-DIMITROULEAS

IN RE: MARJORY STONEMAN DOUGLAS
HIGH SCHOOL SHOOTING FTCA LITIGATION
_____/

## ORDER ON DEFENDANT UNITED STATES OF AMERICA'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

THIS CAUSE is before the Court on Defendant United States of America (the "United States" or "Defendant")'s Motion to Dismiss for Lack of Subject Matter Jurisdiction [DE 206], filed herein on April 21, 2020. The Court has carefully considered the Motion, Plaintiffs, consisting of representatives of the estates of murder victims, parents of injured minors, and injured individuals who are not minors, ("Plaintiffs") Response to the Government's Motion to

Dismiss [DE 219], Defendant's Reply [DE 220], Plaintiffs' Surreply [DE 223], and is otherwise fully advised in the premises.

## I.      BACKGROUND

On February 14, 2018, Nikolas Cruz entered Marjory Stoneman Douglas High School in Parkland, Florida, killed 17 students and teachers, and injured 17 others.  On November 13, 2018, Plaintiffs Frederic and Jennifer Guttenberg, as co-representatives of the Estate of Jaime Guttenberg, one of the murdered students, filed case no. 18-cv-62758-WPD, alleging a claim of negligence against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b).  Plaintiffs alleged therein that the Federal Bureau of Investigation ("FBI") failed to comply with its mandatory obligations to handle, investigate, and intervene on tips it received about Nikolas Cruz's plans to carry out a mass shooting, resulting in the death of their daughter. *See* [DE 1].

On March 5, 2019, the United States filed a Motion to Dismiss. *See* [DE 17]. [1]   The Motion to Dismiss presented two independent grounds for dismissal.  First, the United States argued that it did not owe a duty to Plaintiffs and their daughter under Florida law.  Second, the United States argued that the FTCA's discretionary function exception, 28 U.S.C. § 2680(a), bars the claim based on the decisions of the FBI on how to assess, prioritize, and investigate tips of potential criminal activity. *See* [DE 17].   On April 15, 2019, the Court entered an Omnibus Order granting Plaintiffs leave to conduct jurisdictional discovery

---

[1] On June 28, 2019, Philip and April Schentrup, as co-representatives of the Estate of Carmen M. Schentrup (the "Schentrups"), filed their Complaint against the United States. *See* case no. 19-cv-61623.  A Joint Motion to Consolidate for Pretrial Proceedings was filed on July 23, 2019, which the Court granted on July 31, 2019. *See* [DE's 54, 55].  Pursuant to Rule 42, Fed. R. Civ. P., these two cases were consolidated for pretrial proceedings, including the completion of jurisdictional discovery and adjudication of Defendant's Motion to Dismiss. *See* [DE 55].  Since that time, approximately twenty-one (21) additional cases have been filed in this district and were consolidated into this action for all pretrial proceedings, including the resolution of the instant Motion to Dismiss [DE 206]. *See* [DE's 195, 225, 227].

regarding the existence and content of any mandatory established policies, protocols, and procedures, whether written or otherwise, governing the FBI's conduct in assessing or handling tips regarding potential threats to life, active shooters, mass shootings, terrorism threats, and/or school shootings.

*See* [DE 27].  Jurisdictional discovery took much longer than the Court anticipated. *See* [DE 187]

The Court determined the delay to be predominately attributable to the United States' conduct in

improperly withholding relevant material, and on March 5, 2020, the Court imposed the

following remedy:

> Jurisdictional discovery remains closed.  The United States' Motion to Dismiss [DE 17] is denied as to the FTCA's discretionary function exception, without prejudice to the United States raising this argument at summary judgment or trial following full discovery, in the event that the Court denies the Motion to Dismiss as to the United States' argument that it did not owe a duty to Plaintiffs and their daughter under Florida law.[2]  Plaintiffs shall now have fourteen (14) days to either respond to that argument in the Motion to Dismiss or file an Amended Complaint.

*See* [DE 187].

On March 26, 2020, Plaintiffs filed the Consolidated Verified Amended Complaint,

which is the operative pleading. *See* [DE 190].  According to the factual allegations of the

Consolidated Verified Amended Complaint, which the Court assumes to be true for the purposes

of this Motion to Dismiss:

Prior to 2012, concerned citizens with information about potential threats to life could

directly contact their local FBI field office and could even speak directly with FBI agents and

analysts. Compl. ¶ 20. This meant that the personnel at the local offices—the agents and analysts

---

[2] The Court notes that this is consistent with the Eleventh Circuit's approach with regard to the FTCA's discretionary function exception, that "the finding of subject matter jurisdiction should be made together with a merits determination under Rule 56 when, as will often be the case, the two are sufficiently intertwined." *See Douglas v. United States*, 814 F.3d 1268, 1281 (11th Cir. 2016) (Tjoflat, concurring).  *See also Lawrence v. Dunbar*, 919 F.2d 1525, 1530 (11th Cir. 1990) ("When the jurisdictional basis of a claim is intertwined with the merits, the district court should apply a Rule 56 summary judgment standard . . . .").

tasked with investigative and intelligence duties—would receive calls directly from the public and process information about potential threats themselves. ¶ 20.  In 2012, the FBI upended this system, and replaced it with the Public Access Line ("PAL"). ¶ 21. The FBI established the PAL in 2012 to serve as a centralized system to receive tip information from the public to the FBI about crimes and threats and relay that tip information to FBI agents and analysts. ¶ 21.  In so doing, the PAL undertook to serve as the nation's core hub, repository, and distribution point for tips about potential threats to life, including mass shootings and school shootings. ¶¶ 23–33.

On September 24, 2017, Ben Bennight, a Mississippi bail bondsman, received a comment on his YouTube channel from someone with the username "nikolas cruz," which is the first and last name of Nikoklas Cruz, who made no attempt to conceal is identity.  ¶¶ 35-36. The comment read, "going to be a professional school shooter." ¶ 35.  Bennight immediately reported Cruz's threatening comment to the FBI. ¶ 37.  The FBI entered the tip into the Guardian system and assigned the lead to FBI agents at a local field office. ¶ 37.  FBI agents from the local field office interviewed the bail bondsman about the comment. ¶ 38.  The FBI closed its file on the matter in October 2017. ¶ 39.

The PAL also specifically undertook to serve as the intake system and repository for the tip about Nikolas Cruz relayed by a concerned caller on January 5, 2018. ¶¶ 40–55.  A little more than one month before the shooting, the FBI received another tip warning that Cruz would commit a school shooting. ¶ 40.  On January 5, 2018, a person purportedly close to Nikolas Cruz telephoned the PAL to report her concerns about Cruz's behavior. ¶ 41. This tip was extremely urgent and highly specific, both about the likelihood that Cruz would soon try to hurt or kill others, and about Cruz's likely target: his former high school in Parkland, Florida. Id. ¶¶ 43-55. The January 5 caller provided detailed information about Cruz's desire to kill people, his erratic

behavior, his history of violence, his disturbing social media posts, his fixation with ISIS, the potential of him conducting a school shooting, and his increasing obsession with amassing guns, including assault-style rifles. ¶ 41.  The caller expressed a variety of concerns about Cruz, ranging from his "mental capacity of a 12 to a 14 year old," to the fact that "he's so into ISIS," to the fact that he "bought all these rifles and ammunition and he posted pictures of them on Instagram." ¶¶ 41-55. The caller noted that Cruz was living with a family who let him keep his guns in the house. ¶ 53.  At one point during the call, the caller expressed her concern about Cruz "getting into a school and just shooting the place up." ¶ 55. The PAL's responses to the tipster had the effect of assuring the her that the FBI would take the appropriate investigative action—at the very least, look into the threat and potentially follow-up with her. ¶ 64.  In reliance on the PAL's undertaking to get the information into the right hands—and assured that the PAL would in fact do so—the caller explicitly forewent other efforts she had considered, such as contacting the Department of Homeland Security, other law enforcement agencies, or Marjory Stoneman Douglas High School, to tell them about Cruz's plans to shoot up a school and efforts to carry them out. ¶¶ 56–64.

The FBI did not take appropriate investigative steps in response to the call. ¶ 65.  The FBI failed to document the information it received from the January 5, 2018 caller. ¶ 122.  No Guardian *i.e.*, documentation which directly led to certain investigative steps being taken, was prepared for this information. ¶ 121.  The PAL failed to get the information provided by the caller to the PAL to the right hands in the FBI. ¶ 65.  Therefore, the tip never reached the FBI's agents and analysts, including those at the local FBI Field Office in Miami, Florida, where additional investigative steps would have been taken. ¶ 65. The FBI agents and analysts were therefore never able to assess, investigate, mitigate, or prevent the threat. ¶¶ 64-65, 113.  The

information provided by the January 5, 2018 caller to the PAL was not forwarded to the FBI Miami Field Office or passed along to Marjory Stoneman Douglas High School or local law enforcement agencies in Parkland, Florida. ¶ 65.

On the afternoon of February 14, 2018, Nikolas Cruz entered the grounds of Marjory Stoneman Douglas High School and made his way to Building 12 of the school. ¶ 84. Upon entering Building 12, Cruz murdered 17 people and injured at least 17 others. ¶¶ 83-91. Cruz fled the scene and was later apprehended by local law enforcement. ¶ 90.

After the shooting, the FBI made a series of extraordinary admissions. ¶¶ 125-162.  FBI officials told victims' families as well as the public that PAL failed to follow established protocols in handling the information received on January 5, 2018.  ¶¶ 125-162.  The FBI also said that had the tip reached the Miami Field Office—the very place the tip would have gone directly had the PAL not been created—"appropriate investigative steps would have been taken." ¶¶ 121–62.  And in the days after the shooting, the FBI also admitted to Mr. Guttenberg, the father of one of the students who was killed, that were it not for the mistakes the FBI made, his daughter would still be alive. ¶¶ 124–127.

On April 21, 2020, Defendant United States filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction, arguing that the Court should dismiss these actions pursuant to Fed. R. Civ. P. 12(b)(1) because Florida state law would not impose liability on a private individual in similar circumstances to the United States in this case and therefore the United States has not waived its sovereign immunity under the FTCA. *See* [DE 206].   In contrast, Plaintiffs argue that they have adequately pled that a private citizen can owe a duty of care in similar circumstances under Florida law. *See* [DE 219].  The Motion is now fully briefed and ripe for review. *See* [206, 219, 220, 223]. For the reasons below, the Court denies the Motion.

## II.    LEGAL STANDARD

"Federal courts exercise limited subject matter jurisdiction, empowered to hear only those cases within the judicial power of the United States as defined by Article III . . . or otherwise authorized by Congress." *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994).  "A defendant may attack subject matter jurisdiction under Rule 12(b)(1) by making 'facial attacks' or 'factual attacks.'" *Bierer-Carter v. United States*, 806 F. Supp. 2d 1245, 1248 (S.D. Fla. 2011) (quoting *United States v. Spitzer*, 245 F. App'x 908, 910 (11th Cir. 2007)).  "When there is a facial attack on the complaint, courts look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Id.* (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)). While courts generally do not consider extrinsic evidence when considering a facial attack, they may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also McElmurray v. Consolidated Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244 (11th Cir. 2007) (noting Rule 12(b)(1) facial attack standard is analogous to Rule 12(b)(6) standard).

## III.    DISCUSSION

A.  *Whether the United States has waived sovereign immunity under the FTCA depends on whether Florida negligence law imposes a duty of care on a private person under like circumstances*

The United States has waived its sovereign immunity under two related sections of the FTCA that specify that the tort duties imposed on the United States are those that would be imposed on a private person under state law. *See* 28 U.S.C. §§ 1346(b), 2674.  Pursuant to 28

U.S.C. § 1346(b), the United States is liable "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. §§ 1346(b), 2674; *FDIC v. Meyer*, 510 U.S. 471, 477 (1994).  Pursuant to 28 U.S.C. § 2674, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances."  Accordingly, in FTCA cases, the private person in similar circumstances duty inquiry is an issue of subject matter jurisdiction. *See, e.g., Lawrence v. Dunbar*, 919 F.2d 1525, 1528 (11th Cir. 1990) ("Unless, according to the law of Florida, the United States could be liable for this alleged tort . . . if it were a private person, then not only is the sovereign's immunity intact, but the district court is without subject matter jurisdiction and must dismiss the suit.").

Thus, in order to determine whether the Court has subject matter jurisdiction over Plaintiff's negligence claim against the United States pursuant to the FTCA, the Court must determine whether the relevant state law, which both sides agree is Florida negligence law, imposes a duty of care on a private person under like circumstances. *See Ochran v. United States*, 273 F.3d 1315, 1317 (11th Cir. 2001) ("[T]he FTCA was designed 'to provide redress for ordinary torts recognized by state law.' Indeed, our court has squarely addressed this issue, holding that unless the facts support liability under state law, the district court lacks subject matter jurisdiction to decide an FTCA claim.") (citation omitted); *see also Lippman v. City of Miami*, 622 F. Supp. 2d 1337, 1341 (S.D. Fla. 2008) (dismissing FTCA negligence claim based on FBI's actions because no private person could be held liable for similar conduct).  "The pertinent inquiry will resolve both the question of subject matter jurisdiction and a necessary element of the tort claim." *Lawrence*, 919 F.2d 1525, 1529 (11th Cir. 1990).

Under Florida law, the threshold inquiry in a negligence case is whether the defendant owes a legal duty to the plaintiff. *See Wallace v. Dean*, 3 So. 3d 1035, 1046 (Fla. 2009). Whether a duty exists is a question of law. *Goldberg v. Fla. Power & Light Co.*, 899 So. 2d 1105, 1110 (Fla. 2005).

> B.  *The Supreme Court cases which form the cornerstone of the relevant analysis*

A trilogy of Supreme Court cases—*Indian Towing*, *Rayonier*, and *Olson*—explain that for purposes of the duty inquiry in FTCA cases, courts must find private person analogies for government tasks. *See Indian Towing Co. v. United States*, 350 U.S. 61 (1955); *Rayonier Inc. v. United States*, 352 U.S. 315 (1957); *United States v. Olson*, 546 U.S. 43 (2005).  The Court will give an overview of each, as they form the cornerstone of the relevant analysis.  The Court will then turn to the duty inquiry in the instant case.

In *Indian Towing*, the plaintiff's tugboat went aground after a lighthouse operated by the Coast Guard ran out of power. *See Indian Towing Co. v. United States*, 350 U.S. 61 (1955).  The plaintiffs brought a negligence claim against the United States under the FTCA for damages sustained due to the Coast Guard's failure to maintain the lighthouse in working order. *Id.* The Supreme Court held that the Coast Guard, having undertaken to provide lighthouse service, had a duty to use due care to make certain that the lighthouse was kept in good working order and to use due care to discover failure of the light and to repair same or give warning that it was not functioning. *Id.* at 69.  If the Coast Guard failed in this duty and thereby caused damage to plaintiffs, the United States was liable under the FTCA.

In so ruling, the Supreme Court rejected the government's position that, because only the Coast Guard operated lighthouses, this was a "uniquely governmental" function which private citizens do not perform and that no private analog existed. *See id.* at 64. The Supreme Court

rejected the government's argument on the ground that "all Government activity is inescapably

'uniquely governmental.'"  The Supreme Court also explicitly held that he duties owed by

federal employees—even for acts performed only by the government—are as broad as those

owed by private individuals in similar or "like" circumstances, not under the "same"

circumstances. *See id.* at 64.  The Supreme Court in *Indian Towing* also rejected the

government's position that the relevant comparison is to state or municipal entities, rather than to

private persons or entities:

> Furthermore the Government in effect reads the statute as imposing
> liability in the same manner as if it were a municipal corporation and not as if it
> were a private person, and it would thus push the courts into the 'non-
> governmental'—'governmental' quagmire that has long plagued the law of
> municipal corporations. A comparative study of the cases in the forty-eight States
> will disclose an irreconcilable conflict. More than that, the decisions in each of
> the States are disharmonious and disclose the inevitable chaos when courts try to
> apply a rule of law that is inherently unsound. The fact of the matter is that the
> theory whereby municipalities are made amenable to liability is an endeavor,
> however awkward and contradictory, to escape from the basic historical doctrine
> of sovereign immunity. The Federal Tort Claims Act cuts the ground from under
> that doctrine; it is not self-defeating by covertly embedding the casuistries of
> municipal liability for torts.

*Id.* at 65.  Thus, importantly, courts analyzing the United States' duty under the FTCA by

analogizing to private persons under the relevant state law cannot superimpose additional

limitations on liability that state law may afford their own state or municipal employees under

state law. *Id.*  Courts must ignore the special role of government because, while other doctrines,

such as the discretionary function exception, serve as substantive and administrative safeguards

to governmental liability in FTCA cases, the duty element does not. *Id.* at 68-69.

Applying these principles to the facts of *Indian Towing,* the Supreme Court concluded

that the relevant private analog was the duty imposed on the private "good Samaritan": "it is

hornbook tort law that one who undertakes to warn the public of danger and thereby induces

reliance must perform his 'good Samaritan' task in a careful manner." *Id.* at 64–65.

> The Coast Guard need not undertake the lighthouse service. But once it
> exercised its discretion to operate a light on Chandeleur Island and engendered
> reliance on the guidance afforded by the light, it was obligated to use due care to
> make certain that the light was kept in good working order; and, if the light did
> become extinguished, then the Coast Guard was further obligated to use due care
> to discover this fact and to repair the light or give warning that it was not
> functioning. If the Coast Guard failed in its duty and damage was thereby caused
> to petitioners, the United States is liable under the Tort Claims Act.

*Id.* at 69.

In *Rayonier*, 352 U.S. 315 (1957), the plaintiffs alleged that their property was damaged

due to the negligence of United States Forest Service's firemen's negligence in fighting a forest

fire. *Rayonier Inc. v. United States*, 352 U.S. 315 (1957). The government "argued that the Act

only imposes liability on the United States under circumstances where governmental bodies have

traditionally been responsible for the misconduct of their employees and that neither the common

law nor the law of Washington imposes liability on municipal or other local governments for the

negligence of their agents acting in the 'uniquely governmental' capacity of public firemen." *Id.*

at 318-19.  The Supreme Court rejected the government's argument, reasoning that the relevant

consideration for determining whether the United States is liable is "whether a private person

would be responsible for similar negligence under the laws of the State where the acts occurred."

*Id.* at 319.  The Supreme Court also made it clear that whether the relevant state law would

impose negligence liability upon a municipal or other government entity (for example a state

firefighter under similar circumstances) is not the relevant inquiry. *See id.* at 319 ("We expressly

decided in *Indian Towing* that the United States' liability is not restricted to the liability of a

municipal corporation or other public body.").  Further, the Supreme Court acknowledged that,

"[i]t may be that it is 'novel and unprecedented' to hold the United States accountable for the

negligence of its fire-fighters, but the very purpose of the Tort Claims Act was to waive the Government's traditional all-encompassing immunity from tort actions and to establish novel and unprecedented governmental liability." *Id.* at 319.  The Supreme Court also rejected the government's "warn[ing] that if it is held responsible for the negligence of Forest Service firemen, a heavy burden may be imposed on the public treasury. . . [because] a fire may destroy hundreds of square miles of forests and even burn entire communities." *Id.* at 320. The Court reasoned that "after long consideration, Congress, believing it to be in the best interest of the nation, saw fit to impose such liability on the United States in the Tort Claims Act," and thus "[t]here is no justification for this Court to read exemptions into the Act beyond those provided by Congress." *Id.*

      In *Olsen,* the Supreme Court emphasized that the FTCA waives the United States' sovereign immunity where state law would make a private person liable in tort, not where state law would make state or municipal entity liable, even where uniquely governmental functions are at issue. *See United States v. Olson*, 546 U.S. 43 (2005).  In *Olsen,* injured mine workers sued the United States, claiming that the negligence of federal mine inspectors helped bring about a serious accident at an Arizona mine. *Id.* at 45.  The district court dismissed the claim, ruling that plaintiffs' allegations were insufficient to show that Arizona law would impose liability upon a private person in similar circumstances. *Id.* at 45.  On appeal, the Ninth Circuit reversed the district court. *Olson v. United States*, 362 F.3d 1236, 1240 (9th Cir. 2004), *vacated and remanded*, 546 U.S. 43 (2005).  First, the Ninth Circuit reasoned that, where " 'unique governmental functions' " are at issue, the Act waives sovereign immunity if " 'a state or municipal entity would be [subject to liability] under the law [...] where the activity occurred.' " *Olson v. United States*, 362 F.3d 1236, 1240 (9th Cir. 2004), *vacated and remanded*, 546 U.S. 43

(2005).  Second, the Ninth Circuit determined that federal mine inspections, being regulatory in nature, are " 'unique governmental functions,' " since "there is no private-sector analogue for mine inspections." *Id*. The Ninth Circuit then held that Arizona law would make "state and municipal entities" liable in the circumstances alleged; hence the FTCA waives the United States' sovereign immunity. *Id.*

On appeal, the Supreme Court reversed the Ninth Circuit. *See United States v. Olson*, 546 U.S. 43 (2005).  The Supreme Court explained that the Ninth Circuit's reasoning, as set forth *supra*, got the relevant duty analysis under the FTCA wrong for two reasons, as follows:

> The first premise is too broad, for it reads into the Act something that is not there. The Act says that it waives sovereign immunity "under circumstances where the United States, if a *private person*," not "the United States, if a state or municipal entity," would be liable. 28 U.S.C. § 1346(b)(1) (emphasis added). Our cases have consistently adhered to this "private person" standard. In *Indian Towing Co. v. United States*, 350 U.S. 61, 64 (1955), this Court rejected the Government's contention that there was "no liability for negligent performance of 'uniquely governmental functions.' " It held that the Act requires a court to look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability under the FTCA "in the performance of activities which private persons do not perform." *Ibid*. In *Rayonier Inc. v. United States*, 352 U.S. 315, 318–319 (1957), the Court rejected a claim that the scope of FTCA liability for " 'uniquely governmental' " functions depends on whether state law "imposes liability on municipal or other local governments for the negligence of their agents acting in" similar circumstances. And even though both these cases involved Government efforts to escape liability by pointing to the absence of municipal entity liability, we are unaware of any reason for treating differently a plaintiff's effort to base liability solely upon the fact that a State would impose liability upon a municipal (or other state governmental) entity. Indeed, we have found nothing in the Act's context, history, or objectives or in the opinions of this Court suggesting a waiver of sovereign immunity solely upon that basis.
>
> The Ninth Circuit's second premise rests upon a reading of the Act that is too narrow. The Act makes the United States liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674 (emphasis added). As this Court said in *Indian Towing*, the words " 'like circumstances' " do not restrict a court's inquiry to the same circumstances, but require it to look further afield. 350 U.S., at 64; *see also* S.Rep. No. 1400, 79th Cong., 2d Sess., 32 (1946) (purpose of FTCA was to make the tort liability of the United States "the same as that of a private person under like circumstance, in

accordance with the local law"). The Court there considered a claim that the Coast Guard, responsible for operating a lighthouse, had failed "to check" the light's "battery and sun relay system," had failed "to make a proper examination" of outside "connections," had "fail[ed] to check the light" on a regular basis, and had failed to "repair the light or give warning that the light was not operating." *Indian Towing*, 350 U.S., at 62. These allegations, the Court held, were analogous to allegations of negligence by a private person "who undertakes to warn the public of danger and thereby induces reliance." *Id.*, at 64–65. It is "hornbook tort law," the Court added, that such a person "must perform his 'good Samaritan' task in a careful manner." *Ibid.*

The Government in effect concedes that similar "good Samaritan" analogies exist for the conduct at issue here. It says that "there are private persons in 'like circumstances' " to federal mine inspectors, namely, "private persons who conduct safety inspections." Reply Brief for United States 3. And other Courts of Appeals have found ready private person analogies for Government tasks of this kind in FTCA cases. *E.G., Dorking Genetics v. United States*, 76 F.3d 1261 (C.A.2 1996) (inspection of cattle); *Florida Auto Auction of Orlando, Inc. v. United States*, 74 F.3d 498 (C.A.4 1996) (inspection of automobile titles); *Ayala v. United States*, 49 F.3d 607 (C.A.10 1995) (mine inspections); *Myers v. United States*, 17 F.3d 890 (C.A.6 1994) (same); *Howell v. United States*, 932 F.2d 915 (C.A.11 1991) (inspection of airplanes). These cases all properly apply the logic of *Indian Towing*. Private individuals, who do not operate lighthouses, nonetheless may create a relationship with third parties that is similar to the relationship between a lighthouse operator and a ship dependent on the lighthouse's beacon. *Indian Towing, supra*, at 64–65, 69. The Ninth Circuit should have looked for a similar analogy in this case.

*United States v. Olson*, 546 U.S. 43, 45–47 (2005).  The Supreme Court accordingly remanded

the case back to the Ninth Circuit to apply the logic of *Indian Towing* by finding a private person

analogy for the government task at hand. *Id.* at 47.

### C.  Finding a private person analog is mandated; the public duty doctrine is inapplicable

As set forth *supra*, binding Supreme Court precedent mandates that courts must find

private person analogies for government tasks that cases for purposes of conducting the duty

analysis in FTCA cases. *See Indian Towing*, 350 U.S. 61; *Rayonier*, 352 U.S. 315; *Olson*, 546

U.S. 43.  The Eleventh Circuit and Florida federal districts are in accord.  *See Zelaya v. United States*, 781 F.3d 1315, 1324 (11th Cir. 2015); *Turner ex rel. Turner v. United States*, 514 F.3d 1194 (11th Cir. 2008); *Williams v. United States*, 314 F. App'x 253, 259 (11th Cir. 2009); *Starnes ex rel. AS v. United States*, No. 06-10079-CIV, 2007 WL 5238398, at *11 (S.D. Fla. May 15, 2007).

In *Zelaya v. United States*, 781 F.3d 1315, 1324 (11th Cir. 2015), the Eleventh Circuit explained that, "[n]otwithstanding these conceptual difficulties" a state tort analog to a private person duty is required, even though "no private person has such duties under state law." *Zelaya v. United States*, 781 F.3d 1315, 1324 (11th Cir. 2015).

In *Turner ex rel. Turner v. United States*, 514 F.3d 1194 (11th Cir. 2008), the Eleventh Circuit reiterated the relevant test mandated by the Supreme Court, and further held that the "like circumstances" language is not very restrictive, but only requires an analogy to a similarly situated private party:

> Under the FTCA, the United States is liable for tortious conduct "in the same manner and to the same extent as a private individual under like circumstances" after applying the applicable law in the same jurisdiction. 28 U.S.C. § 2674. The Supreme Court has stated that "the words 'like circumstances' do not restrict a court's inquiry to the same circumstances, but require it to look further afield." *United States v. Olson*, 546 U.S. 43, 46 (2005) (citation omitted). Accordingly, along with several sister circuits, we interpret the "like circumstances" requirement not to be as strict as an "identical" or "same" circumstances test. *E.g., Hacesa v. United States*, 309 F.3d 722, 726 n. 3 (10th Cir.2002) ("[T]he 'like circumstances' inquiry requires only that the United States be analogized to a similarly situated private party ...." (citation omitted)); *Stratmeyer v. United States*, 67 F.3d 1340, 1345 (7th Cir.1995) ("When deciding what the liability of a private entity operating under 'like circumstances' would be, we note that the 'like circumstances' comparison is not as demanding as an 'identical circumstances' test would be."); *Doe v. United States*, 58 F.3d 494, 497 (9th Cir.1995) ("[W]hat is meant by 'like circumstances' is analogous circumstances not identical ones.").

*Turner ex rel. Turner v. United States*, 514 F.3d 1194, 1203 (11th Cir. 2008)

In *Williams v. United States*, 314 F. App'x 253, 259 (11th Cir. 2009), an unpublished

opinion, the Eleventh Circuit addressed the FTCA's waiver of sovereign immunity in a situation

where a federal prisoner was injured by an FBI agent's vehicle used in blocking his path of

escape.  Explicitly applying *Olsen*, the Eleventh Circuit undertook to determine whether a

private party would be liable for battery in similar circumstances, *not* whether a state or

municipal law enforcement officer would be liable for battery in similar circumstances.  *See id.*

at 259 ("[T]he United States may be liable for Agent Campbell's battery of Williams, but only to

the extent 'a private person would be liable to [Williams] in accordance with the law of

[Georgia].' 28 U.S.C. § 1346(b)(1); *see also United States v. Olson*, 546 U.S. 43, 44–47 (holding

that United States' liability under the FTCA is to be based on the state law liability of a private

party, not of a state or municipal entity)).  Therefore, the Eleventh Circuit determined that the

relevant analysis under the FTCA was whether a private person performing a lawful citizen's

arrest under Georgia law would be permitted to use the amount of force in attempting to restrain

an escaping felon that the FBI officer used against Williams. *See id.*

In *Starnes ex rel. AS v. United States*, No. 06-10079-CIV, 2007 WL 5238398, at *11

(S.D. Fla. May 15, 2007), Judge Moore made it clear that Government cannot escape liability in

an FTCA action by arguing that a governmental entity would not be liable for negligence under

Florida law:

> In *United States v. Olson*, 546 U.S. 43 (2005), the Supreme Court
> examined the issue of how to assess the United States Government's liability
> under 28 U.S.C. § 2674. Noting that 28 U.S.C. § 1346(b)(1) provides that
> sovereign immunity is waived "under circumstances where the United States, if a
> private person, would be liable," *Id.* at 512 (emphasis added), the Supreme Court
> abrogated a line of Ninth Circuit cases which held that the United States would be
> liable, if a state or municipal entity would be liable under state law. The Court
> stated that its cases had consistently adhered to the "private person" standard.
> **Thus, applying *Olson*, notwithstanding the fact that a governmental entity**
> **would not be liable under Florida law for negligent licensure of a day care**

> facility, the Court must determine if a private person would be held liable, under like circumstances.

*Starnes ex rel. AS v. United States*, No. 06-10079-CIV, 2007 WL 5238398, at *11 (S.D. Fla. May 15, 2007) (emphasis added). *See also McCloskey v. Mueller*, 446 F.3d 262, 267 (1st Cir. 2006) ("The search for analogous state-law liability is circumscribed by the explicit language of the FTCA, which restricts that search to private liability.... In other words, we must look for 'some relationship between the governmental employee[ ] and the plaintiff to which state law would attach a duty of care in purely private circumstances.' ") (emphasis in original) (citation omitted); *Carter v. United States*, 982 F.2d 1141, 1144 (7th Cir.1992) ("The national government is never situated identically to private parties. Our task is to find a fitting analog under private law.").

The Government, presumably disagreeing with the proposition that binding Supreme Court precedent mandates that courts must find private person analogs for government tasks for purposes of conducting the duty analysis in FTCA cases, has continued since *Olsen* -- and continues in the instant case -- to argue legal positions which are foreclosed by *Indian Towing*, *Rayonier*, and *Olson*. In particular, the Government attempts to distract the Court from engaging in the required private person analog analysis and obfuscate the relevant issues by (1) relying extensively on cases that apply state law "public duty doctrine" which shields state governmental entities from tort liability[3]; (2) focusing such reliance on what duties law enforcement officers

---

[3] Florida's public duty doctrine limits the tort duties of state governmental entities, not private ones. *See Wallace v. Dean*, 3 So. 3d 1035, 1045 (Fla. 2009) ("[T]he public-duty doctrine expressed in *Trianon Park Condominium Association v. City of Hialeah*, 468 So.2d 912, 919–21 (Fla. 1985), and its exceptions, relate *exclusively* to the question of whether the government owes a duty of care to the individual plaintiff or group of plaintiffs as opposed to the general public."). The United States nonetheless relies extensively on this doctrine throughout its Motion. *See* [DE 206]. Florida's *Trianon* analysis – which pervades the United States' analysis at every turn -- differs fundamentally from federal courts' duty analysis under the FTCA. Under the FTCA,

owe and do not owe under Florida public duty doctrine[4]; and (3) advancing the general

proposition that the law rarely imposes a duty to take affirmative action to protect others, in the

---

courts are required to analyze the government's duty using a private person analog. *See Indian Towing*, 350 U.S. 61; *Rayonier*, 352 U.S. 315; *Olson*, 546 U.S. 43.  By contrast, under *Trianon*, Florida courts generally first sort the government's activity into one of the four categories, and then, only if necessary, engage in a private-person analysis. If the activity falls into Category I (legislative and executive officer functions) or Category II (law enforcement and protection of public safety), Florida courts do not conduct any private-person analysis at all. Therefore, to the limited extent that Florida's *Trianon* analysis resembles an FTCA analysis, it is only in cases falling under Categories III (capital improvements and property control) and Category IV (services for health and welfare of citizens). *See id.*  The United States' attempt to justify its mostly inapposite arguments based on the similarity of the language used in the FTCA and in Florida's Tort Claims Act, *see* Fla. Stat. § 768.28, is not persuasive.  This is because, under *Trianon*, courts need not reach a private-person analysis in many cases. The United States reliance on *Trianon* Category II cases to argue there is no duty under Florida law using a private person analog is disingenuous.  *See* fn. 4.

[4] For instance, the United States extensively relies on *Pollock v. Florida Dep't of Highway Patrol*, 882 So. 2d 928, 935 (Fla. 2004) throughout its entire brief. However, neither of the grounds the Florida Supreme Court decided that case on – concepts of "premises liability" as to Florida Highway Patrol's lack of control over Florida highways, and law enforcement liability under Florida's public duty doctrine – meet the Supreme Court's requirement that the Court must find private person analogies for government tasks for purposes of conducting the duty analysis in FTCA cases. *See Indian Towing*, 350 U.S. 61; *Rayonier*, 352 U.S. 315; *Olson*, 546 U.S. 43.  In fact, as Justice Pariente noted in her dissent in *Pollock,* had the court conducted a private-person analysis under traditional tort principles, the result would have been the opposite. *See Pollock*, 882 So. 2d at 939-43.  Other largely inapplicable cases the United States relies on include, but are not limited to, *Anderson v. Snyder*, 389 F. Supp. 3d 1082, 1093 (S.D. Fla. 2019) ("In determining whether the Sheriff owed a duty of care to Decedent, I must first determine whether the Sheriff's actions constitute a category II or category IV activity. For the reasons explained below, I conclude that the police function of responding to emergency calls pursuant to the Baker Act is a category II, law enforcement activity, for which the police owe a duty to the general public rather than to individual citizens. Accordingly, Defendants' Motion is granted as to Count 1."); *Greer v. Ivey*, 242 F. Supp. 3d 1284, 1297 (M.D. Fla. 2017), *aff'd in part, rev'd in part and remanded*, 767 F. App'x 706 (11th Cir. 2019)) ("The Court agrees with the Town that Holstine was engaged in the enforcement of law and protection of the public safety—a category II activity."); *Pierre v. Jenne*, 795 So. 2d 1062, 1063 (Fla. 4th DCA 2001) ("The operation of a 911 emergency call system is part of the law enforcement and protection of public safety service provided by a sheriffs office and therefore constitutes a *Trianon* Category II function"); *Manfre v. Shinkle*, 184 So. 3d 641, 646 (Fla. 5th DCA 2016) ("Thus, in the context of cases involving this particular *Trianon* [II] category, the courts have held that because the duties to enforce laws and protect all citizens are owed to the public, law enforcement officers do not owe those duties to injured individuals like Shinkle.").

absence of a "special relationship" between the defendant and the injured party, and no special

relationship exists here.[5]  These arguments all fail.  *See, e.g., Lumsden v. U.S.*, 555 F. Supp. 2d

580, 594–95 (E.D.N.C. 2008) ("The 'public duty' doctrine has no application to an FTCA action,

however. Whether or not state or local law enforcement officers would be liable under state law

on the same or analogous facts is irrelevant under the Federal Tort Claims Act."); *White v. U.S.*,

2014 WL 4782855, at *25 (D.S.D. Sept. 24, 2014) ("The government asserts that, under South

Dakota state law, police officers are not liable for negligence because they generally have a duty

---

The Court notes that it is instructive to compare the analysis of Florida's *Trianon* Category II governmental tort cases with that of a Florida case regarding a bungled 911 call against a private entity. *See Vendola v. S. Bell Tel. & Tel. Co.*, 474 So. 2d 275, 278 (Fla. 4th DCA 1985) ("[w]hen it undertook the service of tracing [911] calls, Southern Bell exposed itself to the venerable principle of law that an action undertaken for the benefit of another, even gratuitously, must be performed in accordance with an obligation to exercise reasonable care").

*Wallace v. Dean*, 3 So. 3d 1035, 1049 (Fla. 2009) is also a useful comparison. There, the Florida Supreme Court held that because the sheriff's deputies affirmatively sought to provide a service (a 911 safety check to a specific individual), they were not attempting to enforce any law and were not engaged in the protection of the general public. *Id.* at 1049.  Accordingly, the Florida Supreme Court ruled that their activity fell not within *Trianon* category II (law enforcement and protection of the public safety) but instead within *Trianon* category IV (professional, educational, and general services for the health and welfare of citizens). Importantly, the Florida Supreme Court held:

> Therefore, the public-duty doctrine associated with category II of *Trianon*, and any exceptions thereto, are inapposite to the case at bar. We thus consider whether the Sheriff owed the decedent a common-law duty of care pursuant to traditional principles of tort law without having to engage in any inquiry concerning the public-duty doctrine or whether a "special duty" or "special relationship" existed between the Sheriff and the decedent.

*Id.* at 1049.  Without the category II shield, the sheriff's deputies were found to have violated a duty under §324A to summon an ambulance after undertaking to conduct a safety check on a caller's unresponsive neighbor. *Id.* at 1052.

[5] The "special relationship" argument is particularly puzzling in the instant case.  The United States' brief states on the first page of its argument section: "Here, no special relationship existed between the FBI and either Cruz or his victims that created a duty. In fact, the Complaint does not allege that the Government's duty derived from a special relationship. Rather, the Complaint asserts four grounds upon which the duty may be found." *See* [DE 206] at p. 5.  The United States then proceeds to devote three pages to arguing that no special relationship existed. *See* [DE 206] at pp. 8-11.

to the public at large, and not to particular individuals. . . . However, as discussed at length above, the appropriate inquiry under the FTCA is not whether state law would hold a police officer liable under the facts presented. Rather, the question is whether state law would hold a private person liable under the facts presented."). The United States again makes these arguments in the instant case; they are rejected.  The Court will not analyze them further, as they are foreclosed by Supreme Court precedent and thus are simply irrelevant to the duty question that is presently before the Court. *See, e.g.*, *Indian Towing*, 350 U.S. at 65 (the FTCA is "not self-defeating by covertly embedding the casuistries of municipal liability for torts").  Here, the Court is not writing on a clean slate; the Court must follow United States Supreme Court precedent, whether it agrees with the logic or not.

> D.  *Whether a private person under similar circumstances to the FBI's PAL in this instance would owe a duty to Plaintiffs/Plaintiffs' decedents under Florida law*

Being mindful at all times of the above-stated principles established by the Supreme Court in the trilogy of *Indian Towing, Rayoner,* and *Olsen,* the Court now endeavors to apply the duty inquiry to the facts of this case.

As the Court stated *supra*, under Florida law, the threshold inquiry in a negligence case is whether the defendant owes a legal duty to the plaintiff. *See Wallace v. Dean*, 3 So. 3d 1035, 1046 (Fla. 2009).  Whether a duty exists is a question of law. *Goldberg v. Fla. Power & Light Co.*, 899 So. 2d 1105, 1110 (Fla. 2005). The question before the Court on the United States' Motion to Dismiss is whether a private person under similar circumstances to the FBI's PAL in this instance would owe a duty to Plaintiffs/Plaintiffs' decedents under Florida law.

We start with the principle that, under Florida law, there is generally no duty to stop crime or to otherwise prevent the misconduct of third parties. *See Abad v. G4S Secure Sols. (USA), Inc.*, 293 So. 3d 26, 30 (Fla. 4th DCA 2020) ("It is a well-established common law rule

that a person or entity generally has no legal 'duty to prevent the misconduct of third persons.'")
(citations omitted).[6]  However, such a duty can arise under any of several exceptions. *See, e.g.,*
*Vazquez v. Lago Grande Homeowners Ass'n*, 900 So. 2d 587, 593 (Fla. 3rd DCA 2004)
(collecting cases).  Plaintiffs contend that each of the three following independent theories,
reflected in longstanding principles of Florida tort law, compel the Court to hold that Plaintiffs'
Amended Complaint has sufficiently alleged facts demonstrating a legal duty in this case: (1) the
undertaking doctrine; (2) the zone of risk doctrine; and (3) duties arising from mandatory internal
protocols.  The Court will address each, in turn.

    *1. The Undertaking Doctrine*

        *a. An undertaking*

First, Plaintiffs contend that the FBI owed a duty of reasonable care toward the students
and teachers of Marjory Stoneman Douglas High School under the "voluntary undertaking" or
"Good Samaritan" doctrine, pursuant to Florida common law and the Restatement (Second) of
Torts §§ 324A(a) and 324A(c). *See* [DE 190] at ¶ 165.

Florida has adopted the Restatement (Second) of Torts' articulation of the voluntary
undertaking doctrine. *See Clay Elec. Co-op., Inc. v. Johnson,* 873 So. 2d 1182, 1186 (Fla. 2003).
"Whenever one undertakes to provide a service to others, whether one does so gratuitously or by
contract, the individual who undertakes to provide the service—i.e., the "undertaker"—thereby

---

[6] As the United States points out, Florida state and municipal law enforcement officers do not
generally have an affirmative duty under Florida law to protect each individual citizen. *See*
*Pollock v. Fla. Dep't of Highway Patrol*, 882 So. 2d 928, 935 (Fla. 2004) ("The responsibility to
enforce the laws for the good of the public cannot engender a duty to act with care toward any
one individual, unless an official assumes a special duty with regard to that person.").  As the
Court discussed at length, *supra*, The United States relies primarily on requirements and
limitations derived from *Trianon* Category II cases that do not conduct private person analyses.

assumes a duty to act carefully and to not put others at an undue risk of harm." With respect to

undertakings for the protection of a third person, the Restatement reads:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965).

Courts analyzing FTCA cases routinely find cognizable duties arising in a wide variety of

undertakings by the federal government, following the Second Restatement approach. *See, e.g.,*

*Indian Towing*, 350 U.S. at 64-65 (operation of a lighthouse) ("[I]t is hornbook tort law that one

who undertakes to warn the public of danger and thereby induces reliance must perform his

'good Samaritan' task in a careful manner."); *Sowell v. U.S.*, 835 F.2d 1133, 1134 (5th Cir. 1988)

(processing of serviceman's life insurance allotment form) ("Under Louisiana tort law, a person

who undertakes to voluntarily perform a service they would otherwise not be obligated to

perform, must perform that undertaking with due care"); *Neal v. Bergland*, 646 F.2d 1178 (6th

Cir. 1981), *aff'd sub nom. Block v. Neal*, 460 U.S. 289 (1983) ("Plaintiff's tort claim, however, is

on firmer ground; namely the principle expressed in s 323 of the Restatement (Second) of Torts

(1965) that one who undertakes to act, even though gratuitously, is required to act carefully and

with the exercise of due care and will be liable for injuries proximately caused by failure to use

such care.")  (supervision of construction of prefabricated home and negligent inspection of

home); *Cross Bros. Meat Packers, Inc. v. U.S.*, 705 F.2d 682 (2d Cir. 1983) (breach of

government officials' duty to use due care in inspection and supervision of grading meat for

quality).

> The government has been held liable for the negligence of its employees in the
> way they put out a forest fire, *Rayonier, Inc. v. United States*, 352 U.S. 315
> (1957); for the negligent design and construction of a drainage ditch which caused
> damage to a railroad, *Seaboard Coast Line Railroad Co. v. United States*, 473
> F.2d 714 (5th Cir. 1973); for negligence of the Coast Guard in undertaking a
> rescue operation, *United States v. DeVane*, 306 F.2d 182 (5th Cir. 1962); for
> negligence in inaccurately marking the location of a wrecked ship, *Somerset
> Seafood Co. v. United States*, 193 F.2d 631 (4th Cir. 1951); and for negligence in
> failing to require a subcontractor to comply with a contract's safety requirements,
> *Barron v. United States*, 473 F.Supp. 1077 (D. Hawaii 1979).

*Neal*, 646 F.2d at 1182.  The Eleventh Circuit instructs that the applicable state's Good

Samaritan doctrine can be particularly useful to courts in finding a private person analogy when

the activities at issue are uniquely governmental functions rendering it "conceptual[ly]

difficult[]" to apply the required FTCA analysis. *See Zelaya v. United States*, 781 F.3d 1315,

1324–25 (11th Cir. 2015).

In the instant case, with regard to the voluntary undertaking doctrine, the Consolidated

Verified Amended Complaint alleges a non-exhaustive list of more than a dozen examples of

what Plaintiffs argue are applicable private person analogs, as follows:

> 172. The FBI employees who acted negligently are liable to the same extent as private
> persons in like circumstances. Plaintiffs allege the employees owe the same duty of care
> applicable to the private persons in the analogous situations listed below, among others:
>
> a. A private person who undertakes to warn the public of danger and thereby
> induces reliance must perform his good Samaritan task in a careful manner;
>
> b. Having voluntarily undertaken to maintain streetlights, an electric utility
> company owed the public a duty to use reasonable care in performing
> maintenance;
>
> c. Having voluntarily undertaken to maintain a lighthouse, the government owed

a duty of care to all seafarers injured as a result of the negligent operation of the lighthouse;

d. Having voluntarily undertaken to provide firefighting services, the government owed a duty of care to private landowners who could be foreseeably harmed by the government's failure to exercise reasonable care in its firefighting;

e. Having voluntarily undertaken to conduct safety inspections, inspector owed a duty of care to conduct the inspection carefully;

f. Sheriff owed common-law duty of care pursuant to undertaker's doctrine to individual who died several days after sheriffs performed safety check in response to neighbor's 911 call; the neighbor relied on the sheriffs to prevent harm and forewent other safety precautions such as summoning an ambulance;

g. A retirement home, having undertaken to supervise a resident who it believed to be dangerous behind the wheel of a car, owed duty of care to roofer on the premises who was injured by retiree's negligent driving;

h. Physicians owe a duty of care to third persons outside of the physician-patient relationship in instances where the physician undertakes the treatment of a patient with a communicable or contagious disease; the duty encompasses a duty to correctly inform the patient about the contagious nature of the disease in order to prevent spread to those who are within the foreseeable zone of harm;

i. Mental health professionals owe a duty of care to third persons outside of the therapist-patient relationship, which encompasses a duty to warn, in instances where patient communicates intent to harm third person;

j. If a private company, while having no affirmative duty to assist in firefighting, undertakes to render fire protection services to airport users, it is liable for the negligent discharge of the undertaking;

k. Where the parents of a teenager who had been having emotional problems called the sheriff's office to transport their son to a mental health facility for treatment, sheriff owed duty of care to protect teenager from self-inflicted injuries;

l. Where university undertook to run a residential rehabilitation program that accepted children with severe behavior problems and failed to take security measures to prevent children from running away, university owed duty of reasonable care toward those injured by runaway children because, having undertaken to rehabilitate children with behavior problems, the university had a duty to exercise reasonable care in carrying out its efforts;

m. Police owed common law duty of care, under the voluntary undertaking

doctrine, to hiker where officers assured third party that they would check into safety of hiker, thereby discouraging third party from taking action, leading to the hiker's death.

*See* [DE 190] at ¶ 172.

To the extent that the United States' Motion to Dismiss analyzes the relevant elements under Florida's voluntary undertaking doctrine pursuant to § 324A, it argues that Plaintiffs fail to allege facts that satisfy the elements needed to state a claim.[7] The Court will address each element.

  a. *First element of an undertaking duty – an undertaking*

As stated above, with respect to undertakings for the protection of a third person, the Restatement reads:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965).

Accordingly, the first element of an undertaking duty under § 324A is an undertaking to "render services to another, which [the undertaker] should recognize as necessary for the

---

[7] With regard to the undertaking doctrine, the United States' Motion to Dismiss primarily attacks the application of the undertaking doctrine in this case by arguing that where the enforcement of laws and the protection of the public safety are at issue, Florida's public-duty doctrine precludes the finding of a duty absent a special relationship, citing *Trianon* Category II cases in support. As the Court explained in detail, *supra*, the Court rejects these arguments.

protection of a third person[.]" *See* § 324A. *See, e.g., Indian Towing*, 350 U.S. at 65 (undertaking

was the government's operation of a lighthouse).

The Consolidated Verified Amended Complaint alleges that the FBI undertook to render

services to others, including but not limited to the January 5, 2018 caller:  Plaintiffs allege that

the PAL undertook to serve as the central repository and conduit for information regarding

potential threats to life, and to handle and relay that information to the agency's agents and

analysts, even to the exclusion of other governmental entities that could have handled the

information. *See* [DE 206] at ¶¶ 23–33, 166, 173, 178.

Further, Plaintiffs sufficiently allege that the PAL's undertaking was explicitly "for the

protection of . . . third person[s]."  Plaintiffs allege that the FBI expressly set up the PAL as a

service for the public to provide information about the types of threats the FBI is responsible for

investigating, including threats of terrorism and violent crime. *See* [DE 206] at ¶¶ 21–33.  The

language of § 324A addresses scenarios in which someone undertakes to provide services to one

person (here, the callers to the PAL), which he should recognize as necessary for the protection

of third persons (here, the victims of the shooting). The doctrine does not require that the PAL

must have undertaken to provide services to the victims of the shooting. [8]  Therefore, the Court

---

[8] The United States argues that the FBI did not engage in any undertaking for which it can be held liable because it did not render services or aid to the victims, did not control or assume responsibility for Cruz, and did not create or broaden the risk posed by Cruz, citing to *L.A. Fitness Int'l, LLC v. Mayer*, 980 So. 2d 550, 561 (Fla. 4th DCA 2008) (determining that employees of a commercial health club owed a duty to patron in cardiac distress to reasonably summon emergency responders, but that the preliminary step of assessment a pulse does not commit one to a voluntary undertaking duty to perform the skilled treatment of CPR).   The United States asserts that this case "stands for the unremarkable proposition that individuals cannot be held liable for failing to perform an activity they have not undertaken to perform." [DE 220] at p. 11. To the extent *L.A. Fitness* is relevant to the analysis here, the United States is misidentifying the allegations in the Consolidated Verified Amended Complaint regarding what the alleged undertaking to render services that is at issue.  Plaintiffs allege that the PAL undertook to serve as the central repository and conduit for information regarding potential

rejects the United States' argument that the undertaking doctrine is inapplicable because "the Complaint here does not allege that the FBI affirmatively engaged in conduct which sought to provide a service to the specific individuals who were injured or killed by Nikolas Cruz, or to Marjory Stoneman Douglas High School." *See* [DE 206] at p. 13.  To the contrary, pursuant to § 324A an undertaker can owe a duty to third parties that are unknown or unidentifiable at the time of the undertaking.[9]  This principle is well-established in Florida law.[10] "The voluntary undertaking doctrine simply stands for the proposition that one 'who undertakes to act, even when under no obligation to do so, thereby becomes obligated to act with reasonable care....' The undertaking of such an act foreseeably broadens the zone of risk to include unidentified third parties." *Dent v. Dennis Pharmacy, Inc.*, 924 So. 2d 927, 929 (Fla. 3rd DCA 2006) (quoting *Union Park Mem'l Chapel v. Hutt*, 670 So.2d 64, 67 (Fla. 1996); *Kowkabany v. Home Depot, Inc.*, 606 So.2d 716, 721 (Fla. 1st DCA 1992) (holding that by undertaking to safely load landscaping timbers into a vehicle, defendant owed a duty of reasonable care to bicyclist who was struck by timbers protruding from vehicle window).

---

[9] threats to life, and to handle and relay that information to the agency's agents and analysts, even to the exclusion of other governmental entities that could have handled the information. *See* [DE 206] at ¶¶ 23–33, 166, 173, 178.

[9] The United States acknowledges in its Reply that it does not contest this general proposition of law. *See* [DE 220] at 4.  However, the United States suggests that the Court nonetheless rely on Florida *Trianon* Category II cases *Pollock*, 882 So. 2d at 932 and *Anderson*, 389 F. Supp. 3d at 1093-94, to require no duty to any individuals absent a special duty of care due, applying the Category II law enforcement and public safety standard.

[10] Other jurisdictions applying § 324A are in accord. *See, e.g., DiMarco v. Lynch Homes-Chester Cty., Inc.*, 525 Pa. 558, 561 (1990) (finding liability under subsection (c) of the Restatement (Second) of Torts § 324A to hold that physician treating patient with contagious disease owes duty to third parties to correctly inform patient about the contagious nature of the disease).

Based on the foregoing, Plaintiffs' allegations that FBI's PAL undertook to render services to others, including but not limited to the January 5, 2018 caller, to serve as the central repository and conduit for information regarding potential threats to life, and to handle and relay that information to the agency's agents and analysts meet the first element of § 324A, undertaking to "render services to another, which [the undertaker] should recognize as necessary for the protection of a third person[.]" *See* § 324A.

#### b.   *Second element of an undertaking duty – prong § 324A(c) or prong § 324A(a)*

The second element of an undertaking duty under § 324A is physical harm to a third person resulting from the undertaker's failure to exercise reasonable care. This second element can be satisfied in any one or more of three ways:  the undertaker's negligence increases the risk of harm, the undertaker performs a duty owed by the "other" to the third person, and/or the "other" relies on the undertaking in a way that contributes to the harm. Plaintiffs contend that they have alleged sufficient facts to support two of those three: the harm is suffered because of reliance of the other or the third person upon the undertaking, and failure to exercise reasonable care increased the risk of harm. One prong is sufficient, so these are properly considered as disjunctive, alternative bases for satisfying the second element of an undertaking duty under § 324A.  The Court will address each.

#### i.   *Prong § 324A(c)*

First, Plaintiffs argue that the Consolidated Verified Amended Complaint sets forth sufficient facts to satisfy the § 324A (c) prong - that the harm is suffered because of reliance of the other or the third person upon the undertaking.  The comments to the restatement, explain what is required for reliance as follows:

> Reliance. The actor is also subject to liability to a third person where the harm is
> suffered because of the reliance of the other for whom he undertakes to render the

services, or of the third person himself, upon his undertaking. This is true whether or not the negligence of the actor has created any new risk or increased an existing one. Where the reliance of the other, or of the third person, has induced him to forgo other remedies or precautions against such a risk, the harm results from the negligence as fully as if the actor had created the risk.

Restatement (Second) of Torts § 324A, comment e, at 144 (1965).)

With regard to reliance on the undertaking, the Consolidated Verified Amended

Complaint alleges, in part, as follows:

166. The FBI undertook to serve as the receiver, repository, and conduit of information regarding potential threats to life, active shooters, mass shootings, terrorism threats, and school shootings. In response to the FBI's undertaking, the public relied on the FBI as the exclusive receiver, repository, and conduit of information concerning these threats, even to the exclusion of other governmental entities that could have handled the information. The individuals who contacted the FBI with information about Cruz did, in fact, rely on the FBI to exercise reasonable care in its undertaking to process the information and pass it along to the FBI employees or other law enforcement agencies who would have taken additional investigative steps. Indeed, the FBI induced reliance through its public outreach efforts and in its communications with the individuals who provided the FBI information about Cruz.
. . .

173.a. The January 5 caller relied on the FBI as the exclusive forum for reporting school shootings because, in response to the tipster's expressed ambivalence about whether the FBI was the proper forum for reporting information about Nikolas Cruz, the FBI reassured the tipster, both implicitly and expressly, that the FBI was the proper forum for reporting such information, that the FBI would investigate the matter, and that the FBI would follow-up with the tipster
. . .

60. The January 5 caller relied on the FBI to investigate the matter and decide the best course of action. She believed that if she gave the information about Cruz to the FBI, it would use due diligence to investigate the tip appropriately. Because she relied on the FBI to handle the tip with reasonable care, she forewent other potential remedies and precautions. For example, she did not contact other law enforcement agencies or Marjory Stoneman Douglas High School to tell them about Cruz's violent plans and efforts to carry them out because she relied on the FBI's undertaking to handle the information appropriately. If the FBI had not undertaken the task of collecting information of this sort and handling it appropriately, the caller would have taken other measures to ensure that Cruz was prevented from carrying out an attack. In short, having been assured that she had provided the information to the right entity and that the FBI would handle her tip with due diligence, the caller took no further action concerning the threat posed by Cruz.

61. The January 5 caller expected the FBI would look into the issue further, explaining "I just want someone to know about this so they can look into it" and "when you look into this, you can make the decision as to whether you want to go further or not." On several occasions, the tipster also explained that by coming to the FBI, she was giving over the responsibility of handling the information to the FBI. She said, "If they think it's something worth going into, fine. If not, um, I just know I have a clear conscience if he takes off and, and just starts shooting places up." She also said she was getting the information "off [her] chest in case something does happen and I do believe something's going to happen."

62. The FBI customer service representative asked the caller "So if anybody else has questions they can call you back. Is that correct, ma'am?" The caller replied "Yes, you can, hun." The FBI intake specialist also sought specific details on Cruz's whereabouts, including his current address and phone number. The January 5 caller understood that these questions were meant to compile all the information that would be passed along to agents or analysts who would give the information its due diligence and take appropriate investigative steps.

63. The January 5 caller wanted to be sure that her detailed and urgent information about Cruz's desire and steps toward an attack would be properly investigated. When the January 5 caller was preparing to end the call, she expressly reconfirmed that the FBI would look into the information she provided. The tipster would not have obtained the peace of mind she was looking for—and she would have sought assistance elsewhere—unless she felt confident that the FBI would look into the information she gave it. The January 5 caller stated, "Um, when you look into this, you can make the decision as to whether you want to go further or not . . . and I do believe something is going to happen . . . ." In response, the customer service representative said, "I do appreciate you calling that in, ma'am."

64. The tipster surmised from the phone call that that the FBI would "look into" the information she gave it, meaning that the agency would pass the information along to FBI agents or analysts with the experience and expertise to conduct at least some investigative steps, enough steps to either neutralize the threat posed by Cruz or conclude that it did not merit further action. The FBI's responses to the tipster had the effect of assuring the her that the FBI would take the appropriate investigative action—at the very least, look into the threat and potentially follow-up with her.

. . .

168. The harm to the students and teachers at Marjory Stoneman Douglas High School was suffered because the January 5 caller relied on the FBI's undertaking. Specifically, Plaintiffs allege:

a. The January 5 caller relied on the FBI's undertaking by, for example, foregoing other protective actions, remedies, and precautions against harm. After her call

with the FBI on January 5, the caller did not notify other authorities about the risks Cruz posed, she did not notify Marjory Stoneman Douglas High School of the risks, and she did not take other actions to intervene in Cruz's plans;

b. The January 5 caller would have alerted other authorities and taken other protective actions were it not for the FBI's undertaking;

c. The January 5 caller forewent other precautions on the belief that the FBI would (a) follow its own mandatory directives to vet and process the information; (b) exercise reasonable care in its handling of the information she provided the FBI about Nikolas Cruz; (c) pass the information along to an agent with the authority and expertise to look into the information she provided; and (d) investigate the information she provided the FBI;

d. The January 5 caller relied on the FBI to pass the information along to individuals within the FBI who would take investigative steps;

e. The January 5 caller relied on the FBI to exercise reasonable care in processing, vetting, documenting, and disseminating the information it received;

f. The January 5 caller relied on the FBI to follow its own mandatory directives to ensure that the information was appropriately regarded as a potential threat to life and processed according to that designation;

g. The January 5 caller relied on the FBI as the exclusive forum for reporting school shooting threats (and threats about potential threats to life, active shooters, mass shootings, and terrorism threats) because the FBI had undertaken to announce it was the appropriate entity to investigate the sorts of crimes that Cruz threatened to carry out;

h. The January 5 caller was justified in her reliance on the FBI's undertaking given its affirmative efforts to induce the public to rely on it to serve as the repository and conduit of information about threats to life, school shootings, mass shootings, and terrorism threats;

i. The January 5 caller was justified in her reliance on the FBI's undertaking because, when she sought assurances from the FBI's customer service representative that the FBI was the proper forum for reporting information about Cruz, the FBI reassured her, both implicitly and expressly, that the FBI was the proper forum for reporting such information, that the FBI would investigate the matter, and that the FBI would follow-up with the caller as the investigation proceeded;

j. Given the tipster's reliance on the FBI and its assurances, the bureau's failure to exercise reasonable care in the handling and relaying of the information concerning a potential school shooting by Cruz created a broad zone of risk that

such information would never be disseminated to an appropriate governmental body and that the tip would never be investigated and acted upon; and

k. Such failure posed a general threat of harm to the students and staff at Marjory Stoneman Douglas High School—Cruz's foreseeable target and the intended beneficiaries of the tip, to whom the FBI ultimately owed a duty to perform its undertaking in a reasonable manner.

169. As a result of the FBI's undertaking and the tipsters' justifiable reliance, the FBI knew or reasonably should have foreseen that the failure to exercise reasonable care in handling and relaying credible information it received concerning the threats Cruz posed created a broad zone of risk that encompassed the students and teachers at Marjory Stoneman Douglas High School. The students and teachers at Marjory Stoneman Douglas High School were the foreseeable third-party beneficiaries of the FBI's services. Both tips the FBI received—in September 2017 and January 2018—alerted the FBI that Cruz intended to shoot up a school. The January 5 caller told the FBI that Cruz had gotten expelled from high school; the high school Cruz was expelled from was Marjory Stoneman Douglas High School. The FBI was aware that Cruz still lived in Parkland, Florida—the town where Marjory Stoneman Douglas High School is located.

*See* [DE 190] at ¶¶  60-64, 166, 168, 169.

The United States contends that Plaintiffs' allegations of reliance are insufficient because they are speculative and because the allegations mischaracterize the nature of the January 5, 2018 call.  The United States also disputes the factual allegations of reliance, arguing that the Consolidated Verified Amended Complaint's allegations indicating the January 5, 2018 caller forewent alerting another law enforcement agency after the January 5, 2018 call or taking alternative protection measures are "patently false" or alternatively, that they are alleged "in a clear effort to raise a factual issue requiring discovery." *See* [DE 206] at p.16.  Further, to the extent reliance is measured by an objective standard[11], the statements from the Consolidated

---

[11] The language of § 324A does not specifically include this requirement while it is required in other sections of the Restatement (Second) of Torts. *Compare* § 324A Liability to Third Person for Negligent Performance of Undertaking ("One who undertakes ... to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if . . . (c) the harm is suffered because of *reliance* of the other or the third person upon the undertaking") *with* § 311 Negligent Misrepresentation

Verified Amended Complaint as set forth above are sufficient to allege that the reliance was reasonable.  Based on the foregoing factual allegations set forth *supra*, Plaintiffs have alleged sufficient facts to meet the reliance prong at the motion to dismiss stage. Additionally, the Court has carefully reviewed the transcript of the January 5, 2020 call with the PAL, *see* [DE 206-1] and finds that the allegations in the Consolidated Verified Amended Complaint do not falsely represent the contents of the call.

Accordingly, at this stage of the litigation, the Consolidated Verified Amended Complaint sets forth sufficient facts to satisfy Restatement (Second) of Torts § 324A(c). Because a private person or entity under similar circumstances to the FBI's PAL in this instance, who voluntarily undertook to serve as the central repository and conduit for information regarding potential threats to life, and to handle and relay that information to the agency's agents and analysts, would owe a duty of reasonable care in the undertaking to Plaintiffs/Plaintiffs' decedents under Florida negligence law.  "The Government may not escape liability because we cannot find any private person either who had done so or might undertake such a vast project. . . The Supreme Court rejected the argument that the Tort Claims Act 'must be read as excluding liability in the performance of activities which private persons do not perform' with the consequence that 'there would be no liability for negligent performance of 'uniquely governmental functions.'" *United States v. Gavagan*, 280 F.2d 319, 327 (5th Cir. 1960)[12]

---

Involving Risk of Physical Harm ("One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in *reasonable reliance* upon such information, where such harm results. . .") (emphasis added).  Moreover, the United States fails to persuade the Court that the alleged reliance was objectively unreasonable based on the factual allegations in the Consolidated Verified Amended Complaint.

[12] Fifth Circuit cases decided prior to October 1, 1981 are binding precedent in this circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

(citations omitted). The United States' Motion to Dismiss Plaintiff's negligence claim against the United States pursuant to the FTCA for lack of subject matter jurisdiction is due to be denied.

Nevertheless, the Court will address the other, alternative, independent theories under principles of Florida tort law that Plaintiffs argue would also require the Court to hold that Plaintiffs' Amended Complaint has sufficiently alleged facts demonstrating a legal duty in this case: the "increase the risk" variant of § 324A undertaking doctrine; the zone of risk doctrine; and duties arising from mandatory internal protocols.

ii.    *Prong § 324A(a)*

Another disjunctive, alternative ground for satisfying the second element of an undertaking duty under § 324A subjects the undertaker to liability to the third person for physical harm resulting from its failure to exercise reasonable care in the undertaking, if its failure to exercise reasonable care increased the risk of such harm. *See* § 324A(a).

In *Clay Elec. Co-op., Inc. v. Johnson*, 873 So. 2d 1182, 1186 (Fla. 2003), a child walking to his school bus during the early morning darkness was fatally struck by a truck in an area where a street light was inoperative. *Id.* at 1184.  The street lights had been installed by the Jacksonville Electric Authority several years before the subject accident. *Id.*  Also, several years before the subject accident, defendant Clay Electric entered into a contract with the Jacksonville Electric Authority which required that Clay Electric to maintain the lights. *Id.*  Despite Clay Electric's obligation to maintain the lights, it did not. *Id.*  It never instituted a system to regularly inspect the lights at night or to determine which lights needed replacement bulbs or repairs. *Id.* Relying on § 324A undertaking doctrine, the Florida Supreme Court found that Clay Electric assumed a specific, legally recognized duty to the plaintiffs to act with due care in maintaining the streetlights under both the increased risk and reliance prongs:

>   [B]oth the "increased risk" and "reliance" subsections are implicated here.
>   Clay Electric's failure to exercise due care in maintaining the streetlights caused
>   the roadway to be cast in darkness, thus increasing the risk that [the driver] would
>   be unable to see [the child] Dante. Further, Clay Electric, in undertaking to
>   maintain the streetlights, arguably caused [the child's mother] to rely on the fact
>   that the lights would be operating properly and that Dante's pathway to the school
>   bus stop would be lighted. On this record, both "increased risk" and "reliance"
>   pose viable issues to be decided by the trier-of-fact.
>
>   Clay Electric first contends that the "increased risk" subsection is
>   inapplicable here because Dante was no worse off with an inoperative streetlight
>   than he would have been with no light at all. This claim, however, misses the
>   point. The plaintiffs did not allege that Clay Electric negligently installed the
>   streetlights on an otherwise unlighted street. Rather, they alleged that Clay
>   Electric negligently maintained the streetlights on an otherwise lighted street.
>   Construing the present record in the light most favorable to the plaintiffs, it
>   appears that Clay Electric undertook the maintenance of operative streetlights on
>   Collins Road, and it was the company's subsequent negligence that resulted in the
>   roadway being cast in darkness. This raises a jury question as to whether Clay
>   Electric's negligence increased the risk of harm to Dante.

*Clay Elec. Co-op., Inc. v. Johnson*, 873 So. 2d 1182, 1186 (Fla. 2003).  Thus it was defendant

Clay Electric's failure or inaction in not doing what it had undertaken to do that allowed the

lighting to fail, making a lit street dark, which increased the risk to pedestrians. *Id.* at 1187-88.

In *Union Park Mem'l Chapel v. Hutt*, 670 So. 2d 64, 67 (Fla. 1996), the Florida Supreme Court

explained how a funeral director who had voluntarily undertaken to lead a funeral procession's

failure to exercise reasonable care in doing so, can implicate a duty to third parties under both the

reliance and increase the risk prongs of § 324A pursuant to Florida negligence law:

>   Voluntarily undertaking to do an act that if not accomplished with due
>   care might increase the risk of harm to others or might result in harm to others due
>   to their reliance upon the undertaking confers a duty of reasonable care, because it
>   thereby "creates a foreseeable zone of risk." *McCain v. Florida Power Corp.*, 593
>   So.2d 500 (Fla.1992); *Kowkabany*, 606 So.2d at 720–21 (relying on both McCain
>   and Restatement (Second) of Torts, § 324A to find defendant's voluntary
>   undertaking to safely load landscape timbers into vehicle created duty to third
>   party who was injured by timbers). In joining a funeral procession that has been
>   organized by the funeral director, procession participants are likely to rely to
>   some degree on the director for their safety in transit. Thus, depending on the
>   circumstances, the director's failure to exercise reasonable care in planning and

leading a procession foreseeably may increase the risk of harm to procession members.

We recognize that a funeral director has no general duty to orchestrate or lead a funeral procession. However, once a director voluntarily undertakes to do so, the director assumes at least a minimal duty to exercise good judgment, and ensure that procession members proceed to the cemetery in a safe manner. Whether a funeral director exercised reasonable care in a given case will depend on the circumstances of that case; and, therefore, must be determined on a case-by-case basis by the trier of fact.

*Union Park Mem'l Chapel v. Hutt*, 670 So. 2d 64, 67 (Fla. 1996). *See also Wallace,* 3 So. 3d at 1052 (deputies increased risk of harm to decedent by inducing third parties to forebear from rendering further aid); *U.S. v. Gavagan*, 280 F.2d 319, 325-328 (5th Cir. 1960) (finding liability under the Good Samaritan doctrine where "critical mistakes were made, not by men taking great personal risk in heroic salvage service under trying conditions, but by those ashore in the failure to pass on and evaluate vital information," which "worsen[ed] the plight of the crew members of the sinking vessel).

In this case, with regard to the § 324A (a) prong – that the failure to exercise reasonable care increased the risk of such harm, the Consolidated Verified Amended Complaint alleges, in part, as follows:

167. The FBI's failure to exercise reasonable care in its undertaking increased the risk of harm to the students and teachers at Marjory Stoneman Douglas High School. Had the FBI exercised reasonable care, the harms suffered by these victims would have been prevented, reduced, or made less likely. Moreover, by assuring the public that tips would be handled with reasonable care and properly investigated—and expressly and specifically making such assurances to the January 5 caller—the FBI made it less likely that the caller would take other steps to mitigate the threat posed by Cruz, including but not limited to seeking the assistance, investigation, and intervention by other law enforcement entities.

Plaintiffs also allege in the Consolidated Verified Amended Complaint that the FBI's undertaking to create the PAL and to operate the PAL to serve as the nation's central repository and conduit for tips and information regarding potential threats to life, and to handle and relay

that information to the agency's agents and analysts, even to the exclusion of other governmental entities that could have handled the information, increased the risk of harm to Plaintiffs' decedents in at least two ways. First, as detailed above, the January 5 caller relied on the PAL's undertaking and therefore forewent additional steps that would have mitigated or prevented the harm to Plaintiffs' decedents. Second, had the FBI not undertaken to create the PAL to function as the central repository for receiving and conveying threats about the public, callers would still have been able to directly contact their local field office concerning threats to human life. *See* [DE 190] at ¶¶ 20-21.  In particular, had the FBI not created and operated the PAL as the repository and conduit for tips from the nation's civilians regarding school shooting threats, the January 5 caller would have been able to directly provide the threat information to the Miami Field Office. And the FBI admitted in a public statement that had the FBI's Miami-based agents received this information, they would have taken appropriate investigative steps. *See* [DE 190] at ¶¶ 181–83.  At this stage of the litigation, the Court finds that Plaintiffs have alleged sufficient facts to satisfy the duty element under the Restatement (Second) of Torts § 324A(a) pursuant to Florida negligence law.  Therefore, like in the case of *Indian Towing*, the government "need not undertake the [FBI's PAL] service," but having done so, "it was obligated to use due care" in the undertaking. *See Indian Towing*, 350 U.S. at 69.

2. *The zone of risk doctrine*

Plaintiffs next contend that the FBI owed a duty of reasonable care toward the students and teachers of Marjory Stoneman Douglas High School based on the allegations of the Consolidated Verified Amended Complaint under Florida's "foreseeable zone of risk" inquiry pursuant to *McCain v. Fla. Power Corp.*, 593 So.2d 500 (Fla. 1992)

In *McCain,* the plaintiff, an operator of an electrical trencher, was injured when the trencher blade struck an underground Florida Power electrical cable.  *Id.* at 501. Florida Power had earlier come out and marked areas where it would be safe to use the trencher. *Id.* There was some evidence at trial, albeit conflicting, indicating that the plaintiff was in an area marked "safe" when he struck the cable. *Id.*  A jury verdict was entered in the plaintiff's favor, taking into account a reduction for the plaintiff's comparative negligence. *Id.*  The Florida Second District Court of Appeal reversed and remanded for entry of a directed verdict for Florida Power, concluding that the injury was not foreseeable and therefore no duty existed. *Id.* at 501-02.  The Florida Supreme Court determined that the appellate court confused the concept of foreseeability in determining duty with the concept of foreseeability in determining proximate causation, and instructed that courts applying Florida negligence law may not merge these concepts into a single hybrid foreseeability analysis. *Id.*

In reversing the appellate court, the Florida Supreme Court held that Florida may recognize novel negligence claims flowing from the facts of a particular case even in the absence of prior precedent because Florida negligence law "recognizes that a legal duty will arise whenever a human endeavor creates a generalized and foreseeable risk of harming others." *See* 593 So.2d at 503.  The Florida Supreme Court distinguished the foreseeability analysis for determining the existence of a duty from the foreseeability analysis of determining proximate causation:

> Contrary to the tacit assumption made by the district court, foreseeability relates to duty and proximate causation in different ways and to different ends. The duty element of negligence focuses on whether the defendant's conduct foreseeably created a broader "zone of risk" that poses a general threat of harm to others. The proximate causation element, on the other hand, is concerned with whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred. In other words, the former is a minimal threshold legal requirement for opening the courthouse doors, whereas

the latter is part of the much more specific factual requirement that must be proved to win the case once the courthouse doors are open. As is obvious, a defendant might be under a legal duty of care to a specific plaintiff, but still not be liable for negligence because proximate causation cannot be proven.

*Id.* at 502–03 (citations and footnote omitted).

Under the *McCain* "foreseeable zone of risk" doctrine, "the determination of the existence of a common law duty flowing from the general facts of the case under our negligence law depends upon an evaluation of the concept of foreseeability of harm." *Williams* (citing *McCain*, 593 So. 2d at 503). *McCain* stands for the principle that "where a person's conduct is such that it creates a 'foreseeable zone of risk' posing a general threat of harm to others, a legal duty will ordinarily be recognized to ensure that the underlying threatening conduct is carried out reasonably." *Id.* Since McCain, the Florida Supreme Court has "emphasized that 'reliance on the *McCain* foreseeability test [is] appropriate because we had intended *McCain* to function 'as a restatement of the law of negligence.' " *Williams v. Davis,* 974 So.2d 1052, 1058 (Fla.2007) (quoting *Whitt v. Silverman,* 788 So.2d 210, 218 (Fla. 2001). *McCain*'s "zone of foreseeable risk" analysis has been applied to a "countless variety of factual circumstances in order to determine the existence of a duty under our [Florida's] negligence law." *See Williams*, 974 So.2d at 1057 n. 3 (Fla. 2007) (cataloging with approval numerous negligence cases in which a duty has been recognized under the foreseeable zone of risk analysis established in *McCain*). *See also United States v. Stevens*, 994 So. 2d 1062, 1067 (Fla. 2008) ("Again, we reaffirm our previous declarations that the "foreseeable zone of risk" test discussed in *McCain* is the test to be applied under Florida law to determine whether a duty exists under our negligence law.").

In *Stevens*, the Florida Supreme Court answered a certified question from the Eleventh Circuit on the existence of duty under Florida law in an FTCA case. *Id.* at 1064. Unknown individuals had mailed letters containing anthrax to locations in several cities, including to

plaintiff Stevens' workplace in Florida. *Id.* Stevens died after inhaling the anthrax, and his estate sued the United States and a private research facility, alleging that they were the source of the anthrax. *Id.*  The complaint alleged that the government failed to provide adequate security for the handling or shipping of anthrax, and that the anthrax was stolen either in transit or from another facility to which the materials had been sent. *Id.* at 1064.  The complaint did not describe the relationship between the government and the people who stole and mailed the anthrax. *Id.*

The United States moved to dismiss, arguing there, similarly to here, that "it could not be liable for any third party criminal activity allegedly occasioned by negligent security practices because it owed no duty of protection to Stevens, a stranger, and did not have a duty or ability to control the unidentified third party tortfeasor or tortfeasors responsible for intercepting or mailing the anthrax." *Id.* at 1065. It also argued there, as it does here, that the plaintiffs had alleged only omissions—failing to secure the anthrax—rather than affirmative acts that created a new risk. *Id.* at 1069 n.4. The federal district court rejected these arguments and denied the government's motion, concluding that Stevens' claim fell under Florida's "foreseeable zone of risk" theory under *McCain*. On certification from the Eleventh Circuit, the Florida Supreme Court agreed with the federal district court's analysis and conclusion. *Id.* at 1068.  The plaintiff's allegations -- that a reasonable laboratory operator would understand that the public would be exposed to an unreasonable risk of harm unless it implemented adequate security procedures to guard against the risk of unauthorized interception of toxic materials from its laboratory and that Stevens' death was a foreseeable consequence of the defendant's failure to use reasonable care in adopting and implementing security measures reasonably necessary to protect against unauthorized interception -- were sufficient to establish a duty. *Id.* at 1069.

"[T]he essence of the zone of risk is not the foreseeability of the specific injury that occurred, but whether the zone of risk poses a general threat of harm to others." *Herndon v. Shands Teaching Hosp. & Clinics, Inc.*, 23 So. 3d 802, 804 (Fla. 2nd DCA 2009) (hospital owed duty of care to members of general public, including the patient murdered with injection of stolen controlled drugs, to prevent theft and removal of drugs without a doctor's authorization). Importantly, [u]nder the "foreseeable zone of risk" analytical paradigm set out in *McCain*, a duty to warn or protect against criminal conduct precipitated by third persons may arise where the risk is foreseeable to defendant, regardless of defendant's control over instrumentality or person causing the harm." *Faddish v. Buffalo Pumps*, 881 F. Supp. 2d 1361, 1371 (S.D. Fla. 2012).   As the Florida Supreme Court stated in *McCain*, duty "is a minimal threshold legal requirement for opening the courthouse doors." 593 So.2d at 502.

The United States argues that Plaintiffs' reliance upon *McCain* and other cases involving defendants whose own affirmative conduct created an unreasonable risk of harm is misplaced because, as the United States frames the analysis, the risk was Nikolas Cruz, and the FBI's PAL neither created the risk nor controlled it so therefore cannot be found to have a duty.  The Court disagrees.  Plaintiffs allege in the Consolidated Verified Amended Complaint that the FBI created and operated the PAL to serve as the central repository and conduit for conveying information regarding potential threats to life, including school shooting threats, threats of terrorism and violent crime, and to handle and relay that information to the agency's agents and analysts, even to the exclusion of other governmental entities that could have handled the information, eliminating concerned citizens' – including the tipsters who warned about Cruz – ability to directly contact their local FBI field office concerning threats to human life.  Plaintiffs allege that this affirmative conduct of eliminating the ability of concerned citizens to contact

their local FBI field offices directly and instead rerouting these concerned citizen tipster calls

regarding school shooting threats to PAL employees in West Virginia created a risk that

information about imminent threats to life from concerned citizen tipsters would not be relayed

to those equipped to act, including the local FBI field office.  Here, Plaintiffs' allegations are

sufficient to demonstrate that Defendant's conduct created a foreseeable zone of risk that satisfies

the duty element under *McCain* and its progeny.

        *3.  Duties Arising from Mandatory Internal Protocols*

        The final alternative, independent theory under principles of Florida tort law that

Plaintiffs argue also requires the Court to hold that the Consolidated Verified Amended

Complaint has sufficiently alleged facts demonstrating a legal duty in this case is that the FBI's

adoption of mandatory internal directives establishes a duty.

        Plaintiffs allege that FBI had "a duty to comply with mandatory directives" governing

how information on school shootings and other threats was to be handled," and that the FBI

"adopted those procedures as the standard of conduct." [DE 190] at ¶ 176. Specifically, Plaintiffs

allege that the PAL had a duty under established protocols to, among other things, forward the

information received to the Miami Field Office, to law enforcement in Parkland, and to Cruz's

foreseeable targets—the students and teachers at Marjory Stoneman Douglas. *See id.* at ¶ 178.

        Plaintiffs argue that the assumption of these mandatory internal protocols created a legal

duty.  However, the cases Plaintiffs rely upon do not demonstrate that a private entity's internal

policies and procedures create an independent duty of care under Florida negligence law.

Plaintiffs cite only two cases applying Florida law, *Pollock v. Fla. DHP*, 882 So. 2d 928, 937

(Fla. 2004) and *City of Jacksonville v. DeRay*, 418 So. 2d 1035, 1037 (Fla. 1st DCA 1982).  As

the Court explained earlier, *Pollock* is a *Trianon* Category II case that does not conduct a private

person analysis and thus is largely inapposite.  Nevertheless, to the extent it might be useful to

determining the issue of whether internal protocols give rise to an independent duty of care under

Florida tort law, the Florida Supreme Court held as follows:

> We further conclude that FHP's internal operating procedures and policies did not impose a duty to dispatch officers to the scene of the stalled tractor-trailer. On this issue, we approve the reasoned analysis of the district court which concludes that, in the context of governmental tort litigation, written agency protocols, procedures, and manuals do not create an independent duty of care. *See Pollack*, 745 So.2d at 450. While a written policy or manual may be instructive in determining whether the alleged tortfeasor acted negligently in fulfilling an independently established duty of care, it does not itself establish such a legal duty vis-a-vis individual members of the public. *Accord Alderman*, 493 So.2d at 497–98 (holding that FHP regulation requiring officers to report damaged road signs did not impose a duty to report damaged signs, repair them, or warn motorists of the potential dangers); *see also Mayo v. Publix Super Markets, Inc.*, 686 So.2d 801, 802 (Fla. 4th DCA 1997) (holding that a company's internal safety policies may serve as evidence relevant to standard of care but do not themselves establish that standard); *Gunlock v. Gill Hotels Co., Inc.*, 622 So.2d 163, 164 (Fla. 4th DCA 1993) (same with regard to company policy); *Metro. Dade County v. Zapata*, 601 So.2d 239, 243–44 (Fla. 3d DCA 1992) (same with regard to rules governing conduct of county lifeguards). This principle applies, unless, of course, the sovereign adopts such protocols and procedures as standards of conduct, in which case there would exist an independent duty of care. *See City of Jacksonville v. DeRay*, 418 So.2d 1035, 1036–37 (Fla. 1st DCA 1982) (affirming final judgment against the City for its failure to follow the protocols provided for in the traffic control devices manual which the City had adopted as the standard for signalization and street markings); *State Dep't of Transp. v. Cooper*, 408 So.2d 781 (Fla. 2d DCA 1982) (same).

*Pollock*, 882 So. 2d at 936–37.  In *City of Jacksonville v. DeRay*, 418 So. 2d 1035 (Fla. 1st DCA

1982), the court assessed whether a *municipality* complied with a manual that was adopted by the

*sovereign* as the standard of care. *See id.* at 1037 ("In short, there was no breach of duty in that

there was no showing that the City failed to comply with the mandatory provisions of the Manual

which had been adopted as a standard."). It does not appear that Florida law equates internal

rules or policies to an independent duty. *See Wal Mart Stores, Inc. v. Wittke*, 202 So. 3d 929, 931

(Fla. 2nd DCA 2016) ("The trial court's elevation of the alleged violation of internal policies and

procedures to the status of a legal duty necessitates reversal of the order granting Ms. Wittke a new trial.").  Accordingly, while the FBI's mandatory internal protocols may very well be pertinent to this case, they do not independently answer the duty inquiry under the FTCA.

## IV.    CONCLUSION

Based upon the foregoing, the Court holds that Florida negligence law imposes a duty of care on a private person or entity under like circumstances to the FBI's PAL in this instance.

It is **ORDERED AND ADJUDGED** as follows:

1.   Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction [DE 206] is **DENIED**.

2.   Defendant shall file an answer to the Consolidated Verified Amended Complaint [DE 190] within fourteen (14) days of the date of this Order.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 31st day of August, 2020.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies provided to:

Counsel of Record