UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED ACTION

Case No.: 18-62758-CIV-DIMITROULEAS
(Former case no. 20-60483-CIV-WPD)

WILLIAM OLSON,

                Plaintiff,

vs.

UNITED STATES OF AMERICA,

                Defendant.

_____/

## AMENDED COMPLAINT

Plaintiff William Olson brings this action against Defendant United States of America and alleges:

## NATURE OF THE ACTION

1.      This is an action for negligence as a result of a horrific mass shooting that was completely preventable.

2.      "I know he's going to explode," a woman who knew Nikolas Cruz said on the FBI's tip line on January 5, 2018. Through the proper channels for citizens to convey information to the FBI, she provided a detailed and specific tip that Cruz "was going to slip into a school and start shooting the place up." He wanted to kill people, and he had the means to do so—he had spent the last several months collecting rifles and ammunition. Forty days later, Mr. Cruz did just what tipster warned the FBI he would do. He entered his former high school—Marjory Stoneman Douglas High School in Parkland, Florida—and executed 17 people.

3.     Plaintiff in this action is William Olson, who was a 14-year-old high school freshman on the afternoon of February 14, 2018, when Cruz shot him in his classroom at Marjory Stoneman Douglas High School.

4.     On or before February 14, 2014, the FBI knew that Nikolas Cruz had the desire, means and capability to carry out a mass school shooting.

5.     The FBI had non-discretionary obligations, governed by established protocols, to handle and investigate tips concerning potential school shootings in a reasonable manner—at a minimum not to ignore the information entirely—and to act against Cruz to prevent him from committing the mass shooting that permanently injured William Olson. Yet, contrary to its own established rules, the FBI failed to take any action whatsoever with the information it received. If the FBI had complied with its mandatory obligations to investigate and intervene in Cruz's plans to carry out a mass shooting at Stoneman Douglas High School, Cruz would not have succeeded in carrying out his attack and William Olson would not have been shot and permanently injured.

6.     As a direct, proximate, and foreseeable result of the FBI's negligence, Cruz was able to kill 17 students and teachers and wound many more.

7.     William Olson brings this lawsuit under the Federal Tort Claims Act, 28 U.S.C. §§1346. He seeks all federal tort damages for bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of the capacity for the enjoyment of life, medical expenses in the past and in the future, loss of earnings, loss of the ability to earn money in the future and/or aggravation of a preexisting condition.

## JURISDICTION AND VENUE

8.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §1331.

9.      Venue is properly in the Southern District of Florida pursuant to 28 U.S.C. §1391(b) because Plaintiffs' claims arose in Broward County, Florida, which is located in the Southern District of Florida.

10.      Plaintiffs have complied with and exhausted all applicable pre-suit notice requirements of the Federal Tort Claims Act. More than six months before the filing of this complaint, the FBI received the Plaintiffs' Notice of Claim. The FBI did not issue a formal denial of the Plaintiffs' claim within six months, and thus the claim was deemed denied in August 2018.

## THE PARTIES

11.      Plaintiff William Olson is a resident of Parkland, Broward County, Florida.

12.      The United States of America is a defendant in this action pursuant to the Federal Tort Claims Act, 28 U.S.C. §§1346, arising from the acts and/or omissions of employees and agents of the Federal Bureau of Investigation, an agency of the defendant.

13.      The Federal Bureau of Investigation is a federal law enforcement agency statutorily empowered by the United States Congress to enforce and investigate certain alleged violations of the United States Criminal Code. The FBI is part of the Department of Justice and formally subject to oversight and direction by the Attorney General.

## FACTS

### I.      The Red Flags

14.      Before the Parkland shooting, law enforcement, including the FBI, received several warnings about Nikolas Cruz's desire and capability to carry out a school shooting.

**A.** **Long before the shooting, local law enforcement was aware of Cruz's propensity for violence and stated intention to commit a school shooting.**

15.     In January 2013, Nikolas Cruz's mother, Lynda Cruz, called the Broward County Sheriff's Office after Nikolas threw her against a wall. She advised the Broward County sheriff that Nikolas had anger issues and ADHD.

16.     In February 2016, the Broward County Sheriff received a report from an unnamed neighbor who said Cruz was posting photos of himself with guns on Instagram and saying he planned to shoot up his high school. At the time, Cruz was a student at Marjory Stoneman Douglas High School. The Sheriff's office forwarded the information to the school resource officer.

17.     In September 2016, a school resource officer at Stoneman Douglas reported to the Sheriff's office that Cruz had ingested gasoline in an effort to commit suicide and was cutting himself. It was also reported that Cruz stated he wanted to buy a gun and that he possessed hate-related symbols. A sheriff's deputy responded to Cruz's home on allegations that Cruz was hurting himself and talking about buying a gun.

18.     In September 2016, the Florida Department of Children and Families opened a case on Cruz, calling him "a vulnerable adult due to mental illness." The report noted that Cruz said he planned to buy a gun, but "it is unknown what he is buying the gun for."

19.     In January 2017, Cruz was reported for an assault at Stoneman Douglas and referred for a threat assessment, according to the school's discipline records.

20.     In February 2017, Cruz bought the AR-15 he used in the shooting from Sunrise Tactical Supply in Coral Springs, Florida. Upon information and belief, Cruz purchased at least five weapons in the year before the shooting, all rifles and shotguns.

21.     In November 2017, a cousin of Lynda Cruz called the Broward County Sheriff's Office to report that Cruz possessed "rifles" and requested that BSO recover the weapons.

22.     The same month, Rock Deschamps called law enforcement to report that Cruz had buried a 9mm gun in the backyard. Deschamps said, "I'm positive he hid a weapon."

23.     A few weeks later, a family friend, Rocxanne Deschamps, called authorities to report a fight between Cruz and her son. She said Cruz became violent, punching walls, and left to get a gun. On the call, Deschamps told the police dispatcher that Cruz had bought "tons of ammo," he had used a gun against people before, and he had put a gun to others heads in the past.

24.     On November 30, 2017, the Broward County Sheriff's Office received a tip from a caller in Massachusetts who said that Cruz was collecting guns and knives. The caller said she was concerned that Cruz would kill himself one day, and she believed Cruz could be a school shooter in the making.

**B.     For more than two years before the shooting, Cruz had been posting disturbing and threatening content on social media.**

25.     By at least December 2015, Cruz was using social media to post pictures of himself holding weapons, including guns and knives:





26.     Cruz also used social media to post advertisements for weapons he wanted to buy. In one instance, Cruz posted an advertisement for the Maverick 88 Slug on Instagram. In the post, Cruz asked his Instagram followers for advice about gun costs and passing background checks:



27.     Throughout the rest of 2017, Cruz continued to post photos displaying his growing collection of weapons and ammunition, including the AR-15 that Cruz eventually used in the shooting.

6







28.     Cruz also posted a photo on his Instagram account of a disemboweled frog surrounded by blood, saying he had killed it:



29.     In the months preceding the Parkland shooting, Cruz made several threatening comments under videos on YouTube and other sites. They include:

- "I whana shoot people with my AR-15"

- "I wanna die Fighting killing s**t ton of people"

- "I am going to kill law enforcement one day they go after the good people."

**C.    Five months before the shooting, the FBI learned that Cruz had professed his intention to become a school shooter.**

30.    On September 24, 2017, a Mississippi bail bondsman named Ben Bennight received a comment on his YouTube channel from Nikolas Cruz. In the post, <u>Cruz said he was "going to be a professional school shooter"</u>:



31.    Nikolas Cruz made no attempt to conceal his identity. He used his first and last name, rather than a unique username, in the post.

32.    <u>Bennight immediately reported Cruz's threatening comment to the FBI</u>. The next day, two FBI agents interviewed Bennight about the comment.

33.    The FBI closed its file on this matter in October 2017.

**D.    One month before the shooting, the FBI received another tip warning that Cruz would commit a school shooting.**

34.    On January 5, 2018, a person close to Cruz contacted the FBI's Public Access Line (PAL) tipline to report her concerns about Cruz's behavior.

35.    The caller warned that Cruz was 18 years old but had "the mental capacity of a 12 to a 14-year-old." She explained that Cruz's mother had just recently died, and Cruz had been exhibited violent and suicidal behavior since his mother's death.

36.    The caller explained that, since his mother's death, Cruz "started off saying he wanted to kill himself." In response, the caller called the Parkland Police Department and spoke

to an officer there about Cruz's behavior. Then, the caller explained, "just recently," Cruz "switched it to he wants to kill people." In other words, Cruz had professed a desire to kill other people. The caller explained that Cruz had said he wanted to kill people publicly, in a post on his Instagram, but about two days later, he took the post down:[1]

> His mother just passed away on the first of November. He's got Instagram accounts. He started off saying he wanted to kill himself. So what I did was I called the Parkland, which is where he lives. Uh, Parkland Police Department and I spoke to a officer[____][PH], uh,[____][PH]. Um, I didn't hear anything on, you know, my—I left it. I gave him all the information I had. And then just recently, now he has switched it to he wants to kill people. And then he put that on his Instagram and about two days later, he took it off.

37.    The caller also said that Cruz was "so into ISIS" and that she was "afraid . . . something's gonna happen."

> Um, if you go onto his Instagram pages, you'll see all the guns he-he's so into ISIS and, um, I-I'm afraid this is, so-something's gonna happen.

38.    The caller told the FBI that she was even more concerned about Cruz's propensity for violence because he had been acquiring guns, including rifles, since his mother's death. Before his mother died, Cruz had "pulled a rifle on his mother." Then, after his mother's death, Cruz took money out of his mother's account and "brought all these rifles and ammunition and he posted pictures of them on the Instagram."

> And he had pulled a rifle on his mother before she had, uh, passed away because she wanted to get money to [UI]. Um, and the whole, and another problem is that—and-and he's 18 and his mother's life insurance policy is, uh, coming in and he is going to receive $25,000 from that and then at 21, uh, 24, and up to 30, he's receiving, uh, $25,000 every year after that, uh, from a, um, a wrongful death suit that the mother had on the father, on his father. So, he went out and he, um, took money out of his mother's account. I don't know how he got the debit card, but he did. And he, uh, took money. This is after she passed away. And he took the money out, the social security money out. And he took it, and he bought all these rifles and ammunition and he posted pictures of them on the Instagram.

---

[1] The quoted language is from the transcript of the tipster's call to the FBI on January 5, 2018.

39.     The caller explained that she and another cousin of Cruz's had grown very concerned about Cruz, and she wanted the FBI to know so that they could look into it. She expressly stated that Cruz might "take[] off and . . . start shooting places up."

> And the family that, you know, distant cousin and-and myself, um, are very concerned about this because I just want someone to know about this so they can look into it. If they think it's something worth going into, fine. If not, um, I just know I have a clear conscience if he takes off and, and just starts shooting places up.

40.     The caller also warned the FBI about Cruz's social media accounts, which contained Cruz's credible statements and other evidence of his desire or planning to kill people, and photos of Cruz's weapons including "all kinds of rifles." The caller urged the FBI to go onto Cruz's Instagram page, where Cruz had posted about his desire to kill people.

> Uh, on the Instagram, he says, "I want to kill people." Um. Yeah, let me see. [UI] uh, yes, "I want to kill people." And, um, I can, give you, the Instagram accounts and you can look at them and you'll see the pictures.

41.     The caller gave the FBI specific details about Cruz's Instagram accounts, spelling out, letter-by-letter, the handles Cruz used on Instagram so that the FBI could verify the information for itself.

> Okay. The one account where it was on there, "I want to kill people," and then he took it down is Nikolas, N-I-K-O-L-A-S underline Cruz, C-R-U-Z underline. Now there's another, um, that you should really look at and that's Nikolas. Oh this is all one word all, uh, underca-lowercase. N-I-K-O-L-A-S-C-R-U-Z-M-A-K-A-R-O-V.

42.     The caller described in detail various posts on Cruz's Instagram account that displayed his weapons, including guns, knives, and ammunition. The caller said the Instagram page contained a photo of "a whole bag with all kinds of rifles" and "scopes." She explained that Cruz was expecting to receive thousands of dollars from his mother's estate, and he would use that money to buy more guns.

> See, if you go on that, it'll show you all these pictures of him dressed up in, he-he-he wants to be a, he also wants to join the Army so [UI]. He shows the gun that he purchased. The Maverick, uh, 88 Slug. He paid $219 for it. Um, and he shows you all the, uh, knives that he's got and the gun. And he does hold up one gun. And I noticed at the end of the one gun it has an orange tip. And that's just to let the police know it's not real. I believe. And, um, he does use that. It's like an air, air pistol. Um, but, you know, and then the other one is where he's um, cutting up frogs and, uh, and he shows his guns also. Uh, where is it? Okay, the, uh, Nikolas Cruz M-A-K-A-R-O-V. In that one there, he's . . . tell you how confused he is he's got the Make America Great Again hat on. And his face is all covered with a scarf. And it shows you a dirt road. It shows you the frogs. They're a little bloody. The American eagle, uh, ammunition. What looks to be a something that you shoot at, it's in a frame. His rifle, and then a whole bag with all kinds of rifles and-and stuff on it. And scopes. I mean he-he . . . and . . . [UI] the main concern is also when he gets this $25,000. He's not going to give it to this man to invest. He's going to buy guns.

43.     The caller also explained that Cruz's Instagram accounts contained photos of animals Cruz had mutilated and killed, and she provided the FBI with additional details about Cruz's mutilation of animals. She told the FBI that Cruz's interest in killing animals, cutting them up, and posting photos of them was "a red flag."

> Okay. And then there's an-there's another one, um, uh, it-it's Cruz, C-R-U-Z, underline, Nikolas, N-I-K-O-L-A-S. Um, and that's where all [UI]. And, now, it-it's cutting up animals and things like that. Little animals. Right now it's just frogs and I know for a fact it was a bird at one time. Uh, just to, just to give you a little background on him. You know how a bird will fly around in the backyard and then hit your glass door, your sliding glass doors and hit the ground?
>
> Mhm.
>
> Well that's what happened. He brought the bird into the house. He threw it on his mother's kitchen counter and he started cutting it up. He has all kinds of hunting knives. I don't know what knife he used though. And he started cutting the, uh, bird up and his mother, Linda [PH], said, "What're you doing?" And he says, "I want to see what's inside." Now . . . I don't know. [chuckle] That to me would be a red flag.

44.     In addition, the caller said that Cruz had expressed an affinity for ISIS, even dressing up as a member of ISIS and posting messages in Arabic that appeared to threaten that he would do something.

> And then, uh, you know, wanting to kill all these animals and uh, he wants to um, uh, do something in Arabic and uh, he-he dresses up like a ninja or a, or a-a-a ISIS guy. And he has pictures of all the rifles and everything on the Instagram, on one of these accounts.

45.     Over and over again, the caller stressed the danger of Cruz's access to guns combined with his erratic behavior and propensity to act violently. The caller said with certainty that she knew Cruz was "going to explode."

> You know, it-it's just, it's so much and I know he's-he's going to explode. A man he befriended, some young boy who's also on Instagram, and, um, his father, this boy's father took him in. Him and his wife took Nikolas in and said he could live there and, uh, his guns and everything could be in the house because he has them locked up.

46.     The caller was specific about the way she expected Cruz to explode—<u>he was going to shoot up a school.</u>

47.     The caller said she felt compelled to call because "it's alarming to see these pictures and to know what [Cruz is] capable of doing and-and what could happen." She explained that he had exhibited violent and erratic behavior in the past, including picking up a chair and throwing it at someone—a student or a teacher at Marjory Stoneman Douglas High School—because he didn't like the way they were talking to him. The caller explained that Cruz had been kicked out of school for his violent behavior, and she specifically said Cruz was going to get into a school and shoot the place up.

> And, um, I don't know. It-it just . . . it's alarming to see these pictures and to know what he's capable of doing and-and what could happen. He's not in school any longer. He never graduated high school. He's thrown out of all these schools because he would pick up a chair and just throw it at somebody, a teacher or a student because he didn't like the way they were talking to him. Um, I-I just think about, you know, getting into a school and just shooting the place up.

48.     The caller <u>gave the FBI representative the name and phone number</u> of the individuals who Cruz was living with, and she <u>provided the address of the home where Cruz was living</u> at the time.

49.     She ended the call by telling the FBI that she needed to report the information to the FBI so that it could investigate because, she said, "I do believe something's going to happen."

> Okay. Very good. Um, I didn't know whether to call you or Homeland Security or who, but, like I said. Um, when you look into this, you can make the decision as to whether you want to go further or not. I just want to, you know, get it off my chest in case something does happen and I do believe something's going to happen, but . . .

50.     The FBI did not take appropriate investigative steps in response to the call. The Bureau did not forward the information to the local FBI Field Office in Miami, Florida where additional investigative steps would have been taken; the FBI did not pass the information along to local law enforcement in Parkland, Florida; and the FBI did not pass the information along to Cruz's likely target—Marjory Stoneman Douglas High School—so that the school could take appropriate measures to prevent the massacre. These failures violated the FBI's own established protocols and mandatory operating procedures.

**E.     The FBI took on the responsibility of investigating and preventing mass shootings.**

51.     The FBI instructs the public to report information about potential mass shootings.

52.     For example, on the "Contact Us" page of the FBI's website, the FBI instructs concerned citizens to "submit a tip" to report suspected terrorism or criminal activity. The website tells the public "If you see something, say something."

53.     The FBI's website explains that it is the go-to entity for concerned citizens to report a potential mass shooting. The website states that "[t]he FBI concentrates on crime problems that pose major threats in American society. Significant violent crime incidents such as mass killings, sniper murders, and serial killings can paralyze entire communities and stretch state and local law enforcement resources to their limits."

54.     In addition, the FBI takes on the responsibility of investigating and preventing acts of terrorism—i.e., terrorist acts perpetrated by individuals inspired by or associated with foreign terrorist organizations and nations or U.S.-based movements that espouse extremist ideologies of

a political, religious, social, racial, or environmental nature. According to the FBI's website, "[p]rotecting the United States from terrorist attacks is the FBI's number one priority." The FBI focuses, in part, on homegrown violent extremists—those sympathizers who have been inspired by global jihad, who are based in the U.S., have been radicalized primarily in the U.S., and are not directly collaborating with a foreign terrorist organization. Before the Parkland shooting, the FBI received information that Cruz sympathized with ISIS—the foreign terrorist organization. The FBI also knew Cruz had been posting messages in Arabic and had been dressing as a member of ISIS in public social media posts.

55.     In this case, the FBI's tip intake specialist assured the tipster that the FBI, and not some other governmental body, was the proper forum for reporting school shooting threats. On the call, the tipster expressed some ambivalence about whether she was calling the correct governmental agency, saying, for example, that she "didn't know whether to call you or Homeland Security or who," and the FBI intake specialist responded by assuring the caller that the FBI appreciated that the tipster had chosen to call. The FBI intake specialist did not direct the caller to report her observations and concerns to anyone else. Either implicitly or explicitly, the FBI assured the tipster that she had reported her information to the right place.

56.     The tipster relied on the FBI to investigate the matter and decide the best course of action. The tipster expected the FBI would look into the issue further, explaining "I just want someone to know about this so they can look into it" and "when you look into this, you can make the decision as to whether you want to go further or not." On several occasions, the tipster also explained that by coming to the FBI, she was giving over the responsibility of handling the information to the FBI. She said, "If they think it's something worth going into, fine. If not, um, I just know I have a clear conscience if he takes off and, and just starts shooting places up." She also

said she was getting the information "off [her] chest in case something does happen and I do believe something's going to happen"

57.     Either expressly or implicitly, the FBI's responses to the tipster had the effect of assuring the her that the FBI would take action—at the very least, look into the threat and potentially follow-up with her. The FBI intake specialist asked the caller "So if anybody else has questions they can call you back. Is that correct, ma'am?" The caller replied "Yes, you can, hun." The FBI intake specialist also sought specific details on Cruz's whereabouts, including his current address and phone number.

**F.     By at least January 2018, the FBI knew or should have known Nikolas Cruz would carry out a mass shooting at Marjory Stoneman Douglas High School.**

58.     The FBI had received a substantial amount of information with which to characterize Nikolas Cruz as a potential threat to life before the shooting at Marjory Stoneman Douglas High School.

59.     According to the FBI's own written guidance, Cruz was clearly a potential threat to life, and the FBI's mandatory operating procedures required the FBI to investigate and intervene.

60.     The FBI's own published manuals shed light on Cruz's potential risk. For example, in 2015, the FBI's Behavioral Analysis Unit studied ways to reduce mass shootings and other forms of targeted violence. It published the results of the study in a guidebook called "Making Prevention a Reality: Identifying, Assessing, and Managing the Threat of Targeted Attacks."

61.     The FBI's guidebook for preventing targeted attacks explains that "bystanders are a key component for prevention of targeted violence events." It defines a bystander as "anyone positioned to have awareness of risk factors or to observe warning behaviors related to a person who may be considering acting violently," including "a friend on social media, a classmate, a co-

worker, a neighbor, a family member, or a casual observer." A bystander "can potentially intervene by various means, but most importantly by simply conveying what he knows, observes, or fears may happen." The FBI counsels that bystanders are "an absolutely critical component of prevention." In key research studies reviewed by the FBI, researchers found that "in 81% of school shooting cases they reviewed, the offender told at least one person about the attack beforehand" and in "59% of cases at least two other individuals had some information about the event before it was carried out." When bystanders report what they know to authorities, they "create opportunities for intervention and ultimately prevention."

62.     The FBI's guidebook explains that persons of concern are often identified when they make a threat—*i.e.,* an expression of intention to inflict injury or damage. It explains that threats "must all be taken seriously and thoroughly evaluated."

63.     The FBI's guidebook also lists several "warning behaviors" that evidence an increasing and accelerating risk that someone will carry out a targeted attack. The FBI notes that "[w]hen warning behaviors are evidenced, they require a threat management strategy and operational response. They are, for the most part, proximal behaviors, occurring more closely in time to a potential act of targeted violence."

64.     The FBI defines a "pathway to violence warning behavior" as any behavior that is part of research, planning, preparation, or implementation of an attack. Examples of pathway warning behaviors include "obtaining weapons and gear as well as familiarization with the weapons."

65.     A tipster warned the FBI in January 2018 that Nikolas Cruz had demonstrated "pathway to violence" warning behaviors, including a preoccupation with acquiring weapons and ammunition to carry out a violent attack.

66.     The FBI defines a "fixation warning behavior" as "an increasing preoccupation with a person or a cause."

67.     A tipster warned the FBI in January 2018 that Nikolas Cruz had demonstrated fixation warning behaviors, including by telling the FBI that Cruz is "so into ISIS" and had posted messages in Arabic on social media that appeared to be related to the terrorist organization.

68.     The FBI defines an "identification warning behavior" as one that becomes evident when a person adopts a "pseudo-commando" identity. "A preoccupation with firearms and a desire to use them for revenge may be evident. . . . The practical aspect of identification warning behavior may feature an unusual fascination with weapons or other military or law enforcement paraphernalia. This can be demonstrated through actual weapons, ammunition or paraphernalia purchases, or through virtual activities such as intense preoccupation with and practice on first-person shooter games, or in-depth on-line research of weapons. A psychological aspect of identification may involve physical costuming, immersion in aggressive or violent materials, or fantasizing about offending violently."

69.     A tipster warned the FBI in January 2018 that Nikolas Cruz had demonstrated identification warning behaviors. On the call, the tipster noted that Cruz had an unusual fascination with guns and weapons, posting many photos on Instagram of guns he had purchased. He had also posted "pictures of himself dressed up" as a member of ISIS and in military garb.

70.     The FBI defines "novel aggression warning behavior" as an act of violence in which the person is "testing" his ability to actually engage in a violent act, or experimental aggression. "Examples of acts of novel aggression could include animal cruelty, assault, firearm discharge, arson or bombing, rehearsed violence with inanimate objects fantasized to be human targets, or even vandalism."

71.     A tipster warned the FBI in January 2018 that Nikolas Cruz had demonstrated novel aggression warning behaviors including committing concerning acts of animal cruelty, assaulting his mother and school peers, and pulling a rifle on his mother in order to get money to buy more weapons.

72.     The FBI defines "leakage" as "a communication *to a third party* of intent to do harm to a target through an attack." The FBI advises that "[w]hen leakage in any form is discovered, it should be recognized as such and not dismissed as fantasy writing or mere venting . . . A full consideration of all facts and circumstances will help threat managers discern the difference."

73.     In the months preceding the school shooting, two tipsters warned the FBI that Nikolas Cruz had "leaked" his intent to kill other people and to become a "professional school shooter."

74.     The FBI guidebook also describes the numerous methods of intervention well short of arrest to deal with a person of concern once a threat of a targeted attack is identified. These management options include third-party monitoring, third-party intervention, direct interview, administrative actions, civil actions, criminal enforcement, setting specific boundaries and limits, 100% enforcement, mental health commitments, alternatives to violence counseling, outpatient mental health care, stress and anger management classes, and other types of services.

75.     In addition, "[w]hen a concern for violence rises above low," the FBI guidebook instructs threat management teams to do increased vigilance and target hardening. In other words, the FBI suggests increasing security measures at the threat's likely target. "Examples of increased vigilance may include increased awareness by personnel in and around the environment in question, training on and adherence to security procedures, identification verifications,

information sharing, and law enforcement alerts. . . . Target hardening can involve a thorough security process review, reduction of access points to the facility, more visible security, parking lot security and escorts, flagging the address in the '911' system, and other measures deemed appropriate."

76.    The FBI defines a "low" level of concern scenario as one where, for example, the person of concern "may have evidenced few to no warning behaviors, he may "not have a significant number of risk factors," or "circumstances may make it nearly impossible for the subject to carry out his threat (e.g., the person of concern is incarcerated, does not have a proxy willing to act violently on his behalf, and the target it outside the institution)."

77.    The FBI defines a "moderate" level of concern scenario as one where, for example, "others may be concerned about the person potentially acting out violently," the person "may have an increased number of risk factors (e.g., acting out violently, a paranoid personality disorder, substance abuse, or instability in employment and relationships)," and stressors may be present in the person's life that could move the person further toward violence. In this scenario, the FBI advises that "monitoring and additional actions are necessary or desirable to further evaluate and respond to the situation to a point of resolution."

78.    The FBI defines an "elevated" level of concern scenario as one where, for example, a person of concern is making preparations such as "weapons acquisition and training that are both contextually inappropriate and an escalation from his norm," or "increasing warning behaviors may become more evident," or "stressors in a person's life appear to be escalating and his abilities to cope with them appear diminished," or "suicidal/homicidal ideation" is present. In this scenario, the FBI explains that "the person of concern is reaching a critical point on a pathway to violence." To deal with the threat, "a threat management team and additional resources should focus on

reducing his susceptibility to violence and the target's vulnerability, through guidance and enhanced security efforts."

79.    The FBI defines a "high" level of concern scenario as one where, for example, a person of concern "has exhibited highly concerning warning behaviors," the person "has the means and ability to carry out a violent attack," or the person exhibits a combination of serious mental illness, substance abuse or dependence, a history of violence or other risk factors. According to the FBI, "violence is possible and could occur within the near future following any precipitating events. Immediate and continuing attention is required from threat management resources to ensure violence does not occur."

80.    The information communicated to the FBI on the January 5 call alerted the FBI that Cruz was exhibiting an elevated or high level of risk. The FBI was told about Cruz's young age and low mental skills, his mother's recent death, his communicating suicidal and homicidal ideation, his sympathizing with ISIS, his violent history, and his preoccupation with acquiring rifles, among other things. These, along with Cruz's other warning behaviors and risk factors, should have alerted the FBI that Cruz was capable of committing violence in the near future.

81.    In June 2018, the FBI published "A Study of the Pre-Attack Behaviors of Active Shooters in the United States between 2000 and 2013." The study explains that "[i]n the weeks and months before an attack, many active shooters engage in behaviors that may signal impending violence. While some of these behaviors are intentionally concealed, others are observable and— if recognized and reported—may lead to a disruption prior to an attack."

82.    The FBI explained that active shooters tend to be "individuals who fail to successfully navigate multiple stressors in their lives while concurrently displaying four to five observable, concerning behaviors, engaging in planning and preparation, and frequently

communicating threats or leaking indications of an intent to attack. As an active shooter progresses on a trajectory toward violence, these observable behaviors may represent critical opportunities for detection and disruption."

83.     Prior to the attack, the FBI was aware that Nikolas Cruz had displayed many of the observable concerning behaviors that precipitate a mass shooting. The FBI study explains that shooters typically undergo multiple stressors in the year before an attack, which could include the death of a relative, mental health problems, school-related problems, and conflicts with parents. The FBI also provides a list of concerning behaviors that are typically observed in active shooters before an attack. The list includes observed instances of inappropriate anger, inappropriate firearms behavior, more than the usual amount of discord in ongoing relationships with family, communication to a third-party of the intent to harm another person, indications of mental health issues, physical aggression, and violent media usage.

84.     The tipster warned the FBI that Cruz had experienced multiple triggering stressors and displayed observable concerning behavior in the months before the shooting. The tipster told the FBI that Cruz's mother had died, he had expressed a desire to kill himself and others, he had been kicked out of school for engaging in violently aggressive behavior directed toward his peers, and he had pulled a rifle on his own mother before her death. Cruz delighted in torturing and mutilating animals, and he posted gruesome pictures on social media. He had communicated his violent inclinations publicly using social media.

85.     The FBI was also aware, or reasonable should have foreseen, that Marjory Stoneman Douglas High School was Nikolas Cruz's likely target. Cruz was 19 years old at the time of the shooting, and he had previously attended Marjory Stoneman Douglas High School. On the January 5 call, the tipster warned the FBI that Cruz would shoot up a school. Months earlier,

in October 2017, <u>Cruz had expressed his desire to become a school shooter in a YouTube comment</u> <u>reported to the FBI</u>.

86.     The FBI was also aware, or with reasonable diligence should have discovered, that Cruz had a history of acting violently at Marjory Stoneman Douglas High School. The tipster told the FBI that Cruz had thrown a chair at a student or teacher at his high school, and he had been kicked out of that school. Cruz's history of violence at the school was well-documented and would have been easily discovered during a reasonable investigation into Cruz.

87.     In addition, the FBI knows that active shooters in Cruz's age group are very likely to choose their former school as a target. In the FBI's study on pre-attack behaviors, the FBI explained that "active shooters often attacked people and places with which they were already familiar. There was a known connection between the active shooters and the attack site in the majority of cases (73%, $n = 46$), often a workplace or former workplace for those 18 and older (35%, $n = 19$), and almost always a school or former school for those younger than 18 (88%, $n = 7$)."

## II.     <u>The Shooting</u>

88.     On the afternoon of February 14, 2018, Marjory Stoneman Douglas students were anticipating the dismissal bell when, instead, they heard the sound of gunfire.

89.     At 2:21 p.m. Nikolas Cruz entered Building 12 of the school after an Uber dropped him off at the school's entrance.

90.     Cruz walked into the halls of the first floor of the school and activated the fire alarm in order to draw unsuspecting students and faculty members from their classrooms.

91.      He removed his .223-caliber AR-15-style rifle from a soft black case he was carrying, and began to shoot into four different classrooms, going back and forth between them

and killing eleven people and injuring thirteen, including William Olson in classroom 1216, before moving on.

92.     He proceeded, through the school's west stairwell, up to the second floor, where he roamed across the halls, stopping to shoot into one classroom without injuring anyone inside.

93.     He then took the east stairwell up to the third floor of the school, where he continued shooting, ultimately murdering six other people and injuring several others.

94.     After shooting several rounds through the window of the third-floor teachers' lounge onto fleeing students below, Cruz dropped his weapon and removed his ammunition vest so he could blend into the crowd of students running away.

95.     Cruz walked out of the Stoneman Douglas campus with the crowd of students, proceeded to a Walmart store to buy a drink, and then on to a nearby McDonald's. He then continued to roam freely until he was detained more than one hour after the shooting began in a Coral Springs neighborhood while walking down the street.

III.     **The FBI's Admissions**

     A.     **The FBI's Call to Fred Guttenberg.**

96.     Frederic and Jennifer Guttenberg are co-personal representatives of the Estate of Jaime T. Guttenberg, their 14-year old daughter who was killed at Marjory Stoneman Douglas High School.

97.     On February 16,  just two days after the shooting, the Guttenbergs were sitting with their rabbi and a funeral director planning Jaime's funeral. They were in the process of picking a casket for their daughter when Fred looked at his phone and saw that he had received a text message and a missed call from a representative for the FBI. The text message advised Fred that the FBI had important information to share with him. Fred asked the FBI agent to call him.

98.     During the call, <u>the FBI agent told Fred that the FBI was at fault for failing to</u> <u>prevent the tragedy</u> that took his daughter's life. The FBI agent said that the FBI's tragic mistakes were about to become public, and he wanted to make sure Fred heard it from the FBI first.

99.     The FBI representative told Fred that, before the shooting, the FBI had received information about the killer that should have been acted upon and was not. The FBI agent also admitted that, had the Bureau acted upon the information it had received, the FBI would have been able to prevent Cruz from carrying out the shooting.

100.    Fred asked the FBI representative, "Are you telling me that if the FBI did not make a mistake and did their job a month sooner, my daughter would still be alive today?" To that, the FBI agent replied, "I'm afraid so, sir."

**B.     The FBI Statement on the Parkland Shooting.**

101.    On February 16, 2018, the FBI issued a statement <u>admitting it had violated</u> <u>established protocols</u> in responding to information it received about Cruz prior to the shooting.

102.    In the statement, the FBI stated that "[o]n January 5, 2018, a person close to Nikolas Cruz contacted the FBI's Public Access Line (PAL) tip-line to report concerns about him. The caller provided information about Cruz's gun ownership, desire to kill people, erratic behavior, and disturbing social media posts, as well as the potential of him conducting a school shooting."

103.    The FBI admitted that "under established protocols, the information provided by the caller should have been assessed as a potential threat to life. The information then should have been forwarded to the FBI Miami Field Office, where appropriate investigative steps would have been taken."

104.    The statement makes clear that the FBI was under a non-discretionary duty to assess the information about Nikolas Cruz as a "potential threat to life." This assessment would trigger a non-discretionary duty to forward information to the FBI Miami Field Office. And, at that point,

the FBI Miami Field Office would have had a non-discretionary duty to take appropriate investigative steps.

105.    **FBI officials did not have discretion to do nothing**. Established protocols required the FBI to act in specific ways in response to the information it received about Nikolas Cruz: assess the information as a potential threat to life and forward it to the FBI Miami Field Office.

106.    Further, FBI Miami Field Office personnel did not have discretion to do nothing. The FBI's statement explains that if the information had been forwarded to the FBI Miami Field Office, "appropriate investigative steps *would have been taken*." The statement leaves no room for discretion on the part of the FBI Miami Field Office in deciding whether to take appropriate investigative steps. An investigation was required under established protocols.

107.    Doing nothing in response to a tip regarding a potential threat to life is not an act embraced within the discretion granted to agents of the FBI.

108.    The FBI admitted in its statement that established protocols "were not followed for the information received by the PAL on January 5. The information was not provided to the Miami Field Office, and no further investigation was conducted at that time."

109.    In other words, the FBI admitted that it violated established protocols, which governed its conduct in responding to the information it received about Cruz.

110.    Despite the FBI's awareness of Cruz's gun ownership, desire to kill people, erratic behavior, disturbing social media posts in which he made statements about becoming a school shooter and more, and the likelihood of him committing a school shooting, the bureau failed to follow established protocols that would have prevented the shooting from taking place.

111.    The FBI's failure to abide by established policies, procedures, protocols, and/or guidelines directly and proximately caused the horrific tragedy that injured William Olson and so many others, and cost the lives of at least 17 others.

**C.      The FBI's Press Conference on the Parkland Shooting.**

112.    On February 22, 2018, Acting Deputy Director of the FBI, David Bowdich, held a press conference in which he <u>acknowledged that "there was a mistake made</u>."

113.    He further admitted that strong processes and protocols existed to deal with and respond to tips, "it's just they were not followed."

**D.      The FBI's Congressional Testimony on the Parkland Shooting.**

114.    The FBI also admitted its negligent failures in sworn public testimony.

115.    Acting Deputy Director Bowdich testified about the Parkland shooting in hearings before the Senate and House Judiciary Committees on March 14 and 20, 2018.

116.    During his testimony, Bowdich, admitted that the FBI had received two separate tips alerting them to the dangers Nikolas Cruz posed and failed to respond to the tips properly.

117.    Bowdich admitted that the FBI "clearly should have done more" in response to these alerts. He then summarized the current results of their investigation into what the FBI failed to do to prevent this massacre. The findings were the following:

- On September 25, 2017, the FBI received an e-mail alerting them that somebody under the username "Nikolas Cruz" had posted a comment on YouTube that said **"I'm going to be a professional school shooter."**

- In response to this tip, the FBI opened a "Guardian" lead and assigned it to their Jackson Field Office in Mississippi. Representatives from that office visited and interviewed the tipster. They then determined that the identity of the commenter could not be

determined and closed the investigation without any further follow-up or alert to local law enforcement agencies.

- On January 5, 2018, the FBI received a call-in tip from a woman who identified herself as a close friend of the Cruz family.

- This caller alerted the FBI to Cruz's statements about harming himself and others; his references to ISIS; previous threats he made against his mother with a rifle; that he had purchased several weapons and said he wanted to kill people; that he was mutilating small animals; and that he, at 18, had the mental capacity of a 12- to 14-year old.

- **The caller told the FBI about the danger that Cruz would "shoot up a school."**

- The FBI operator matched the information from this tip to the previous Guardian lead regarding the YouTube post. She "consulted with her supervisor and the matter was closed" without any further action. Information of this tip was never forwarded along for any further review and local law enforcement was, again, not informed of the tip.

118.    Once they were notified of the shooting at Marjory Stoneman Douglas, the FBI connected the shooter to the previously obtained tips.

119.    Bowdich concluded his testimony by stating that the FBI is "committed…to doing whatever is necessary to correct our mistakes and prevent tragedies like this one from being repeated."

<u>**CAUSES OF ACTION**</u>

<u>**COUNT I: NEGLIGENCE**</u>

120.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs.

121.     **Duty:** The FBI owed a legal duty to the students and teachers of Marjory Stoneman Douglas High School in Parkland, Florida.

122.     First, the FBI owed the students and teachers of Marjory Stoneman Douglas High School in Parkland, Florida, a duty to comply with mandatory investigative procedures governing how information on school shootings were to be handled. FBI personnel were subject to mandatory, non-discretionary investigative procedures that dictated how tips concerning potential school shootings had to be handled. The FBI had adopted those procedures as the standard of conduct for handling information concerning potential school shootings. The FBI knew or reasonably should have foreseen that the failure to properly follow those mandatory investigative procedures upon receiving credible information concerning Nikolas Cruz—including, among other things, his stated desire to commit a mass shooting at a school, his possession of high-powered weapons with which to carry out a school shooting, his disciplinary history as a student at Marjory Stoneman Douglas High School, and his propensity for violence—created a broad zone of risk that posed a general threat of harm to the students and staff at Marjory Stoneman Douglas High School, the foreseeable target of Nikolas Cruz.

123.     Second, the FBI undertook, through its public outreach efforts, to serve as the receiver, repository, and conduit of information regarding school shootings. In response to the FBI's undertaking, the public relied on the FBI as the exclusive receiver, repository, and conduit of information concerning potential school shooting, even to the exclusion of other governmental entities that could have handled the information. As a result of that undertaking and foreseeable reliance, the FBI knew or reasonably should have foreseen that the failure to exercise reasonable care in handling and relaying credible information it received concerning a potential school shooting created a broad zone of risk that such information would never be disseminated to an

appropriate governmental body and that such information would never be investigated and acted upon.

124.    In this case, the FBI undertook the task of handling and relaying the information it received from the January 5th tipster in a reasonable manner. In light of the way the FBI held itself out to the public, its undertaking, and the context and content of the January 5th tipster's call to the FBI in this case, the FBI knew or reasonably should have foreseen that:

    a.  The tipster was justifiably relying on the FBI as the exclusive forum for reporting school shootings because, in response to the tipster's expressed ambivalence about whether the FBI was the proper forum for reporting information about Nikolas Cruz, the FBI reassured the tipster, both implicitly and expressly, that the FBI was the proper forum for reporting such information, that the FBI would investigate the matter, and that the FBI would follow-up with the tipster; and

    b.  Given the tipster's reliance on the FBI and its assurances, failure to exercise reasonable care in the handling and relaying of the information concerning a potential school shooting by Nikolas Cruz created a broad zone of risk that such information would never be disseminated to an appropriate governmental body and that the tip would never be investigated and acted upon; and

    c.  Such failure posed a general threat of harm to the students and staff at Marjory Stoneman Douglas High School—the foreseeable target of Nikolas Cruz and the intended beneficiaries of the tip, to whom the FBI ultimately owed a duty to perform its undertaking in a reasonable manner.

125.     Third, the FBI owed the students and teachers of Marjory Stoneman Douglas High School in Parkland, Florida, a special duty to intervene because:

a.   The FBI instructed tipsters to communicate information regarding potential school shootings, thereby willingly injecting itself into matters involving potential school shootings;

b.   The FBI directly involved itself in handling the tip concerning Nikolas Cruz by fielding the January 5 tipster's call and assuring the ambivalent tipster, both implicitly and expressly, that the FBI would investigate the matter and that calling the FBI was the appropriate course of action, to the exclusion of notifying other law enforcement authorities;

c.   The FBI knew or reasonably could have foreseen that **an identifiable group of individuals**—here, students and teachers of Marjory Stoneman Douglas High School in Parkland, Florida—were the expected targets of Nikolas Cruz's violence or anticipated shootings; and,

d.   Despite knowing or reasonably foreseeing the risk to the students and teachers of Marjory Stoneman Douglas High School in Parkland, Florida, the FBI permitted the danger to exist by failing to act entirely, in admitted violation of mandatory, established protocols.

126.   **Breach:** The FBI failed to exercise reasonable care (a) in complying with mandatory investigative procedures that the bureau had adopted as the standard of conduct for handling information concerning potential school shootings; (b) in complying with non-discretionary duties not to falsely assure people possessing credible information and evidence about anticipated school shootings that their tips and information would be taken seriously and

investigated, and not to dissuade people with such information from contacting other law enforcement agencies (c) in performing the task it undertook—serving as the receiver, repository, and conduit of information regarding school shootings—and upon which the public—and, specifically, the January 5th tipster—relied to their detriment; and (d) in the way it handled the information received concerning Nikolas Cruz and Marjory Stoneman Douglas High School, an entity that was foreseeably at risk of being attacked by Nikolas Cruz. Specifically, the FBI failed to exercise reasonable care in the following ways, among others:

> a.   Doing nothing whatsoever with the information that it received concerning Nikolas Cruz;
>
> b.   Failing to investigate and follow-up on the credible information it received from the public, including the January 5th tipster;
>
> c.   Failing to follow non-discretionary, established protocols that required the FBI to forward the information it had received concerning Nikolas Cruz to its Miami Field Office, which would have had a non-discretionary obligation to take investigative steps;
>
> d.   Failing to intervene, including in any of a number of ways that the FBI has previously identified as effective intervention methods for potential school shootings; and
>
> e.   At the very least, failing to relay the information received from the January 5 tipster to another governmental body that could have handled the investigation.

127.   **Causation:** As a direct and proximate cause of the FBI's negligence, William Olson was shot and injured by Nikolas Cruz. But for the FBI's negligence, Nikolas Cruz would not have shot and injured William Olson. The FBI's failure to investigate the tips and information

it had received, failing to forward the information concerning Nikolas Cruz to appropriate governmental bodies, and failing to follow its mandatory, established protocols, was a direct and substantial cause of the Plaintiffs' loss.

128.   **Damages:** As a direct and proximate cause of the FBI's negligence, William Olson has been damaged. Therefore, pursuant to Fla. Stat. §768.28 and all applicable subparts thereto, he is entitled to recover all available damages, including: bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, mental pain and suffering, loss of the capacity for the enjoyment of life, medical expenses in the past and in the future, loss of earnings, loss of the ability to earn money in the future and/or aggravation of a preexisting condition.

WHEREFORE, the Plaintiff, William Olson, demands judgment against the United States for compensatory damages, costs, and such other relief this Court deems appropriate.

Dated:  October 27th, 2021

Respectfully submitted,

**LEIGHTON LAW, P.A.**

*Attorneys for Plaintiff*
1401 Brickell Avenue
Suite 900
Miami, FL 33131
Phone:          (305) 347-3151
Fax:             (305) 675-0123
Primary email:      John@Leightonlaw.com
Primary email:      Max@Leightonlaw.com
Secondary email:    Carmen@Leightonlaw.com
Secondary email:    MariaF@Leightonlaw.com


By: _____
        JOHN ELLIOTT LEIGHTON
            Florida Bar No. 507921
        MAX N. PANOFF
            Florida Bar No. 84548


## SERVICE LIST

| By: /s/ John Elliott Leighton | ARIANA FAJARDO ORSHAN |
|---|---|
| Fla. Bar No. 507921 | UNITED STATES ATTORNEY |
| LEIGHTON LAW, P.A. | |
| Attorney for Plaintiffs | Steven R. Petri, Assistant U.S. Attorney |
| 1401 Brickell Avenue, Suite 900 | Federal Bar No.: A5500048 |
| Miami, FL 33131 | *Counsel for United States of America* |
| Tel. No. (305) 347-3151 | 500 East Broward Boulevard, Suite 700 |
| Fax No.: (305) 675-0123 | Fort Lauderdale, FL 33394 |
| John@LeightonLaw.com | Tel. No.: (954) 660-5799 |
| Max@LeightonLaw.com | Steve.Petri@usdoj.gov |
| Carmen@Leightonlaw.com | |
| MariaF@Leightonlaw.com | |