UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED ACTION

Case No. 18-62758-CIV-DIMITROULEAS

IN RE: MARJORY STONEMAN DOUGLAS
HIGH SCHOOL SHOOTING FTCA LITIGATION
_____/

**RESPONSE TO PODHURST ORSECK, P.A.'S MOTION FOR AN AWARD OF
COMMON BENEFIT FEES & ALTERNATIVE REQUEST FOR
DISCOVERY AND EVIDENTIARY HEARING**

The undersigned respectfully submit this response in opposition to Podhurst Orseck, P.A.'s ("Podhurst") Motion and Memorandum of Law for an Award of Common Benefit Fees (the "Motion"), D.E. 418, and Rennert Vogel Mandler & Rodriguez, P.A.'s ("Rennert" or the "Rennert firm") Notice of Joinder to Motion and Memorandum of Law for an Award of Common Benefit Fees (the "Joinder"), D.E. 420.

**PRELIMINARY STATEMENT**

Two weeks ago, Podhurst and Rennert announced they would seek 10% of the $127.5 million settlement offer in this case ($12.75 million) as a "common benefit" tax or attorney's fee for their own benefit.[1] The Motion makes this demand. There is no legal or equitable support entitling either firm to such a fee and so the Motion must be denied.

The fee demand came as a surprise. Counsel had no agreement for a common benefit fee. When the case started, the plaintiffs' counsel entered into a joint prosecution agreement ("JPA") binding us to work in the common interest for our clients without any fee commitment to each other. The JPA says nothing about fees. Also, there is no statute, precedent, or court order supporting the fee. Although this is not a class action or a multi-district litigation, even in those cases, common benefit fee protocols are typically entered at the *start* of a case. Podhurst knows this well. Inexplicably, Podhurst avoided mentioning fees altogether when it sought to be

_____

[1] The Federal Tort Claims Act ("FTCA") caps legal fees at 25% of a plaintiff's recovery. 28 U.S.C. § 2678. If all the plaintiffs' counsel were charging the maximum allowable rate, the requested common benefit fee to Podhurst and Rennert would constitute 40% of the total attorney's fee charged. To the extent any attorney is charging a fee below the 25% maximum, the common benefit fee to Podhurst and Rennert would occupy an even greater share of the total fee.

appointed lead counsel a year ago. What is more, the demand came while the plaintiffs and counsel were in the middle of arriving at an allocation of the settlement offered by the government. None of the cases cited by Podhurst support a common benefit fee under these facts.

Apparently recognizing no prior agreement or order supporting its Motion, Podhurst claims that common benefit fee awards are based on "the equitable concept of unjust enrichment." D.E. 418 at 9. But, even if true, no one has been unjustly enriched here. Just as some depended on Podhurst to carry the load in this federal case, Podhurst depended on others to carry the load in the parallel state case. Over the last three-plus years, the plaintiffs' attorneys operated as a team, dividing the tasks required to move the entire case along. One team took the lead on prosecuting the state case against the School Board of Broward County ("School Board"), Broward Sheriff's Office ("BSO"), and others, and ultimately secured a favorable settlement of $25 million from the School Board. No one demanded a common benefit fee from Podhurst, Rennert, or anyone else because of this settlement. Meanwhile, Podhurst built the liability case against the U.S. Federal Bureau of Investigation ("FBI") in federal court. Rennert helped Podhurst. Neither firm was active in prosecuting the state case, instead relying on the work of others. The work of others on the state case, if anything, liberated Podhurst and Rennert to focus on the FBI's liability. Equity supports denial of the Motion.

Lastly, granting the Motion would set a bad precedent. As noted by the federal Manual on Complex Litigation, raising common benefit fee issues early in the case avoids the confusion, conflict, and distrust that arose here. Attorneys seeking such fees from others should be incentivized to raise the request early at the time of leadership appointments. Granting the Motion, however, would have the opposite effect. It should be denied.

Alternatively, we request that the Court defer ruling on the Motion until counsel has had the chance to conduct discovery, present evidence at a hearing, and provide further briefing.

## FACTS

### I.    Introduction

On February 14, 2018, the students, teachers, and staff of Marjory Stoneman Douglas High School ("MSD") in Parkland, Florida suffered the deadliest mass shooting at a high school in U.S. history. The lone shooter was apprehended and is under criminal prosecution. Subsequent investigation revealed several parties who potentially shared fault for the tragedy, including the FBI, the School Board, BSO, school resource officer Deputy Scot Peterson, and campus security

monitor Andrew Medina. Since 2018, the civil litigation arising out of the Parkland shooting has proceeded in both state and federal court. The universe of **plaintiffs** in each venue is largely the same, but the named **defendants** differ.

In **state court**, the Seventeenth Judicial Circuit in and for Broward County, 17 wrongful death estates, 15 bodily injury victims, and 19 post-traumatic stress disorder victims ("PTSD") filed suit against multiple defendants, for a total of 51 state court lawsuits. In each of these state court lawsuits, the plaintiffs sued a principal set of defendants: the School Board, BSO, Peterson, and Medina. The claims against these defendants primarily sound in negligence and gross negligence. The FBI is not a defendant in any of the state court lawsuits. The state court lawsuits were consolidated for pre-trial purposes before The Honorable Patti Englander Henning in the complex tort division.

In **federal court**, this District's Fort Lauderdale division, 16 of the 17 wrongful death estates sued the FBI, 14 of the 15 bodily injury victims sued the FBI, and 10 of the 19 PTSD victims sued the FBI, for a total 40 federal court lawsuits. The FBI is the only defendant in the federal court lawsuits. The claims against the FBI sound in negligence and arise under the FTCA. None of the above-referenced state court defendants were sued in federal court. By order of this Court, the federal lawsuits are consolidated for pre-trial purposes before The Honorable William P. Dimitrouleas under Federal Rule of Civil Procedure 42. D.E. 195, 225, 227, 233, 239, 257.

The plaintiffs are represented by the same attorneys in each venue. A total of 14 law firms filed suit on behalf of the 40 plaintiffs in federal and state court. Those law firms are Grossman Roth Yaffa Cohen, P.A.; The Haggard Law Firm ("Haggard"); Colson Hicks Eidson, P.A. ("Colson Hicks"); Cohen, Blostein & Ayala P.A.; Leighton Law, P.A.; Alan Goldfarb, P.A.; Goldfarb Law, P.A.; Brill & Rinaldi, The Law Firm ("Brill & Rinaldi"); Law Offices of Craig Goldenfarb; Balkan & Patterson LLP; Kelley Uustal PLC ("KU"); the Law Office of Alex Arreaza; Podhurst; and Rennert. Podhurst represents 2 clients (the Estate of Jaime Guttenberg or the "Guttenberg Estate" and Justin Colton) and Rennert represents 1 client (the Estate of Carmen Schentrup or the "Schentrup Estate"). The other 37 plaintiffs who sued in federal court are represented by the other 12 firms.

The federal and state cases have proceeded simultaneously, and, so, a division of labor was necessary to keep both matters on track. Counsel's team approach was memorialized in their written JPA, executed by the attorneys for the plaintiffs, including Podhurst and Rennert, in 2019.

A Podhurst attorney took the lead on drafting, circulating, and securing signatures to the JPA. The JPA was not specific to any venue or lawsuit and participation in the JPA was not conditioned on any attorney agreeing to any "common benefit" fee.

Over the years, all counsel kept in contact to coordinate. Beginning in May 2018 and based on the needs of the case at the time, the attorneys met regularly to discuss the list of pending or contemplated legal actions. During these conferences, the attorneys taking a leadership role provided updates. To facilitate coordination, KU created and administered a group e-mail list so that attorneys could easily correspond. KU also organized and paid for a focus group of jurors and shared its results with the entire group, again with no request for payment.

## II.    The State Case

### A.  The filing of the state suits and Jay Cohen's appointment as liaison counsel

The effort to seek financial compensation for the victims of the shooting began in state court. On April 17, 2018, the first lawsuit arising out of the shooting, *Borges v. Cruz, et al*., No. CACE18008568, was filed by the Law Office of Alex Arreaza in Broward County. This was soon followed by *Pollack v. Cruz, et al.*, No. CACE18009607, filed by Brill & Rinaldi, in the same court on April 30. In the months that followed, counsel in the *Borges* and *Pollack* cases engaged in extensive discovery. Brill & Rinaldi, counsel to the plaintiff in *Pollack*, led the charge on the discovery and liability theories. Their work necessarily benefitted all the victims, whose suits would follow, and counsel for the *Borges* and *Pollack* plaintiffs freely shared their work product with those attorneys who filed suits later. In January 2019, attorney Jay Cohen filed the third state court suit, on behalf of A.P., a PTSD victim.

While these actions were being litigated in state court, other counsel pursued a legislative solution that could avoid lawsuits against state and local agencies altogether. It later became apparent that everyone needed to file suit. Thus, in April 2019, a year after *Borges* and *Pollack* were filed, a group of 20 victims filed suit in state court. This included the Guttenberg and Schentrup Estates. Some adopted the *Pollack* state court complaint drafted by Brill & Rinaldi, which they freely shared. A separate team of attorneys from Haggard and KU prepared a different form complaint to be used for filing suit against the state court defendants.[2] Neither Podhurst nor

---

[2] Complaint and Demand for Jury Trial, *Oliver v. School Bd. of Broward County, et al.*, No. CACE19007802, Fla. 17th Jud. Cir. April 10, 2019 (Haggard complaint); Complaint and Demand

4

Rennert helped write either state court complaint. They adopted the version prepared by Haggard and KU to file suit on behalf of the Guttenberg and Schentrup Estates in state court.[3]

In May 2019, Mr. Cohen, counsel in *A.P.*, was appointed by agreement to serve as liaison counsel on behalf of the plaintiffs in the state cases. Mr. Cohen's court-appointed role in the state case mirrored that of Ms. Infante in the federal case. Mr. Cohen never requested a fee for serving as state court liaison counsel. On July 7, 2019, the state court consolidated all the Parkland state court cases for discovery and pre-trial purposes.

During the period June 2019 through March 2021, as additional state court cases were filed, they were consolidated with the other Parkland cases. In June 2020, Podhurst filed suit on behalf of bodily injury victim Justin Colton in state court and again used the state court complaint prepared by Haggard and KU.[4]

The docket for the consolidated state case contains approximately 1,150 entries. *See* Docket, *In re. Marjory Stoneman Douglas Cases*, No. CACE1980000, *available at* Case Detail - Public - Broward County Clerk of Courts (browardclerk.org) (last visited Dec. 29, 2021).

### B. The state liability and discovery issues

As outlined below, all the work on the state case has been done without any request or expectation of a "common benefit" fee. Moreover, although Podhurst and Rennert represented 3 plaintiffs in the state case, neither firm took an active role in prosecuting these cases, instead relying on the work of others while focusing their efforts on the federal liability case.

The state case has involved a variety of complex liability issues, as shown by the various motions to dismiss filed, including:

---

for Jury Trial, *Alhadeff v. School Bd. of Broward County, et al.*, No. CACE19008077, Fla. 17th Jud. Cir. April 11, 2019 (similar KU complaint).

[3] Complaint and Demand for Jury Trial, *Schentrup v. School Bd. of Broward County, et al.*, No. CACE19007736, Fla. 17th Jud. Cir. April 10, 2019 (complaint filed by Rennert, parallel to Haggard and KU complaints); Complaint and Demand for Jury Trial, *Guttenberg v. School Bd. of Broward County, et al.*, No. CACE19007720, Fla. 17th Jud. Cir. April 10, 2019 (complaint filed by Podhurst, parallel to Haggard and KU complaints).

[4] Complaint and Demand for Jury Trial, *Colton v. School Bd. of Broward County*, No. CACE20009412, Fla. 17th Jud. Cir. June 5, 2020 (second state court complaint filed by Podhurst, parallel to Haggard and KU complaints).

- as to the School Board, whether it had a duty to control the actions of the shooter or warn others of his violent propensity, whether the plaintiffs' claims against it are based on improper inference-stacking, whether it can be liable for negligent hiring or retention of defendant campus monitor Medina, whether its actions are protected as immune discretionary planning-level decisions, whether the School Board's implementation of certain diversionary programs could support the plaintiffs' claim, and whether the School Board's manner of spending certain bond proceeds could support the plaintiffs' claim;[5] and

- as to both Peterson and Medina, whether either had a duty to prevent the shooter from harming others on campus, and whether either of their actions rise to the level of bad faith, malicious purpose, or wanton or willful disregard such that they are personally subject to suit.[6]

The parties in the state case engaged in extensive briefing as to the above liability issues, resulting in successful outcomes for the common benefit of all plaintiffs. The state court denied in part the School Board's motion to strike raising the above issues and denied in full the motions to dismiss filed by Peterson and Medina. The latter two appealed those rulings, which required further briefing and oral argument.[7] This labor resulted in two favorable published appellate opinions.[8] Though both Podhurst and Rennert named the School Board, Peterson, and Medina in their complaints, neither firm helped in briefing or arguing these dispositive motions or appeals.

The state case involved the production of dense discovery. This includes over 13,000 pages of documents produced by BSO, over 12,000 pages of documents produced by the School Board,

---

[5] Plaintiffs' Response to School Board of Broward County's Partial Motion to Dismiss and Motion to Strike, *In re. Marjory Stoneman Douglas Cases*, No. CACE1980000, Fla. 17th Jud. Cir. Dec. 27, 2019.

[6] Plaintiffs Andrew Pollack and Shara Kaplan's Response to Defendant Scot Peterson's Amended Motion to Dismiss Amended Complaint, *Pollack v. Cruz*, No. CACE189607, Fla. 17th Jud. Cir. Oct. 9, 2018; Plaintiffs' Response to Defendant Andrew Medina's Motion to Dismiss Plaintiffs' Amended Complaint, *Pollack v. Cruz*, No. CACE189607, Fla. 17th Jud. Cir. Nov. 2, 2018.

[7] Order on Defendant, Scot Peterson's, Motion to Dismiss & Order on Andrew Medina's Motion to Dismiss, *Pollack v. Cruz*, No. CACE189607, Fla. 17th Jud. Cir. Jan. 14, 2019 & Feb. 22, 2019; Order on Broward County School Board's Partial Motion to Dismiss and Motion to Strike, *In re. Marjory Stoneman Douglas Cases*, No. CACE1980000, Fla. 17th Jud. Cir. Feb. 8, 2021.

[8] *Peterson v. Pollack*, 290 So. 3d 102 (Fla. 4th DCA 2020); *Medina v. Pollack*, 300 So. 3d 173 (Fla. 4th DCA 2020).

129 emergency calls and radio transmissions, and over 2 hours of surveillance video. The state court team also collected and synthesized records from other proceedings. This includes over 200 documents collected in the personnel investigation of MSD school administrators, hundreds of pages of reports and related records from the investigation by the MSD Public Safety Commission, over 200 depositions and statements from the shooter's criminal case, over 2,000 pages of the shooter's school records from his counsel, over 700 pages of reports by BSO Detective John Curcio, and hundreds of pages of records from the Florida Department of Law Enforcement investigation of Peterson. The state court team also gathered records from the Florida Senate hearing where former Broward Sheriff Scott Israel was terminated, grand jury reports, 911 audio from Coral Springs, Florida Highway Patrol reports, and MSD fire alarm records.

Over 38 liability witnesses were deposed in the state case. The deponents include school and law enforcement personnel, former Sheriff Israel, the defendants, and multiple experts. No one at Podhurst or Rennert deposed a single liability witness in the state case. Based on the transcript appearance lists, Podhurst attended 1 liability witness deposition without asking a question. A Rennert attorney appeared at 5 state court depositions but also never asked a question.

Members of the state court team, KU and Brill & Rinaldi, coordinated two live site inspections of the school. One was in August 2021, and another in November 2021. No one from Podhurst or Rennert came to the school for either inspection.

The state court team also retained and prepared a team of 5 experts for the state case. The experts cover various subjects, including school administration and safety, active shooter responses, premises security, and school resource officer practices. Podhurst took no role in retaining or preparing any experts in the state case. Rennert was minimally involved. It retained 1 expert but passed on the task of briefing and preparing him for deposition. Still, Podhurst and Rennert relied on others by adopting the expert witness disclosures filed by other firms.[9]

The state court defendants also retained 5 experts.[10] This expert discovery is still ongoing.

---

[9] Plaintiffs' Guttenberg and Colton's Notice of Adoption of Plaintiff's Disclosure of Expert Witness & Plaintiff Schentrup's Notice of Adoption of Plaintiff's Disclosure of Expert Witness, *In re. Marjory Stoneman Douglas Cases*, No. CACE1980000, Fla. 17th Jud. Cir. June 4, 2021.

[10] Defendant School Board of Broward County's Expert Witness Disclosure, Defendant Scot Peterson's Expert Witness Disclosure & Defendant Andrew Medina's Expert Witness Disclosure, *In re. Marjory Stoneman Douglas Cases*, No. CACE1980000, Fla. 17th Jud. Cir. June 4 & 7, 2021.

As of today, 2 defense experts have been deposed in the state case, and the undersigned is waiting to depose the others. No one from Podhurst or Rennert appeared at either expert deposition or helped the questioners prepare for them. Nor have they helped in the preparation of the remaining expert depositions.

All the above work in the state case has been done without any request or expectation of a "common benefit" fee. And although they represented 3 plaintiffs in the state case, neither Podhurst nor Rennert has ever taken an active role in any of the above tasks.

### C.  The School Board settlement in the state case

In the fall 2021, the plaintiffs settled their claims against the School Board for the sum of $26.25 million. Initially, considerable time was spent investigating a settlement by way of a claim bill in the Florida Legislature. A bill was drafted and filed in the Florida Senate. However, the undersigned successfully negotiated the settlement of a federal civil rights claim. This enabled a payment exceeding the $300,000.00 sovereign immunity cap applicable to state law claims and avoided the need for a claim bill. *See* Fla. Stat. § 768.28(5)(a). This settlement was preceded by countless hours of negotiations with School Board counsel led by state liaison counsel Mr. Cohen on behalf of nearly all plaintiffs and attorney Alex Arreaza on behalf of his client Anthony Borges. Efforts to reach this settlement also included multiple internal strategy sessions and town hall-style video conferences with clients. Podhurst and Rennert's clients were included in the School Board settlement. But no one at either firm led the negotiations with School Board counsel, drafted settlement papers, or marshaled client signatures. Others attended to those duties. Nonetheless, the Podhurst and Rennert clients were never asked to pay a common benefit fee.

The state case continues against the remaining defendants, BSO, Peterson, and Medina.

## III.  The Federal Case

### A.  The filing of the federal suits & federal jurisdictional discovery

On November 13, 2018, Podhurst began the federal litigation by suing the U.S. government on behalf of the Guttenberg Estate under the FTCA. Podhurst drafted the Guttenberg Estate's federal complaint against the FBI and shared it with the group. The day after she filed suit, Ms. Infante of Podhurst asked via e-mail that other plaintiffs' counsel not file their own suits until briefing on the government's anticipated motion to dismiss was complete. The undersigned complied with this request. The government moved to dismiss the Guttenberg Estate's complaint in March 2019 on jurisdictional grounds and the Court postponed plaintiffs' response deadline

until after jurisdictional discovery could be completed. D.E. 17, 18, 27. While the motion to dismiss was pending, the Rennert firm filed suit against the FBI on behalf of the Schentrup Estate, which this Court then consolidated with the Guttenberg Estate's case under Rule 42. D.E. 54, 55.

Thereafter and into early 2020, the parties engaged in jurisdictional discovery and related motion practice. D.E. 32, 56-58, 63, 74, 77, 91, 92, 96, 113, 114, 163, 173. Given various ongoing discovery disputes, this Court extended the jurisdictional discovery deadline. D.E. 40, 65, 88, 131. Jurisdictional discovery formally closed in January 2020, D.E. 131, 170, but discovery disputes remained, D.E. 173, 175.

By February 2020, the government's March 2019 motion to dismiss, D.E. 17, was still pending, but it became clear that it was a good time for others to join the federal case. It had been approximately two years since the shooting. The mandatory pre-suit waiting period for filing an FTCA suit had expired for certain victims under 28 U.S.C. §§ 2401(b), 2675(a). And jurisdictional discovery was closed. D.E. 170. Thus, between February and March 2020, a group of 19 victims sued the FBI in federal court, adopting the federal complaint prepared by Podhurst. These cases were consolidated with the pending ones under Rule 42. D.E. 195. This was a simple pre-trial consolidation of separately filed cases. No party ever sought, nor did the Court order, nor would the law have supported, any class action or multi-district litigation consolidation. Importantly, the consolidation order did not reference legal fees of any kind.

On March 5, 2020, this Court denied in part the government's motion to dismiss. D.E. 187. Podhurst then filed an amended complaint on March 26, 2020, which became the plaintiffs' operative pleading. D.E. 190, 197-205, 207-214. Thereafter, additional victims filed their respective FTCA federal court suits. Podhurst's second client Mr. Colton filed suit in June 2020. All were consolidated with the others under Rule 42, again with no mention of fees. D.E. 225, 227, 233, 239, 257.

### B. Podhurst's appointment as "lead" and the federal liability and discovery issues

In November 2020, Ms. Infante approached the undersigned about serving as court-appointed "lead counsel" in the consolidated federal case. According to Ms. Infante, it was the government's idea that she be appointed as lead counsel to streamline communication. Shortly thereafter, Ms. Infante circulated a draft motion to be appointed "lead counsel," which no one opposed. None of these communications mention fees. Podhurst moved to be appointed lead on November 12, 2020, which this Court granted. D.E. 242, 244 (the "Appointment Order").

The liability case against the FBI was straightforward; there has never been a question that the FBI erred. *See* FBI Statement on the Shooting in Parkland, Florida, Feb. 16, 2018, *available at* <u>FBI Statement on the Shooting in Parkland, Florida — FBI</u>. The dispositive motions in the federal case raised three issues: (a) whether the FBI had a duty of care to the victims; (b) whether the FBI is immune from liability for its errors under the FTCA's discretionary function exception, and (c) whether its errors proximately caused the shooting. D.E. 17, 206, 377.

Federal fact discovery closed in September 2021. By that time, the government had produced approximately 9,550 pages of internal FBI materials and approximately 14,000 pages of e-mails and attachments. D.E. 290 at 6, D.E. 343 at 2. In terms of depositions, Podhurst deposed six witnesses by way of oral questions and four by way of written questions. D.E. 418 at 5-6, 6 n.3, 8. As for liability experts, Podhurst retained three on behalf of the plaintiffs. D.E. 418 at 12. The government has not disclosed liability experts and no federal liability experts have been deposed.

The docket for the federal case contains 430 entries, representing approximately a third of the entries on the state case's docket.

### C.  Other firms' contributions to the federal case

While Podhurst led the federal liability case, others made important contributions. KU and Colson Hicks attorneys vetted expert witnesses, reviewed document productions, and assisted in deposition preparation. A KU attorney accompanied Ms. Infante at the live deposition of the tipster. D.E. 418 at 8. On the eve of the tipster's deposition, attorney David Brill shared the substance of communications between the tipster and one of his clients, forwarded transcripts of prior statements taken of the tipster, and provided strategic advice. Mr. Brill's partner, Joe Rinaldi, appeared at the deposition remotely by Zoom. Mr. Brill also suggested to Ms. Infante that the plaintiffs' liability expert review a certain federal statute, which the expert incorporated into her report. None of these other attorneys seek a special fee for these contributions.

Furthermore, the undersigned's work in the state case has always been important to the federal case. The government alleges that its liability should be reduced on account of the fault of the School Board, BSO, Peterson, and Medina. D.E. 236 at 43-47. The government also sought and received voluminous records produced in the state case, including from the School Board and BSO. D.E. 279, 285, 297, 299, 302. Thus, although Podhurst was appointed as lead counsel, the work of other firms similarly contributed to the preparation of the federal case for trial.

Damages in the federal case were handled on an individual basis. That is, the attorneys for the 37 non-Podhurst/Rennert clients prepared their own clients' initial disclosures, gathered their own clients' medical records, secured their own clients' signatures on authorizations, drafted their own clients' written discovery responses, coordinated their own clients' compulsory examinations, prepared their own clients for depositions, defended their own clients at their depositions, retained their own damages experts, and litigated motions specific to their respective clients. D.E. 262-264, 307, 383-399, 412, 417. The government also moved for summary judgment on the claims of ten PTSD victims. D.E. 375. Mr. Cohen, the attorney for the PTSD victims, responded to the motion, not Podhurst or Rennert. D.E. 400, 402.

### D.  The partial settlement of the federal case & surprise fee motion

On November 22, 2021, this Court was informed that the plaintiffs had agreed to settle with the government. D.E. 408. However, as noted by the Court, this was a "partial settlement at best" because each plaintiff's individual allocation was undetermined. D.E. 427. Thus, over the course of the next several weeks, counsel and the plaintiffs have been working tirelessly to arrive at a voluntary allocation of the settlement offered by the government. While those efforts were underway, however, on December 13, 2021, Podhurst first made its common benefit fee demand. On December 15, 2021, it filed the Motion. D.E. 418. Rennert followed with its joinder. D.E. 420.

The surprise caused by the Motion did not stop the undersigned from moving forward on the allocation issue, however. As of December 27th, it appears that an agreement on allocation was reached. However, the process is not done. Release terms must be reduced to writing. The government has asked for each wrongful death survivor's specific allocation, which must be confirmed with the 16 estates' personal representatives. And counsel is trying to set up a structure option for interested plaintiffs. Getting the settlement from partial to final has required, and continues to require, significant effort by everyone (counsel and clients alike), not just Podhurst and Rennert.

### ARGUMENT

### I.    The Motion is unsupported by precedent.

The fees sought by Podhurst and Rennert are unprecedented in a case where multiple plaintiffs' claims are merely consolidated for pre-trial purposes under Rule 42, lead counsel was appointed without a common benefit fee agreement or order, and counsel expressed no intent to seek common benefit fees until the time of settlement.

Podhurst claims its demand for fees is "in keeping with applicable law," D.E. 418 at 2, but the cases it cites make clear that its demand is novel and there is no authority to support it.  In fact, Podhurst is unable to cite a single case where, as here, there was no prior notice or arrangement for common benefit fees and a court nonetheless awarded fees.

Podhurst claims that "governing Eleventh Circuit law" supports its motion, D.E. 418 at 3, but the Eleventh Circuit cases it cites are all class actions or MDLs, where the court applied the *Johnson* fee factors. *See* D.E. 418 at 10, citing *Amorin v. Taishan Gypsum Co., Ltd.*, 861 Fed. Appx. 730, 733 (11th Cir. 2021), *In re Equifax Inc.*, 999 F.3d 1247, 1279 (11th Cir. 2021), *Johnson v. NPAS Solns., LLC*, 975 F.3d 1244, n.14 (11th Cir. 2020), *In re Air Crash Disaster at Florida Everglades ("Everglades")*, 549 F.2d 1006 (5th Cir. 1977), *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 771 (11th Cir. 1991), & *In re Home Depot Inc.*, 931 F.3d 1065, 1079 (11th Cir. 2019). But, again, this is not a class action or an MDL. More importantly, the Appointment Order did not give notice of any common benefit fees, did not include a common benefit fee protocol, and was not followed by any such protocols, as is typically done in class action and MDL cases. Nor did Podhurst at any prior time announce any intention to seek additional compensation.  Accordingly, these cases are inapposite.

Take *Amorin* as an example, which was a Chinese drywall MDL consisting of thousands of cases consolidated in the Eastern District of Louisiana, where class counsel was appointed. 861 Fed. Appx. at 732. After consolidation, the court remanded a subset of Florida cases to this District, which were then settled by the Florida plaintiffs' individual counsel. *See id*. Common benefit fees had already been awarded to class counsel by the Louisiana district court and the only question was whether additional fees should be paid to class counsel on the Florida settlements. *See id*. at 732, 733. Unlike here, in *Amorin*, "Class Counsel and Individual Counsel entered an agreement to litigate any claims for common benefit fees in the SDFL." *Id*. at 732. It was understood from the outset that Class Counsel would seek fees. That is not the case here.

Nor is the *Everglades* MDL analogous to this case. That was a consolidated MDL arising out of an airplane crash that killed 96 people. 549 F.2d at 1008. Soon after consolidation, the court appointed a plaintiffs' lead counsel committee and then promptly issued two orders giving notice of its intent to award the committee additional fees when the case concluded. *Id*. at 1008-10. Then, when the case settled, the court took up the committee's fee motion. *Id*. at 1010. By contrast, here,

no order was entered giving anyone notice of a future common benefit fee. The "equitable considerations" that Podhurst claims *Everglades* demonstrates hardly apply here. D.E. 418 at 11.

Two cited cases were consolidated cases pursuant to Rule 42, like this case, and did not involve a Rule 23 class action or MDL: *In re City of New York*, CV-03-6049 ERK VVP, 2011 WL 7145228, at *1 (E.D.N.Y. Dec. 2, 2011) and *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759 (9th Cir. 1977). But these cases too are distinguished from the instant one. In *City of New York,* the record made "clear" that the attorneys "were in negotiations . . . from early in the litigation to resolve th[e fees] issue without resort to judicial intervention" and the court noted "no indication of bad faith or delay in bringing th[e] motion." *Id.* at *9. In *Vincent*, the court in the early stages of the litigation established a procedure for selecting a plaintiffs' lead counsel committee and entered an order stating that compensation for the work performed by the committee members would later be fixed by the court and be payable by the members of the plaintiff class. *See* 557 F.2d at 763-64. That did not occur here. Rather, Podhurst sought appointment as "lead" without any mention to the Court or counsel that it would later seek a special fee.

Podhurst cites a handful of cases against the government as persuasive examples of "common benefit awards." D.E. 418 at 12. These cases are also irrelevant. They are largely examples of attorneys moving for statutory fee awards (that is, fee-shifting) against the government. *See Lucarelli v. United States*, 943 F. Supp. 157, 158 (D.P.R. 1996) (determining whether to award prevailing plaintiffs attorney's fees under Equal Access to Justice Act ("EAJA") against the government); *Limone v. United States*, 815 F. Supp. 2d 393, 399 (D. Mass. 2011) (same); *United States v. 2,116 Boxes of Boned Beef*, 726 F.2d 1481, 1486-87 (10th Cir. 1984) (same); *Knights of the K.K.K. v. E. Baton Rouge Par. Sch. Bd.*, 679 F.2d 64, 67, 69 (5th Cir. 1982) (remanding for determination of EAJA fees). None support a surprise tax on other lawyers' contingency fees with their individual clients, which is what Podhurst and Rennert seek here.

## II.   The Motion is unsupported by practice in complex multi-plaintiff cases.

Even if the Court were to look to class action and MDL cases, it should still deny the Motion because the request is inconsistent with the practices that guide such cases.

As noted by Federal Judicial Center's Manual on Complex Litigation, which Podhurst endorses, D.E. 242 at 2, 3, an attorney intending to seek common benefit fees should say so at the start of litigation. It encourages "determining compensation and establishing terms and procedures for it ***early in the litigation***." *Ann. Manual Complex Lit. ("MCL")* § 10.223 (4th ed. 2004)

(emphasis added). As noted therein:

> Judges should consider advising the parties *at the outset of the litigation* about the method to be used for calculating fees and, if using the percentage method, about the likely range of percentages. *At an early conference* or in an early pretrial order after consultation with counsel, it is helpful to establish guidelines and procedures that will lighten the burdens on the participants, clarify expectations, and reduce the opportunities for disputes.

*Id.* at § 14.211 (emphasis added).

To avoid surprise, courts are encouraged to "at least set presumptive guidelines *at the outset of the litigation*" as to the "appropriate level of staffing for the particular litigation." *Id.* at § 14.212 (emphasis added). Similarly, with respect to attorney time records, courts are encouraged to "address this issue *early in the case* by directing counsel to develop record-keeping procedures to facilitate review." *Id.* at § 14.213 (emphasis added). Such guidelines are even encouraged when counsel intends to be compensated on a percentage basis, as "[s]uch records may be used as a cross-check[.]" *Id.*

The reasons for requiring early announcement of an intent to seek common benefit fees are plain and apply here: "To avoid controversy over the interpretation of the terms of the court's appointment order, designated counsel should seek consensus among the attorneys (and any unrepresented parties) when making decisions that may have a critical impact on the litigation. Counsel in leadership positions should keep the other attorneys in the group advised of the progress of the litigation and consult them about decisions significantly affecting their clients." *MCL* at § 10.222. Ethical considerations also require that any efforts by lead counsel to seek common benefit fees be addressed early. Rule 4-1.5(g) of the Florida Rules of Professional Conduct generally provides that lawyers who are not in the same firm may not share in a fee unless the client agrees to the division in writing.

*In re Vioxx Products Liab. Litig.*, 760 F. Supp. 2d 640, 655 (E.D. La. 2010), cited by Podhurst, D.E. 418 at 11, 12, illustrates the point. In March 2005, shortly after the first status conference in this product liability MDL, the court "appointed committees of counsel to represent the parties." *Id.* at 642-43. Soon thereafter, between April and August 2005, the court imposed common benefit fee guidelines and appointed a certified public accountant to "record and review the submissions of common benefit counsel in this MDL." *Id.* at 643-44. When the case settled two years later in November 2007, "the parties included a provision [in the settlement agreement]

14

that expressly provide[d] for a common benefit fee assessment to be fixed by the Court." *Id*. at 645. Then lead counsel moved for the fee. The issue was fronted from the outset, incorporated in a court order, and then memorialized in a written settlement. Nothing close to that occurred here. *See, e.g., also, In re C.R. Bard, Inc., Pelvic Repair Sys. Products Liab. Litig*., Case No. 1:14-md-02511, 2019 WL 4458579, at *15 (S.D.W. Va. Mar. 12, 2019) (court entered an order setting "preliminary procedures for attorneys establishing standards for maintaining and submitting time and expenses for possible future consideration as common benefit," which was "approved by all members of the [Plaintiffs Steering Committee] and signed and submitted by all members of the Plaintiffs' Executive Committee").

   Podhurst knows this is standard practice. The following are a few examples of recent cases where Podhurst occupied a leadership position. In each case, the court entered detailed attorney common benefit fee guidelines at or around the time that it appointed plaintiffs' lead counsel. In one, the Podhurst partner leading this case, Mr. Marks, participated in suggesting the guidelines to the court. The cases are:

- *In re. General Motors LLC Ignition Switch Litigation*, Case No. 14-MC-02543-JMF, S.D.N.Y.: D.E. 36 (August 2014 order appointing Podhurst attorney Peter Prieto to executive committee), D.E. 47 (September 2014 order describing authorized common benefit work, imposing timekeeping requirements, and attaching monthly time and expense report forms);

- *In re. Blue Cross Blue Shield Antitrust Litigation*, Case No. 13-CV-20000-RDP, N.D. Ala.: D.E. 61 (April 2013 order appointing firm founder Aaron Podhurst to steering committee), D.E. 80 (May 2013 order imposing protocols for plaintiffs' counsel time submissions and process for approving common benefit work, and authorizing special master to oversee fee submissions); and

- *In re. NFL Players' Concussion Injury Litigation*, Case No. 12-MD-02323-AB, E.D. Pa.: D.E. 64 (April 2012 order appointing Mr. Marks to executive committee), D.E. 3969 (September 2012 motion by Mr. Marks and others for a time and expense protocol and to appoint auditor); D.E. 3710 (September 2012 order setting time and expense protocol, defining compensable common benefit work, and appointing auditor to review fee submissions).

   Neither Podhurst's request to counsel to support the "lead" appointment, nor its motion to this Court, mentioned any intention to seek additional fees. During the thirteen months in which it served as lead counsel, Podhurst never mentioned any intention to seek such fees. It drafted,

circulated, and agreed to a JPA, in which its attorneys agreed to work with others in the group's common interest without financial conditions. And they took no active role in the state court liability case. All the above led the undersigned to conclude that the work had been divided for the collective benefit of the victims without financial strings attached.

Had Podhurst or Rennert given timely notice of their true intention, the undersigned certainly would have approached the federal case differently. Among other things, we may have engaged Podhurst in a discussion about the terms of the fee, developed staffing and time-keeping guidelines, sought periodic common benefit time reports, sought appointment of a broader plaintiffs' steering committee to fairly allocate common benefit work as in *Everglades*, or perhaps even submitted a competing bid for appointment as lead counsel – as typically occurs in MDL and class action cases. The undersigned never did any of the above, however, because we had agreed by way of the JPA to work together in the common interest, we had arrived at a division of labor, and no one ever suggested seeking extra compensation.

There is no excuse for Podhurst's failure to address compensation matters at the time of its appointment. Citing a *draft* law review article, Podhurst claims that specific orders appointing lead counsel in MDL cases typically do not "address attorney compensation." D.E. 418 at 7. But it omits the author's more relevant comment: "**Of course, these findings do not show that courts never address the financial aspects of leadership appointments.**" David L. Noll, *What Do MDL Leaders Do?: Evidence from Leadership Appointment Orders*, Pound Institute Lewis & Clark Symposium, at 36-37 (Nov. 1, 2017) (emphasis added). This claim also cannot be squared with the above examples where common benefit fee guidelines were entered soon after Podhurst attorneys were appointed to leadership positions. Courts and counsel endeavor to address leadership compensation at the outset of a case to ensure notice and transparency. It is disingenuous to suggest that such matters should be ignored at the outset and dealt with, by surprise, while a settlement is being finalized. As illustrated by the unfortunate distraction that arose here, we should be encouraging counsel seeking leadership positions to raise fee matters early, not late.

### III.   Avoiding unjust enrichment does not support the Motion.

The common benefit doctrine upon which Podhurst relies is "grounded in the equitable powers of the courts under the doctrines of quantum meruit and unjust enrichment." *City of New York*, 2011 WL 7145228, at *3. It "holds that those who obtain a benefit of a lawsuit without

contributing to its cost are unjustly enriched by the successful litigant's success." *Id.* at *3. *See also Camden I*, 946 F.2d at 771 (avoiding unjust enrichment is rationale for common benefit fees).

But the equitable interest in avoiding unjust enrichment is not served by awarding Podhurst and Rennert the demanded fee. Since the case started, counsel has been working with the mutual understanding of a division of labor. While Podhurst led the liability case against the FBI, others lead the liability case against the School Board, BSO, Peterson and Medina in state court. As shown by the number of legal issues, discovery, witnesses, and victims, doing so was necessary to keep both matters on track. Just as others relied on Podhurst to carry the load on the federal liability case, Podhurst relied on others to carry the load on the state liability case.

Moreover, by multiple measures, the state case demanded – and continues to demand – more resources and manpower than the federal case. As noted above, the state case has been pending longer than the federal case. The state case has involved more defendants, dispositive legal issues, fact witnesses, and liability experts than the federal case. Thirty-eight liability witnesses were deposed in the state case as compared to the ten who were deposed in the federal case. And the state docket includes nearly three times as many entries as the federal docket. The work of others on the state case freed up Podhurst and Rennert to focus on the federal case. And the state case continues as to BSO, Peterson, and Medina.

Importantly, the division of labor produced results for all our clients, including those represented by Podhurst and Rennert – a $25 million settlement with the School Board and then a $127.5 million settlement offer from the FBI. Podhurst and Rennert were enriched by the efforts of others in state court. Under these circumstances, equity demands denial of the Motion.

Moreover, it was not all Podhurst and Rennert's work that contributed to the federal case's result. Other firms – including Colson Hicks, KU, and Brill & Rinaldi – made direct contributions to the liability portion of the federal case. They reviewed discovery, helped with deposition preparation, were present at deposition, vetted experts, passed on useful information to a federal expert, shared documents, and offered strategic advice. Given the government's defense that the state court defendants bore fault for the shooting, D.E. 236 at 43-47, the work of the state court team was relevant to federal trial preparation. This is evident from the volume of documents sought and obtained by the government from state agencies, including the School Board and BSO. D.E. 279, 285, 297, 299, 302. Moreover, the dollar amount offered by the government is chiefly a function of the magnitude of the damages suffered by each of the victims. Yet, outside of their 3

clients, the damages aspect of the case was not the responsibility of Podhurst or Rennert. It was the responsibility of the attorneys representing each plaintiff. A dispositive motion directed at ten plaintiffs was handled by their own attorney rather than Podhurst or Rennert. D.E. 400, 402.

Finally, Podhurst and Rennert's liability work at most resulted in only a ***partial*** settlement of the federal case. D.E. 427. Time-consuming and intensive allocation efforts by all counsel, and the plaintiffs, from mid-November to now have been necessary to turn this partial settlement into a final deal. And work remains to be done. Given the manpower and resources devoted to the case's multiple fronts, Podhurst and Rennert cannot maintain that the fee award is required to avoid unjust enrichment.

In support of its unjust enrichment claim, Podhurst suggests that others strategically avoided entering the federal case, claiming that, "No other claimant filed suit until the close of jurisdictional discovery in 2020." D.E. 418 at 5. But in November 2018, Ms. Infante sent an e-mail requesting that others not file suit until after the government's anticipated motion to dismiss was briefed. Podhurst also claims that its "successful litigation of the Government's Motions to Dismiss . . . led most other Plaintiffs to decide to file suit against the United States." D.E. 418 at 17. This is also inaccurate and unsupported. Filing decisions are largely dictated by when a client retains counsel, and furthermore, in FTCA cases, when the pre-suit claim goes out and the government denies the claim. 28 U.S.C. §§ 2401(b), 2675(a). The suggestion that victims were strategically monitoring the federal case for rulings before deciding to file suit is a reach even for this Motion. The state case illustrates that nothing can be gleaned from the timing of the lawsuits. The initial *Borges* and *Pollack* cases were litigated for a year before Podhurst, Rennert, and others filed their suits in state court. But no one suggests that this means Podhurst, Rennert, and others were unjustly enriched by the work of the attorneys who filed first.

## IV.   Granting the Motion would set a damaging precedent.

Given that Podhurst seeks to invoke the Court's equity powers, it should consider "additional factors unique to a particular case which will be relevant to [its] consideration." *Camden I*, 946 F.2d at 775. One such factor that bears consideration is the precedent that would be set if the Motion is granted. Granting it would only serve to encourage attorneys seeking a common benefit fee to lie in wait and take their chances at the end of the case rather than front the issue at the outset. Also, if another attorney could take a share of one's fee based on a surprise eleventh-hour motion, one might be far less willing to divide the workload on a case at the outset.

As underscored by the Manual on Complex Litigation's repeated admonition that fee matters be raised *at the outset* of litigation, these undesirable results should be avoided. Undersigned counsel reasonably relied on the expectations set by Podhurst and Rennert's prior actions. The law should encourage similar reliance by other counsel in the future. It should also discourage the surprise tactics we see here. Denying the Motion serves those important interests.

**V.   Alternatively, the Court should permit discovery and hold an evidentiary hearing.**

Alternatively, the Court should defer ruling on the Motion until counsel has had the chance to conduct discovery and present evidence at an evidentiary hearing. Precedent calls for the consideration of evidence before awarding a common benefit fee. *See Everglades*, 549 F.2d at 1021. Unless the Court will deny the Motion, it should afford the undersigned an opportunity for discovery and an evidentiary hearing before ruling. In the meantime, the facts asserted herein are verified by undersigned counsel. If more information would be helpful to the Court, undersigned counsel is prepared to make any further evidentiary submissions as requested by the Court.

<u>CONCLUSION</u>

WHEREFORE, undersigned counsel requests that the Court deny Podhurst and Rennert's motion for common benefit fees. Alternatively, we request that the Court permit discovery, hold an evidentiary hearing, and review further briefing based on the evidence, before ruling.


Respectfully submitted,

*s/ Alex Arteaga-Gomez, Esq.*
**STUART Z. GROSSMAN, ESQ.**
szg@grossmanroth.com
**NEAL A. ROTH, ESQ.**
nar@grossmanroth.com
**ALEX ARTEAGA-GOMEZ, ESQ.**
aag@grossmanroth.com
**Grossman, Roth, Yaffa Cohen, P.A.**
2525 Ponce de Leon Blvd., Suite 1150
Coral Gables, FL 33134

*Counsel for Plaintiffs ASHLEY MARIE BAEZ, ISABEL CHEQUER, DAMIAN LOUGHRAN and DENISE LOUGHRAN, as Co-Personal Representatives of the Estate of CARA MARIE LOUGHRAN, deceased, ANTHONY MONTALTO and JENNIFER*

*s/Curtis B. Miner, Esq.*
**CURTIS B. MINER, ESQ.**
curt@colson.com
**Colson Hicks Eidson, P.A.**
255 Alhambra Circle, Ste PH
Coral Gables, FL 33134
*Counsel for Plaintiff:  BENJAMIN WIKANDER*

*s/Todd J. Michaels, Esq.*
**MICHAEL A. HAGGARD, ESQ.**
mah@haggardlawfirm.com
**TODD J. MICHAELS, ESQ.**
tjm@haggardlawfirm.com
**The Haggard Law Firm**
330 Alhambra Circle
Coral Gables, FL 33134

MONTALTO, as Co-Personal Representatives of the Estate of GINA ROSE MONTALTO, deceased, and KONG FENG WANG a/k/a JACKY WANG and HUI YING ZHENG a/k/a LINDA WANG as Co-Personal Representative of the Estate of PETER WANG, deceased

Counsel for Plaintiffs STACEY LIPPEL, LINDA BEIGEL as Personal Representative of the Estate of SCOTT BEIGEL, deceased, PATRICIA PADUAY OLIVER and MANUEL OLIVER as Co-Personal Representatives of the Estate of JOAQUIN OLIVER, deceased

s/Jay Cohen, Esq.
**JAY COHEN, ESQ.**
jcohen@jaycohenlaw.com
**Cohen, Blostein & Ayala, P.A.**
100 SE 3rd Avenue, Suite 1100
Fort Lauderdale, FL 33394

Counsel for Plaintiffs J.H., A.P., ELIZABETH STOUT, FELICIA BURGIN, GIULIA GARCIA, MADISON KING, NOAH PACE, HAYDEN KORR, DOMINIC TIMPONE, and ALESSANDRA WEBER, TIA BELL WILLIAMS, as Natural Parent and on behalf of M.W.

s/David W. Brill, Esq.
**DAVID W. BRILL, ESQ.**
david@brillrinaldi.com
**JOSEPH J. RINALDI, JR.**
joe@brillrinaldi.com
**Brill & Rinaldi, The Law Firm**
17150 Royal Palm Blvd., Suite 2
Weston, FL 33326-2333

Counsel for Plaintiffs MADELEINE "MADDY" WILFORD, TOM HOYER and GENA HOYER, as Co-Personal Representatives of the Estate of LUKE HOYER, deceased, ANDREW POLLACK as Co-Personal Representative of the Estate of MEADOW POLLACK, deceased, and RYAN PETTY and KELLY PETTY, as Co-Personal Representative of the Estate of ALAINA PETTY, deceased, and MAX SCHACHTER, as Personal Representative of the Estate of ALEXANDER SCHACHTER, deceased

s/Robert Kelley, Esq.
**ROBERT W. KELLEY, ESQ.**
rwk@kulaw.com
**KIMBERLY WALD, ESQ.**
klw@kulaw.com
**Kelley Uustal**
500 N. Federal Highway, Suite 200
Ft. Lauderdale, FL 33301

Counsel for Plaintiffs KYLE LAMAN, SAMANTHA GRADY, SAMANTHA FUENTES, SAMANTHA MAYOR, ILAN ALHADEFF and LORI ALHADEFF, as Co-Personal Representatives of the Estate of ALYSSA ALHADEFF, deceased

s/Michael A. Goldfarb, Esq.
**MICHAEL A. GOLDFARB, ESQ.**
michael@goldfarblaw.com
**Goldfarb Law, P.A.**
75 Valencia Avenue, Suite 100
Miami, FL 33134

s/Alan. Goldfarb, Esq.
**ALAN GOLDFARB, ESQ.**
agoldfarb@goldfarbpa.com
**Alan Goldfarb, P.A.**
100 SE 2nd Street
Bank of America Tower Suite 4500
Miami, FL 33131

Counsel for Plaintiff ALEXANDER DWORET and MITCHELL DWORET and ANIKA DWORET, as Co-Personal Representatives of the ESTATE OF NICHOLAS DWORET, deceased

*s/Tracy Considine, Esq.*
**TRACY CONSIDINE, ESQ.**
tconsidine@tcjaxlaw.com
**TRACY CONSIDINE, P.A.**
1 Sleiman Parkway, Ste 210
Jacksonville, Fl. 32216

*Counsel for Plaintiff SHARA KAPLAN as Co-Personal Representative of the Estate of MEADOW POLLACK, deceased*

*s/Adam Balkan, Esq.*
**ADAM BALKAN, ESQ.**
adam@balkanpatterson.com
**Balkan & Patterson LLP**
1877 S Federal Hwy Ste 100
Boca Raton, FL 33432-7466

*Counsel for Plaintiffs MELISSA FEIS, as Personal Representative of the Estate of AARON FEIS, deceased, and DEBRA HIXON, as Personal Representative of the Estate of CHRISTOPHER HIXON, deceased*

*s/Alex Arreaza, Esq.*
**ALEX ARREAZA, ESQ.**
The Law Office of Alex Arreaza
320 W Oakland Park Blvd
Wilton Manors, FL 33311-1710

*Counsel for Plaintiff ANTHONY BORGES*

*s/Michael A. Wasserman, Esq.*
**MICHAEL A. WASSERMAN, ESQ.**
mwasserman@800goldlaw.com
**Law Offices of Craig Goldenfarb**
1800 S Australian Avenue, Suite 400
West Palm Beach, FL 33409-6450

*Counsel for Plaintiffs VINCENT RAMSAY and ANNE RAMSAY as Co-Personal Representative of the Estate of HELENA RAMSEY, deceased*

*s/John E. Leighton, Esq.*
**JOHN E. LEIGHTON, ESQ.**
john@leightonlaw.com
**Leighton Law, P.A.**
1401 Brickell Avenue, Suite 900
Miami, FL 33131

*Counsel for Plaintiffs WILLIAM OLSON and MARIAN KABACHENKO*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to all counsel of record by the Court CM/ECF system on this 29th day of December, 2021.

By:      *s/Alex Arteaga-Gomez, Esq.*
         **ALEX ARTEAGA-GOMEZ, ESQ.**